IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
| SPICEY PARTNERS REAL ESTATE HOLDINGS, LLC, *et al.*,[1] | § § § | Case No. 24-90572 (CML) |
|  | § | (Jointly Administered) |
| Debtors. | § § § § | |

**DECLARATION OF DAVID G. HOWE, OF THE DEBTORS, IN
SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

Pursuant to 28 U.S.C. § 1746, I, David G. Howe, declare as follows under penalty of perjury:

1.     I am the Chief Operating Officer of Cosmed Group, Inc. ("Cosmed Group") and Spicey Partners Real Estate Holdings, LLC ("Spicey Partners," and together with Cosmed Group, the "Debtors"). I am authorized to submit this declaration (the "First Day Declaration") on behalf of the Debtors in the above-captioned chapter 11 cases.

2.     I joined Cosmed Group in 1988 as a computer programmer. Shortly after joining, my role with Cosmed Group evolved—leading me to serve in various roles in its spice and medical device divisions. In the mid-1990s, I became the Vice President of Operations, primarily focusing on the medical device division. In 2005, my focus steered towards the pasteurization of raw agricultural materials. In addition to my experience with the Debtors, I have served as an associate member representative to the Board of Directors for the American Spice Trade Association ("ASTA") and am currently the chair of ASTA's Ethylene Oxide Sterilization Committee. I also

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Spicey Partners Real Estate Holdings, LLC (6459) and Cosmed Group, Inc. (8781). The location of the Debtors' service address is 28 Narragansett Ave., Jamestown, RI 02835.

participate in the Ethylene Oxide Sterilization Association and have been a member of the American Association for the Advancement of Medical Instrumentation for over 30 years.  Outside of work-related experience, I have extensive experience in non-profit governance and have served on several boards, including a 3-year term as the Chairperson of the Dr. Martin Luther King, Jr. Community Center in Newport, Rhode Island.

3.      I am generally familiar with the Debtors' businesses, day-to-day operations, corporate structure, financial matters, results of operations, cash flows, and underlying books and records.  Except as otherwise indicated, all facts set forth in this First Day Declaration concerning the Debtors' operations, financial affairs, and restructuring initiatives, and my opinions, are based upon my personal knowledge of the Debtors' businesses, operations, and related financial information gathered from my review of their books and records, relevant documents, and information supplied to me by other advisors and members of the Debtors' management team.  If called to testify, I could and would testify competently to the facts set forth in this First Day Declaration.

4.      On November 14, 2024 (the "Petition Date"), the Debtors filed voluntary petitions for relief in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court").  The Debtors will continue to operate their businesses and manage their properties as debtors in possession.  I submit this First Day Declaration on behalf of the Debtors in support of the Debtors' (a) voluntary petitions for relief that were filed under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and (b) "first-day" pleadings, which are being filed concurrently herewith (collectively, the "First Day Motions").  The Debtors seek the relief set forth in the First Day Motions to minimize the adverse

2

effects of the commencement of the chapter 11 cases on their businesses and to maximize the value of the Debtors' estates.

5.      To familiarize the Court with the Debtors, their businesses, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this First Day Declaration as follows: part one provides a general overview of the Debtors' business operations and corporate structure; part two describes the Debtors' prepetition capital structure; part three describes the circumstances leading to these chapter 11 cases; and part four sets forth the evidentiary bases for the relief requested in each of the First Day Motions.

## I.      Background

6.      For over forty years, Cosmed Group and its predecessor companies have provided various pasteurization and sterilization services for its customers in the medical device and agricultural industries.  Its services fall under two (2) categories.  *First*, Cosmed Group pasteurizes and sterilizes various raw agricultural commodities (such as herbs, spices, nuts, and grains) and medical products, utilizing, as applicable, ethylene oxide ("EtO"), propylene oxide, steam, and dry-heat processes.  *Second*, Cosmed Group manufactures pasteurization and sterilization equipment and technologies for food, agricultural, and medical products.  Cosmed Group also provides consulting services and facility designs for companies operating pasteurization and sterilization processes in-house.

## A.      EtO

7.      As provided above, Cosmed Group relies on the use of EtO for certain of its sterilization services.  EtO is among the most widely utilized industrial chemicals and is used in the manufacture of many every day household items such as anti-freeze and shampoo.  As a sterilant, the chemical was first studied in the 1920s and 1930s by the United States Department of Agriculture to control pests in silos and other raw agricultural products.  The first patent for the

technology by a private party was issued in the 1930s for fumigating bales of tobacco. Over time, more uses and related products of EtO were discovered. The use of EtO for sterilization is less than one percent (1%) of the overall use of the chemical. However, EtO is an important, effective, and reliable process to control bacterial contamination.

8.     As a sterilant, the chemical is compatible with a wide range of materials that are commonly used in the manufacture of medical devices. The types of products that are sterilized with EtO processes include adhesive bandages, tubing sets, orthopedic implants, blood filters, and pacemaker components. More than 55% of sterile medical devices are processed with EtO. While there are competitive technologies, such as steam and irradiation, no other technology is more material friendly.

9.     For example, steam sterilization is suitable only for heat-tolerant materials, such as stainless steel and glass, while sterilization with EtO causes minimal damage to more heat-sensitive materials, particularly plastics. Irradiation sterilization is effective, but the process damages many plastics and causes gauze to turn brown.

10.     EtO sterilization is the only suitable option for complex medical devices, custom kits containing multiple products, and many disposable products. As the use of disposable medical devices grew through the 1980s and 1990s, and as medical devices became increasingly more complex, the demand for and use of EtO sterilization grew.

11.     While EtO is highly compatible with a wide range of materials, it is dangerous to handle. The chemical is mutagenic if inhaled at high concentrations over an extended period of time and has been determined by certain government and international agencies to be a carcinogen if inhaled at high concentrations over a long period of time. EtO is highly flammable and explosive. Liquified and highly concentrated EtO can cause burns and skin irritation on direct

exposure.  The use of the chemical and emissions from sterilization facilities that use it are highly regulated.  Caution must be utilized to minimize worker and end user exposure, and the use of emissions control equipment to minimize emissions from sterilization facilities is mandated by state and federal law.  The EtO sterilization process is designed to avoid fire and explosions and to minimize emissions while ensuring that effective sterilization is achieved.

**B.      The Process**

12.      Sterilization is the last stage in medical device manufacturing.  Products are manufactured, assembled, packaged, labeled, and stacked in boxes on pallets prior to sterilization. In spices, sterilization can occur at any time in the supply chain prior to distribution.  A primary requirement of EtO sterilization is that the packaging layers, the outer box, the inner box, and the primary package, must be gas permeable.  These packages are specifically designed to facilitate the penetration of EtO to kill bacteria prior to entering the market.  The packaging also must be resistant to penetration by bacteria.  Paper and Tyvek are commonly used packaging products to provide the sterile barrier between external contaminants and the packaged product.  For example, prior to a hospital procedure, the Tyvek lid is peeled from a plastic tray to access scissors, needles, gauze, and other sterilized products.  For the use of adhesive bandages, two pieces of paper are peeled from the outside of an adhesive bandage prior to placing the bandage on a wound.

13.      The EtO sterilization process occurs in three stages: (i) preconditioning, (ii) sterilization, and (iii) aeration.  Corrugated boxes filled with products in their final packaging are stacked on pallets.  These pallets are conveyed through the process with forklifts or conveyors.

14.      Preconditioning is performed in a hot and humid environment, commonly 115 degrees Fahrenheit and 65% relative humidity.  This stage is utilized to activate bacteria and make the bacteria sensitive to the sterilization process.  Preconditioning normalizes the condition of the product between seasons.  Products entering the sterilization portion of the process must

5

have the same internal temperature and humidity throughout the year.  Preconditioning typically takes 12 to 14 hours to complete.

15.     When preconditioning is completed, products are moved to a vacuum chamber, which is commonly referred to as the sterilizer.  Typical sterilizers vary in size from a few cubic feet (approximately the size of a dormitory refrigerator) to a semi tractor trailer load of 24 or more pallets.  Once the products are loaded, the sterilizer door(s) is closed to create an airtight vacuum chamber.  Performing the sterilization process in a vacuum chamber allows the sterilization chemical to penetrate deep within the packaging to sterilize long lengths of tubing, tiny crevices on the surface of the products, and between layers of dense gauze.

16.     The sterilization stage begins by lowering the pressure in the chamber with a vacuum pump, which removes air and reduces the concentration of oxygen.  Nitrogen is injected to replace the air.  This combination of vacuum and nitrogen phases are known as "pulses" and are designed to ensure that the environment in the chamber is non-flammable when EtO is introduced.

17.     The second phase of sterilization is "conditioning," during which steam is injected to replace any moisture lost during the transfer from preconditioning and the first air dilution phase. Conditioning occurs at low pressure to allow the steam to penetrate deep within the load.  Steam, like EtO, can penetrate the cardboard, paper, Tyvek, and other packaging layers.

18.     EtO, the sterilant, is a registered pesticide utilized by industry as a fungicide and insecticide.  A manufacturer registered with the United States Environmental Protection Agency delivers EtO to sterilization facilities in stainless steel drums containing 400 pounds of liquid.

19.     Sterilization processes are regulated by the United States Food and Drug Administration (the "FDA").  The FDA mandates that manufacturers validate that: (a) the amount of EtO they use is safe and effective and (b) the residues they use are safe for human exposure.  The

6

FDA also monitors the manufacturers to ensure that processes that have been submitted as part of a pre-market approval are the same as the processes that are used for routine production.

20.     The EtO dosage required for each sterilization cycle is pushed from the drum into the sterilizer by nitrogen.  As the liquid enters the piping, a heat exchanger (*e.g.*, a vaporizer, volatizer, or volatilizer) is used to convert the chemical from a liquid to a gas.  The dosage is controlled by weight and pressure.  In many cases, the concentration is measured directly inside the chamber.  Literature reports that the process is uniformly effective and consistent in ideal conditions at concentrations as low as 400 mg/l.  Higher concentrations are often required to overcome barriers, such as the packaging and product itself.  A typical range for most processes is 500 – 600 mg/l, but companies have recently worked towards reducing the concentration.  Some cycles can run between 400 – 500 mg/l.

21.     Following the introduction of EtO, nitrogen is injected to push the sterilant deeper within the load.  This phase increases the chamber pressure with a target pressure approaching, but slightly below, atmospheric pressure.  This ensures that leakage of air into the chamber and leakage of chemical from the chamber are minimized.

22.     The product is exposed to EtO in the sterilizer for 2 to 8 hours.  The conditions required for sterilization of each product are carefully determined to prevent damage to the product, protect the integrity of the packaging, minimize the dose of EtO, and achieve the required sterility assurance level.  The FDA regulates the time of exposure required for each cycle.

23.     Following EtO dwell, the chemical is removed from the product and the chamber through a series of vacuum and nitrogen pulses called "washes."  These washes are repeated until the concentration of EtO is sufficiently low to prevent a flammable mixture in the chamber when air is reintroduced.  EtO in the gases exhausted from the sterilizer is vented to pollution control

7

devices called scrubbers which reduce the EtO emitted from the sterilizer to near-zero through the use of a chemical reaction in the scrubber.  The concentration of EtO must also be sufficiently low to allow for safe entry by plant workers.

24.     The last stage in the sterilization process is commonly referred to as "air inbleed," during which the chamber is pressurized with air to allow for safe entry.  When air inbleed is complete and the sterilizer is safe for entry, the product is removed from the sterilizer.  During this time, an exhaust blower captures the gases in the chamber to minimize leakage of fugitive EtO from entering the sterilization facility.  Employees wear respirators (SCBA) when unloading a chamber or entering the aeration room.  These processes and safeguards ensure that worker exposure complies with Occupational Safety and Health Administration regulations.

25.     After the product is removed from the sterilizer, it is conveyed to an aeration room. Aeration removes EtO from the product.  The United States Food and Drug Administration establishes safe levels of exposure to EtO depending on the route of the exposure, the sensitivity of the end-user, and the time of the exposure.  The aeration room ensures that these requirements are met.  The room is heated and is equipped with fans to create air turbulence around the product. Air containing low concentrations of EtO is extracted from the aeration room and routed through emissions control equipment to minimize emissions of EtO, which are stringently regulated under federal and state environmental laws.  The room temperature is commonly 115 degrees Fahrenheit, and product may remain in this stage for 12 hours to several days depending on the product and requirements.

26.     Following aeration, product samples may be tested to ensure that the sterilization process was effective.  The entire sterilization process, including testing, typically requires 3 to 14 days.

8

27.     The Debtors' current operations comply with EtO regulatory requirements. However, significant investment in new or modified equipment and processes would be required for the Debtors to comply with regulatory changes finalized this year which will soon become effective.  These regulatory changes would require the Debtors to invest more than $2.5 to $5 million per facility to remain in compliance with applicable regulations.

**C.     The Facilities**

28.     Cosmed Group performs pasteurization and sterilization services at three facilities under different d/b/a's (each a "Facility," and collectively, the "Facilities").  Below is a description of each Facility.

   *i.*     *Linden Facility* (d/b/a ETO Sterilization)

29.     Since 1986, Cosmed Group has operated a facility located at 2500 Brunswick Ave., Linden, New Jersey (the "Linden Facility") under the d/b/a ETO Sterilization.  Cosmed Group currently leases the Linden Facility from CHS Property Development LLC under a 5-year term set to expire on April 1, 2028.  The Linden Facility is the only domestic contract sterilizer servicing the spice industry with EtO and is the largest pasteurization provider for the nut industry on the East Coast.

30.     The Linden Facility is Cosmed Group's largest Facility, with approximately 32 employees.  The Linden Facility's current operations focus primarily on sterilizing spices, nuts, and birdseed.  At the Linden Facility, Cosmed Group operates 4 EtO sterilizers, 4 H2O express steam pasteurizers, a dry heat chamber, and a dry heat screw conveyor.  The Linden Facility also contains 2 shops for manufacturing sterilization-related equipment for the Debtors and third parties.

    *ii.*      *Erie Facility* (d/b/a Cosmed of PA)

31.      In 2016, Cosmed Group acquired the real estate and operations of a facility located at 2205 E. 33rd St., Erie, Pennsylvania (the "<u>Erie Facility</u>").  The Erie Facility is owned by Spicey Partners and operated by Cosmed Group under the d/b/a Cosmed of PA.  The Erie Facility sterilizes medical products for third-party manufacturers and currently has approximately 12 employees.

    *iii.*      *Franklin Facility* (d/b/a Cosmed of NJ)

32.      In 2017, Cosmed Group acquired the operations of a facility located at 19 Park Dr., Franklin, New Jersey (the "<u>Franklin Facility</u>"), operated by Cosmed Group under the d/b/a Cosmed of NJ.  The Franklin Facility sterilizes medical products and currently has approximately 8 employees.  The Franklin Facility operates four sterilizers ranging from 1 to 8 pallets in capacity. Cosmed Group leases the Franklin Facility from KAW, L.L.C. under a ten-year lease set to expire on October 31, 2034.

**D.**      **The Waukegan Facility**

33.      Over the course of its business operations, Cosmed Group has owned and operated several facilities that either have closed or were sold.  In January 2005, five former facilities performing medical products sterilization, including a facility in Waukegan, Illinois (the "<u>Waukegan Facility</u>"), were sold to STERIS Corporation ("<u>STERIS</u>"), a competitor of Cosmed Group.

**E.**      **The Debtors' Corporate Structure**

    *i.*      *The Debtors*

34.      Cosmed Group is a Delaware corporation and is the direct corporate parent of Spicey Partners.  The Debtors' corporate structure is as follows:



ii.     *The Non-Debtor Affiliates*

35.     The Debtors have several affiliates that have common shareholders, but are not Debtors in these cases (collectively, the "<u>Non-Debtor Affiliates</u>").   The Non-Debtor Affiliates comprise of Cosmed Group of Dominican Republic, Inc. ("<u>Cosmed of DR</u>"), Sterilization and Fumigation Services, Inc. ("<u>SFS</u>"), and NA Ventures, LLC ("<u>NA Ventures</u>").   A depiction of the corporate structure of the Debtors and the Non-Debtor Affiliates is attached hereto as **<u>Exhibit A</u>**, and the relationship between the Debtors and the Non-Debtor Affiliates is provided in further detail below.

36.     In 2005, SFS constructed and opened a facility in Newman, California (the "<u>Newman Facility</u>").   The Newman Facility continues to be operated by SFS and solely pasteurizes nut meats using the Debtors' patented organic steam process known as H2O Express. The H2O Express process does not utilize EtO.[2]   Cosmed Group provides SFS with back-office services such as settlements, clearances, record maintenance, regulatory compliance, and accounting.

---

[2]     H2O Express™ is a batch pasteurization process which is performed prior to shipping products to market. Because the product is pasteurized in its final packaging, no opportunity exists for recontamination during subsequent handling and storage.   Further, unlike other steam pasteurization processes, H2O Express™ is based on sub-atmospheric pressure and thus ensures that product water activity and quality are not affected by pasteurization.

11

37.     Cosmed of DR was formed in 2018 and operated a sterilization facility in Santo Domingo, Dominican Republic (the "DR Facility").  In October 2024, all assets of the DR Facility were sold to STERIS.

38.     Cosmed Group leases its corporate office located at 28 Narragansett Ave., Jamestown, RI 02835 from NA Ventures.

## II.     Capital Structure

39.     Over the years, the Debtors, as borrowers, and Washington Trust Company ("Washington Trust"), as lender, have entered into various loan agreements (collectively, the "Washington Trust Loan Agreements").  Pursuant to the Washington Trust Loan Agreements, certain security agreements, mortgages and an assignment of leases and rents, the Debtors' obligations under the Washington Trust Loan Agreements are secured by substantially all of the Debtors' assets.  As of the Petition Date, approximately $5 million is due and owing under the Washington Trust Loan Agreements.

40.     In addition, Cosmed Group, as borrower, entered into a loan agreement with Michael L. Howe (the "Michael L. Howe Loan Agreement") on March 1, 2024.  Cosmed Group's obligations under the Michael L. Howe Loan Agreement are secured by substantially all of Cosmed Group's assets.  As of the Petition Date, approximately $500,000 is due and owing under the Michael L. Howe Loan Agreement.  By agreement between Washington Trust and Michael L. Howe, the Debtors' obligations under the Michael L. Howe Loan Agreement are subordinate to the Debtors' obligations under the Washington Trust Loan Agreements.

41.     On November 13, 2024, Cosmed Group, as borrower, entered into a loan agreement with Cosmed of DR (the "Cosmed of DR Loan Agreement").  Cosmed Group's obligations under the Cosmed of DR Loan Agreement are secured by substantially all of Cosmed Group's

ACTIVE 704206510v1

assets.  Cosmed of DR perfected its security interest by filing a UCC statement.  As of the Petition

Date, approximately $1.23 million is due and owing under the Cosmed of DR Loan Agreement.

### III.   Events Leading to Filing

**A.    Overview of Litigation**

42.    The chapter 11 cases arise from the filing of hundreds of EtO cancer-related
lawsuits against the Debtors.  The Debtors believe that these claims have no merit. Nevertheless,
the number of claims continued to increase, and the Debtors anticipate that, absent a chapter 11
resolution, the litigation and its associated burdens would continue for decades.

43.    Cosmed Group currently is defending litigation in Illinois, New Jersey, and
Pennsylvania related to its current or former operation of facilities in those states at which it has
used EtO to sterilize medical devices or to treat food products. In all cases against the Debtors, the
plaintiffs allege they have suffered personal injuries, including contracting various forms of
cancer, allegedly caused by inhaling EtO emissions from the facilities. The plaintiffs seek
compensatory damages for their alleged injuries, including punitive damages, and injunctive relief.
The plaintiffs in two putative class actions filed in New Jersey and Pennsylvania also seek an order
creating a fund for a medical monitoring program for the putative class members.

44.    Cosmed Group has no insurance coverage for the personal injury litigation.
Cosmed Group's general liability insurance carriers denied coverage under applicable exclusions
to coverage.  As provided in further detail below, Cosmed Group is in litigation with one of its
insurance carriers over whether it is entitled to insurance coverage to defend and, ultimately,
indemnify the Debtors in connection with the EtO litigation.

45.    The Debtors costs of defending the litigation have increased steadily.  Cosmed
Group spent over $2 million in 2024 in defense costs, and costs are rising rapidly.  Cosmed Group

expected to spend between $4.5 million and $7 million in defense costs alone over the next twelve months.

**B.      Illinois Cases**

46.      Since 2019, 302 cases have been filed against Cosmed Group in the Circuit Court of Cook County, Illinois ("Illinois Cases" or, individually, "Illinois Case"). In each Illinois Case, the plaintiffs allege they contracted cancer as a result of inhaling EtO emissions from the Waukegan Facility, which Cosmed Group operated from 1994 through January 2005. Each plaintiff has asserted claims of negligence, willful and wanton conduct, public nuisance, and ultrahazardous activity. Most of the plaintiffs are represented by Edelson P.C.

47.      In some of the Illinois Cases, plaintiffs also asserted claims against Isomedix Operations, Inc., an affiliate of STERIS, which purchased the Waukegan facility from Cosmed Group in January 2005, and/or Medline Industries, L.P., which purchased the Waukegan Facility in 2008 and continues to own and operate it. The Illinois Cases also include claims against Vantage Specialty Chemicals, Inc., the owner and operator of a separate facility in Gurnee, Illinois (the "Gurnee Facility") that manufactures and uses ethylene oxide. Certain Illinois Case plaintiffs also asserted claims against entities and individuals affiliated with Isomedix, Medline, and Vantage. In addition, certain Illinois Case plaintiffs have asserted claims against Vantage's predecessors at the Gurnee Facility, PPG Industries, Inc., and BASF Corporation. Finally, in certain Illinois Cases, the plaintiffs asserted claims against Abbott Laboratories and AbbVie, Inc., which operated facilities near the Waukegan Facility, and Baxter Healthcare Corp. and certain affiliates, which operated a facility in Round Lake, Illinois.

48.      In July 2024, Cosmed Group, Isomedix, and PPG removed 204 of the Illinois Cases to the United States District Court for the Northern District of Illinois (the "Illinois District Court"). The plaintiffs, Medline, and Vantage moved the Illinois District Court to remand the removed

cases to the Circuit Court of Cook County. The remand motions are fully briefed and pending with the Illinois District Court.

49.     An Illinois Case is scheduled for trial on November 15, 2024.  Five Illinois Cases have been consolidated for a second trial scheduled on March 17, 2025.  None of the Illinois Cases has been tried.

50.     The Illinois Cases generally are in active litigation.  Discovery, including document productions, interrogatories, and depositions, expert report preparations, expert depositions, motion practice, and pretrial order compliance is ongoing.

C.     **Pennsylvania Cases**

51.     In August 2024, two cases were filed against Cosmed Group in the Court of Common Pleas in Erie, Pennsylvania. Both Pennsylvania cases relate to Cosmed's current operation of the Erie Facility. The Pennsylvania cases also assert claims against Spicey Partners. In addition, the Pennsylvania cases assert claims against iuvo Bioscience-Erie LLC and Erie Sterilization Real Estate, LLC, which, respectively, operated and owned the Erie Facility before Cosmed and Spicey Partners acquired the facility in December 2016.

52.     In September 2024, iuvo removed both Pennsylvania cases to the United States District Court for the Western District of Pennsylvania.

    i.     *Lefaiver Case*

53.     In the first Pennsylvania case, *Lefaiver v. Cosmed Group, Inc., et al.*, the plaintiffs, a husband and wife, assert claims against Cosmed Group based on alleged negligence, gross negligence, public and private nuisance, ultrahazardous activity, violation of the Pennsylvania constitution, *respondeat superior* or vicarious liability, and loss of consortium, and against Spicey Partners based on alleged aiding and abetting tortious conduct. The plaintiffs seek compensatory and punitive damages. The plaintiffs allege that Mr. Lefaiver was diagnosed with cancer in May

15

2015 resulting from exposure to ethylene oxide emissions from the Erie Facility from 1986 to 1994. Cosmed Group and Spicey Partners have moved to dismiss all claims asserted against them pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that the plaintiffs allege Mr. Lefaiver's cancer diagnosis in May 2015 resulted from exposure to EtO emissions from the Erie Facility from 1986 to 1994, but Cosmed Group did not begin operating the facility until December 2016 and therefore could not have caused the plaintiffs' alleged injuries.  The motion has not yet been fully briefed and is pending.

     *ii.*    *Morton Case*

54.    The second Pennsylvania case, *Morton, et al., v. Cosmed Group, Inc., et al.*, also relates to alleged EtO emissions from the Erie Facility. *Morton* is a putative class action in which the plaintiffs, on behalf of themselves and those similarly situated, assert claims against Cosmed Group and the other defendants based on negligence, gross negligence/willful and wanton misconduct, public and private nuisance, violation of the Pennsylvania Hazardous Sites Cleanup Act, design defect and failure to warn, negligent design and product marketing defect, and restitution/unjust enrichment.

55.    The *Morton* complaint defines the class as "[a]ll individuals who have resided, worked or attended daycare and/or school within a five-mile radius of the Erie Facility, 2205 East 33rd Street, Erie PA 16510 beginning the date of initial emissions of EtO from the Erie Facility."

56.    The plaintiffs seek certification of the class defined in the complaint, compensatory and punitive damages, creation of a fund for medical monitoring for all class members, attorneys' fees and costs, and injunctive relief abating the alleged nuisance.

57.    The plaintiffs recently moved to amend their complaint to add Moog, Inc. and Tartan Holdings, LLC as defendants. The plaintiffs allege that Moog is the successor by merger

16

of Medical Manufacturing Corp., which allegedly operated the Erie Facility before iuvo acquired the facility. The plaintiffs alleged that Tartan Holdings is iuvo's parent company.

58.    Cosmed has not yet responded to the complaint in the *Morton* case.

**D.    New Jersey Case**

59.    In August 2024, a putative class action was filed against Cosmed Group in the Superior Court of New Jersey in Union County, New Jersey. The New Jersey case relates to Cosmed Group's operation of the Linden Facility.  The plaintiffs in the New Jersey case also assert claims against C.H.S. Property Development LLC and its affiliate, JS Urban Renewal Corp. C.H.S. is Cosmed Group's landlord at the Linden facility.

60.    The New Jersey case, *Motley, et al., v. Cosmed Group, Inc., et al.*, was filed by certain of the same counsel who represent the plaintiffs in the *Morton* case in Pennsylvania. The complaint in the *Motley* case is similar to the *Morton* complaint.

61.    In September 2024, Cosmed removed the *Motley* case to the United States District Court for the District of New Jersey.

62.    The plaintiffs in the *Motley* case, on behalf of themselves and those similarly situated, assert claims against Cosmed and the other defendants based on negligence, gross negligence/willful and wanton misconduct, public and private nuisance, design defect, failure to warn, and restitution/unjust enrichment.

63.    The *Motley* complaint defines the class as "[a]ll individuals who have resided, worked or attended daycare and/or school within a five-mile radius of the Linden Facility, 2500 Brunswick Avenue, Linden, New Jersey beginning the date of initial emissions of EtO from the Linden Facility." Recent census data indicates that the putative class may include hundreds or thousands of individuals.

64.     The plaintiffs seek certification of the class defined in the complaint, compensatory and punitive damages, creation of a fund for medical monitoring for all class members, attorneys' fees and costs, and unspecified injunctive relief.

65.     Cosmed Group has not yet responded to the complaint in the *Motley* case.

**E.      Insurance Coverage Litigation**

66.     Cosmed Group has provided timely notice to, demanded indemnity from, and tendered its defense to various insurers with respect to litigation related to alleged EtO emissions from Cosmed Group's facilities.  In response to notices concerning the Illinois Cases, one of Cosmed Group's insurers, Hartford Fire Insurance Company ("Hartford"), commenced insurance coverage litigation on February 26, 2024 in the United States District Court for the District of Rhode Island in the case of *Hartford Fire Insurance Company, et al., v. Cosmed Group, Inc.*, Case No. 24-cv-00080 (the "Coverage Litigation").

67.     In the Coverage Litigation, Hartford seeks declarations from the court that it does not owe Cosmed Group any coverage obligations in connection with the Illinois Cases under commercial general liability ("CGL") policies, products-completed operations hazard ("PCOH") policies, and umbrella liability policies Hartford issued to Cosmed. Hartford contends that it has no duty to indemnify or defend Cosmed Group because (a) pollution exclusions in the Hartford policies preclude coverage, (b) the plaintiffs in the Illinois Cases do not allege liability covered by the Hartford PCOH policies, and (c) various other terms, exclusions and/or provisions in the Hartford policies preclude coverage.

68.     On July 31, 2024, Cosmed Group answered Hartford's complaint and asserted counterclaims against Hartford for (1) breach of contract based on its failure to meet its coverage obligations under the policies at issue to defend and indemnify Cosmed Group in connection with the Illinois Cases, (2) common law and statutory bad faith for unreasonably denying coverage to

Cosmed Group, (3) specific performance of Hartford's coverage obligations, and (4) a declaration that Hartford is obligated to defend and indemnify Cosmed Group in connection with the Illinois Cases.

69.     On September 24, 2024, Hartford moved to dismiss Cosmed Group's counterclaims for bad faith. Hartford's motion remains pending.

70.     Discovery has not yet begun in the Coverage Litigation.

## IV.     Relief Sought in the First Day Motions

71.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions in these chapter 11 cases and seek orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring of the Debtors' capital structure.  The First Day Motions include:

- *Emergency Motion of Debtors for Entry of Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Schedules of Executory Contracts and Unexpired Leases, and (D) Statements of Financial Affairs, and (II) Granting Related Relief* (the "Schedules and Statements Extension Motion")

- *Emergency Motion of Debtors for Entry of Order (I) Authorizing the Debtors to File a Consolidated Creditor Matrix; (II) Authorizing the Debtors to File a Consolidated List of the Top Unsecured Claimants; (III) Approving Certain Notice Procedures for EtO Claimants; (IV) Authorizing the Debtors to Redact Certain Personal Identification Information; and (V) Approving the Form and Manner of Notice of Commencement of These Chapter 11 Cases and Other Information* (the "Notice and Consolidated Creditor List Motion")

- *Emergency Motion of Debtors for Entry of Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief* (the "Utilities Motion")

- *Emergency Motion of Debtors for Entry of Order (I) Authorizing Debtors to Continue Insurance Policies and Pay All Obligations with Respect Thereto and (II) Granting Related Relief* (the "Insurance Motion")

- *Emergency Motion of Debtors for Entry of Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Assessments and (II) Granting Related Relief* (the "Tax Motion")

- *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Existing Cash Management System, (B) Maintain Existing Check Stock, (C) Continue Intercompany Transactions and Provide Administrative Expense Priority for Postpetition Intercompany Claims, and (D) Pay Related Prepetition Obligations and (II) Granting Related Relief* (the "Cash Management Motion")

- *Emergency Motion of Debtors for Interim and Final Orders Debtors' Motion for Entry of an Order (I) Authorizing the Debtors' Use of Cash Collateral and (II) Granting Related Relief* (the "Cash Collateral Motion")

72.     I have reviewed each of the First Day Motions, including the exhibits thereto, and have had their contents explained to me by the Debtors' personnel and advisors.  The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully implementing the Debtors' chapter 11 strategy.  I believe that the Debtors would suffer immediate and irreparable harm absent the ability to obtain the relief requested in such First Day Motions.

73.     Summaries of the factual information with respect to each First Day Motion is provided below.  Capitalized terms, to the extent not otherwise defined in this Declaration, shall have the meanings ascribed to such terms in the respective First Day Motions.

## A.     The Schedules and Statements Extension Motion

74.     Through the Schedules and Statements Extension Motion, the Debtors seek entry of an order extending the required deadline for filing the Schedules and Statements for an additional thirty-one (31) days, without prejudice to the Debtors' right to seek further extensions, if necessary.

75.     Given the size and complexity of the Debtors' operations, a significant amount of information must be accumulated, reviewed, and analyzed to properly prepare the Schedules and Statements.  As stated herein, the Debtors and their professionals have been consumed with a multitude of critical administrative and operational decisions arising in conjunction with the commencement and early administration of these chapter 11 cases, including preparing for the Debtors' entry into chapter 11, and addressing numerous critical strategic matters.  Compiling and consolidating the data required for the Schedules and Statements presents a complex and time-consuming task and will be extremely challenging to complete prior to the expiration of the Initial Deadline.

76.     I believe that a short extension of the deadline to file their Schedules and Statements will allow key personnel to focus on critical operational and restructuring issues during the early days of these chapter 11 cases that will facilitate the Debtors' smooth transition into chapter 11 and pave the way for a successful reorganization that maximizes value for all stakeholders. Accordingly, I respectfully ask the Court to grant the relief requested in the Schedules and Statements Extension Motion.

**B.      The Notice and Consolidated Creditor List Motion**

1.     Through the Notice and Consolidated Creditor List Motion, the Debtors seek entry of an order (i) authorizing the Debtors to file a consolidated creditor matrix in lieu of submitting separate mailing matrixes for each Debtor; (ii) authorizing the filing of a single, consolidated list of the top creditors with the largest unsecured claims against the Debtors based on information available to the Debtors, which list is comprised of (a) all eight (8) law firms representing parties with EtO-related claims (ordered by volume of claims) and (b) the top creditors with the largest non-EtO-related unsecured claims (the "Top Creditor List"); (iii) approving certain notice procedures for EtO Claimants (as defined below); (iv) authorizing the Debtors to redact certain

21

personal identification information for any individual creditors; (v) approving the form and manner of notice of commencement of these chapter 11 cases and the scheduling of the meeting of creditors under section 341 of the Bankruptcy Code; and (vi) granting related relief.

2.      Because segregating and converting their computerized records to a Debtor specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings, I believe that permitting the Debtors to maintain a single consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor, will help alleviate administrative burdens, costs, and the possibility of duplicative service.

3.      The Debtors' largest creditors are EtO Claimants.  Indeed, there were more than three hundred (300) plaintiffs asserting cancer-related EtO claims against the Debtors in jurisdictions across the country as of the Petition Date.  A total of eight (8) law firms represent the various plaintiffs asserting cancer-related EtO claims against the Debtors.  Considering, the Debtors do not believe that listing the individual EtO Claimants with the largest asserted unsecured claims against the Debtors would facilitate the U.S. Trustee's evaluation of potential members of any official committee of unsecured creditors.  Instead, because committees in mass tort chapter 11 cases typically include individual claimants represented by law firms, the Debtors believe that providing the U.S. Trustee with a Top Creditor List that specifies all law firms representing EtO Claimants (ordered by volume of claims), in addition to the creditors with the largest non-EtO-related unsecured claims, would better assist the U.S. Trustee in evaluating such a committee.  Additionally, because many creditors may be shared amongst the Debtors, the Debtors request authority to file a single, consolidated Top Creditor List.  The Top Creditor List will help alleviate administrative burdens, costs, and the possibility of duplicative service.

22

ACTIVE 704206510v1

C.    **The Utilities Motion**

4.      Through the Utilities Motion, the Debtors seek entry of an order (i) authorizing, but not directing, the proposed form of adequate assurance of payment to the Debtors' Utility Companies; (ii) establishing and approving procedures for resolving objections by Utility Companies; (iii) prohibiting Utility Companies from altering, refusing, or discontinuing service to the Debtors on the basis of the commencement of these chapter 11 cases, that a debt was owed by the Debtors for prepetition Utility Services  was not paid when due, or on account of any perceived inadequacy of the Debtors' proposed adequate assurance; and (iv) granting related relief.

5.      To operate their businesses and manage their facilities, the Debtors employ various Utility Services, including, but not limited to, electricity, natural gas, water, network/internet, telecommunications, waste disposal, and other services.

6.      The Debtors intend to pay postpetition obligations owed to the Utility Companies in a timely manner and anticipate having sufficient funds to do so.  Nevertheless, to provide additional assurance of payment pursuant to section 366 of the Bankruptcy Code, the Debtors propose depositing into a segregated account at Washington Trust Bank for the benefit of the Utility Companies (the "Adequate Assurance Account"), cash in an amount equal to one-half (1/2) of the Debtors' average cost of Utility Services for the trailing twelve (12) months, less any deposit held by a Utility Company (the "Adequate Assurance Deposit").  Based on this formula, the Debtors estimate that the total amount of the Adequate Assurance Deposit should equal approximately $43,820.50 as of the Petition Date.

7.      Additionally, the Debtors seek approval of their proposed Adequate Assurance Procedures.  These procedures allow Utility Companies to request adequate assurance for unpaid Utility Services and additional adequate assurance when they believe the proposed amount is not

23

sufficient.  This ensures that all key stakeholder groups obtain notice of such request before it is honored.

8.      Furthermore, the Debtors request that Utility Companies be prohibited from refusing or disrupting Utility Services, for any duration.  Uninterrupted Utility Services are essential to the Debtors' business operations during the pendency of these chapter 11 cases.  Should any Utility Company alter, refuse, or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, and such disruption could jeopardize the Debtors' ongoing reorganization efforts.  I believe it is critical that the Debtors obtain the relief requested herein to ensure they are able to maintain and pay for Utility Services on an uninterrupted basis throughout these chapter 11 cases.  Accordingly, I respectfully ask the Court to grant the relief requested in the Utilities Motion.

**D.      The Insurance Motion**

9.      Through the Insurance Motion, the Debtors seek entry of an order (i) authorizing the Debtors to (a) maintain the existing Insurance Policies (as defined below) and pay all policy premiums, brokers' fees, and other amounts and obligations arising thereunder, and (c) renew, amend, supplement, extend, or purchase Insurance Policies, and (ii) granting related relief.

10.      In the ordinary course of the Debtors' businesses, the Debtors maintain numerous insurance policies providing coverage for, *inter alia,* property, general liability, workers compensation, automobile liability, umbrella and excess liability, D&O, ocean cargo coverage, and a foreign package policy (collectively, the "Insurance Policies").  These Insurance Policies are essential to the preservation of the Debtors' businesses, properties, and assets, and, in many cases, such insurance coverages are required by various regulations, laws, and contracts that govern the Debtors' business conduct, including the requirement by the Office of the United States Trustee that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.

11.     The Insurance Policies are essential to the Debtors' businesses, and I believe it is in the best interests of their estates to permit the Debtors to honor their obligations under their current insurance contracts (including related brokers' fees).  Any other alternative would likely require considerable additional cash expenditures and would be detrimental to the Debtors' efforts to preserve and maximize the value of their estates.

12.     I believe that funding all costs necessary to maintain the Insurance Policies outweighs the harm that could occur if the Debtors do not maintain the Insurance Policies. Accordingly, by the Insurance Motion, the Debtors request authority to continue, in the ordinary course, this shared services arrangement to the extent the Debtors determine that doing so is necessary to maintain the Insurance Policies.

**E.     The Tax Motion**

13.     By the Tax Motion, the Debtors request that the Court (i) authorize the Debtors to satisfy, in the Debtors' sole discretion, all Taxes and Assessments (as defined below) due and owing to various federal, state, and local taxing and regulatory authorities (collectively, the "Taxing and Regulatory Authorities") that arose prior to the Petition Date, including all Taxes and Assessments substantially determined by audit or otherwise to be owed for periods prior to the Petition Date, and (ii) grant related relief.

14.     As more fully set forth in the Tax motion, in the ordinary course of business, the Debtors pay certain taxes and assessments which generally fall into the following categories: (i) income and franchise taxes; (ii) property taxes; (iii) withholding taxes; and (iv) regulatory and other taxes (collectively, the "Taxes and Assessments").

15.     The Debtors pay Taxes and Assessments on a monthly, quarterly, or annual basis, as required by the applicable laws and regulations.  The Debtors estimate that approximately

ACTIVE 704206510v1

$80,000 of Taxes and Assessments relating to the prepetition period will become due and payable after the Petition Date.

16.     I believe that payment of the prepetition Taxes and Assessments is an exercise of sound business judgment and is necessary to ensure a smooth transition into chapter 11.  I am advised that the Debtors must pay the prepetition Taxes and Assessments to prevent the Taxing and Regulatory Authorities from taking actions that would interfere with the Debtors' transition into chapter 11 and wind-down efforts and potentially impose significant costs on the Debtors' estates.  These potential actions may include asserting liens on estate assets or seeking to lift the automatic stay.

17.     I believe payment of prepetition Taxes and Assessments is also warranted here because I understand that the Debtors' nonpayment has the potential to increase the amount of secured claims held by Taxing and Regulatory Authorities against the Debtors' estates. Specifically, Taxing and Regulatory Authorities may assert liens against any personal property for which the Taxes are due and owing. Furthermore, to the extent the Taxing and Regulatory Authorities hold oversecured claims, I am advised that failure to pay the prepetition Taxes and Assessments could result in the accrual of postpetition interest, fees, penalties, and other charges. Therefore, I believe that paying the prepetition Taxes and Assessments now will avoid the potential imposition of liens and the accrual of interest charges and unnecessary fees and penalties on such claims, thereby preserving the value of the Debtors' estates and maximizing the distribution available for other creditors.

18.     Based on the foregoing I believe that granting the relief requested in the Tax Motion is appropriate and in the best interest of the Debtors, their estates, and all parties in interest.

**F.     The Cash Management Motion**

19.     By the Cash Management Motion, the Debtors are seeking entry of interim and final orders (i) authorizing the Debtors to (a) continue using their existing cash management system (the "Cash Management System"), including to continue to maintain the Debtors' existing bank accounts (each a "Bank Account" and, collectively, the "Bank Accounts") at the financial institutions maintaining such Bank Accounts (each, a "Bank" and together, collectively, the "Banks") and existing check stock and (b) honor and pay all prepetition and postpetition Bank Fees (as defined below) payable by the Debtors, and (ii) granting related relief.

20.     The Debtors have utilized the Cash Management System to facilitate the efficient operation of their business and will continue to utilize it throughout these chapter 11 cases.  The Cash Management System is an integrated system used to collect, transfer, and disburse funds. The Cash Management System facilitates cash monitoring and reporting and enables the Debtors to maintain control over the administration of the Bank Accounts.  The Cash Management System is tailored to meet the Debtors' operating needs—enabling the Debtors to control and monitor corporate funds, ensure cash availability and liquidity, and reduce administrative expenses by facilitating the movement of funds and the development of accurate account balances.

21.     Continued use of the Cash Management System will avoid the disruption and delay to the Debtors' business activities that would necessarily result from closing the Bank Accounts and opening new accounts. By preserving business continuity, all parties in interest, including staff, vendors, and customers, will be best served. Further, to the best of Debtors' knowledge, the continuation of Debtors' Cash Management System will not affect the rights of any creditors or parties in interest in these cases.

22.     I believe that requiring the Debtors to implement changes to the Cash Management System at this critical stage of these chapter 11 cases would be expensive, impose needless

27

administrative burdens on the Debtors, disrupt the Debtors' operations, and affect the Debtors' ability to maximize value. Accordingly, I respectfully ask the Court to grant the relief requested in the Cash Management Motion.

**G.     The Cash Collateral Motion**

23.     By the Cash Collateral Motion, the Debtors seek entry of an interim order, substantially in the form attached to the Motion as Exhibit A (the "Interim Order") and a final order (the "Final Order" and together with the Interim Order, the "Cash Collateral Orders") (a) authorizing the Debtors use of Cash Collateral (as defined in the Interim Order) subject to the terms and conditions set forth in the Interim Order, (b) granting certain adequate protection, (c) modifying the automatic stay, and (d) scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order.

24.     The Debtors have an immediate need to use cash collateral on an interim basis.  The Debtors cannot maintain their business operations or the value of their estates during the pendency of these cases without access to Cash Collateral.  The Debtors will use Cash Collateral to, among other things, continue operating their business and satisfy other working capital needs during these cases.  Absent approval of the Interim Order, the Debtors would have insufficient liquidity to continue to operate their businesses and pay costs associated with these cases.  Michael L. Howe and Cosmed of DR consent to the Debtors' use of cash collateral.

25.     The Interim Order provides certain adequate protection to the Prepetition Lenders (as defined in the Cash Collateral Motion) to protect against any diminution in value arising from the Debtors' use of Cash Collateral or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.  Prior to the Final Hearing, the Debtors further propose to make distributions pursuant to the budget attached to the proposed Interim Order (the "Budget"), subject to certain reasonable variances.

26.     Access to Cash Collateral on an interim basis, and ultimately on a final basis, will provide the Debtors with the liquidity necessary to operate their business and preserve the going concern value of the Debtors' estates as the Debtors pursue a restructuring or organized winddown for the benefit of all stakeholders.  Without the immediate access to liquidity contemplated by this Motion, the Debtors' ability to navigate through the chapter 11 process will be jeopardized, all to the detriment of the Debtors' stakeholders.  As a result, the Debtors have an immediate need to use Cash Collateral.

[*Signature page follows*]

**COSMED GROUP, INC.,** *ET AL.*

By: David G. Howe
Title: Chief Operating Officer