**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| SPICEY PARTNERS REAL | § | Case No. 24-90572 (CML) |
| ESTATE HOLDINGS, LLC, *et al.*,[1] | § | |
| | § | (Jointly Administered) |
| Debtors. | § | |
| | § | (Emergency Hearing Requested) |
| | § | |

**EMERGENCY MOTION OF DEBTORS FOR INTERIM**
**AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN**
**POSTPETITION FINANCING, (II) GRANTING PRIMING LIENS AND**
**PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III)**
**MODIFYING AUTOMATIC STAY, (IV) SCHEDULING FINAL HEARING,**
**AND (V) GRANTING RELATED RELIEF**



**Emergency relief has been requested. Relief is requested not later than December 10, 2024.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on December 10, 2024, at 9:00 a.m. (prevailing Central Time) in Courtroom 401, floor 4, 515 Rusk, Houston, TX 77002.**

**You may participate in the hearing either in person or by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at 1-832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's home page.**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Spicey Partners Real Estate Holdings, LLC (6459) and Cosmed Group, Inc. (8781).  The location of the Debtors' service address is 28 Narragansett Ave., Jamestown, RI 02835.

> **The meeting code is "JudgeLopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") hereby submit this motion (the "<u>Motion</u>") for entry of an interim order, substantially in the form attached hereto as **<u>Exhibit A</u>** (the "<u>Interim Order</u>"), and a final order (the "<u>Final Order</u>," and together with the Interim Order, the "<u>DIP Orders</u>"), pursuant to sections 105(a), 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "<u>Bankruptcy Local Rules</u>"), and the Procedures for Complex Chapter 11 Cases in the Southern District of Texas (the "<u>Complex Chapter 11 Procedures</u>"). In support of this Motion, the Debtors incorporate the statements contained in the *Declaration of David G. Howe in Support of Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Priming Liens and Providing Superpriority Administrative Expense Claims, (III) Modifying Automatic Stay, (IV) Scheduling Final Hearing* (the "<u>DIP Declaration</u>") filed contemporaneously with this Motion and the *Declaration of David G. Howe of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [ECF No. 30] (the "<u>First Day Declaration</u>"), and respectfully move as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The bases for the relief requested herein are sections 105(a), 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506, 507, and 552 of the Bankruptcy Code, Rules 2002, 4001, 6003, 6004, and 9014 of the Bankruptcy Rules, and Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1 of the Bankruptcy Local Rules.

## BACKGROUND

3.      On November 14, 2024 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee, examiner, or official committee of unsecured creditors has been appointed in the Debtors' chapter 11 cases.

5.      Additional factual background regarding the Debtors, including their business operations, capital and debt structures, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the First Day Declaration, which is fully incorporated herein by reference.

## RELIEF REQUESTED

6.      By this Motion, the Debtors respectfully request entry of the Interim Order, and the granting of, among other things, the following relief:

(a)      authorizing the Debtors to obtain secured postpetition financing pursuant to the terms and conditions of DIP Term Sheet in substantially the form

attached to the Interim Order (without exhibits or schedules) as <u>Exhibit B</u>, by and among the Debtors, as borrowers, and Zimmer, Inc. and/or its designees or its assignees, as lender (the "<u>DIP Lender</u>"), in an aggregate principal amount not to exceed $7,500,000.00, consisting of a multiple-draw term loan facility (the "<u>DIP Facility</u>", and any draws on the DIP Facility, the "<u>DIP Loans</u>");

(b)     authorizing the Debtors to execute the DIP Term Sheet and all other documents, agreements, and instruments delivered pursuant thereto or executed or filed in furtherance or in connection therewith, all of which shall be in form and substance customary for transactions of this type, and acceptable to the DIP Lender and the Debtors (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with their respective terms, and collectively with the DIP Term Sheet, the "<u>DIP Documents</u>");

(c)     authorizing the Debtors to use the proceeds from the DIP Facility as permitted in the DIP Documents and in accordance with the Interim Order and the Approved Budget (as defined below);

(d)     granting to the DIP Lender automatically perfected security interests in and liens on all assets that constitute the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Documents and the Interim Order, subject to the Permitted Prior Liens (as defined below) and the Carve-Out (as defined below);

(e)     granting superpriority administrative expense claims against the Debtors' estates to the DIP Lender with respect to the DIP Obligations over any and all administrative expenses of any kind or nature, subject to the Carve-Out;

(f)     vacating and modifying the automatic stay pursuant to section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and the DIP Documents;

(g)     waiving any applicable stay with respect to the effectiveness and enforceability of the DIP Orders (including under Bankruptcy Rule 6004);

(h)     scheduling a final hearing (the "<u>Final Hearing</u>") to consider entry of the Final Order; and

(i)     granting the Debtors such other and further relief as is just and proper.

## CONCISE STATEMENT PURSUANT TO RULE 4001 OF THE BANKRUPTCY RULES AND THE COMPLEX CHAPTER 11 PROCEDURES

7.      The following chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Rule 4001(b)(1)(B) and 4001(c)(1)(B) of the Bankruptcy Rules and the Complex Chapter 11 Procedures.[2]

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Parties to the DIP Term Sheet** Bankruptcy Rule 4001(c)(1)(B) | **Borrowers:** Cosmed Group, Inc. and Spicey Partners Real Estate Holdings, LLC (each a "Borrower," and collectively, the "Borrowers") **DIP Lender:** Zimmer Inc., and/or its designees or its assignees. DIP Term Sheet, at p. 1. |
| **Commitment** Bankruptcy Rule 4001(c)(1)(B) | The DIP Lender will provide to the Borrowers a priming, senior secured, superpriority debtor-in-possession credit facility (the "DIP Facility") consisting of a multiple-draw delayed draw term loan facility in the aggregate maximum principal amount of up to $7.5 million (the "DIP Facility Commitment" and the portion thereof drawn by the Debtors, the "DIP Loans"). The DIP Facility will be made available to the Borrowers through an initial maximum aggregate amount of up to $2.0 million (the "Interim Advance") following the entry of the Interim Order.  The balance of the DIP Facility ($5.5 million) will be available only upon and after entry of the Final Order, with draws no more frequently, than bi-weekly absent exigent circumstances demonstrated by the Borrowers, and in accordance with the latest Approved Budget (as defined below). Pending the entry of the Final Order, the DIP Lender shall be afforded all of the protections contained in the Interim Order. DIP Term Sheet, at p. 1-2 |

---

[2] The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced including, without limitation, the DIP Documents and the Interim Order. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Term Sheet or the Interim Order, as applicable.

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Term/Maturity**<br>Bankruptcy Rule 4001(b)(1)(B)(iii), 4001(c)(1)(B) | The DIP Facility shall automatically terminate without further notice or court proceedings on the earliest to occur of:<br><br>i.    six (6) months after entry of the Interim Order (the "<u>Scheduled Maturity Date</u>");<br><br>ii.    the effective date of a plan of reorganization or liquidation for the Debtors confirmed in the Chapter 11 Cases;<br><br>iii.    the date of termination of the commitments under the DIP Facility and/or acceleration of any outstanding borrowings under the DIP Facility, in each case, by the DIP Lender following the occurrence of an Event of Default and upon the delivery of a Termination Notice to the Remedies Notice Parties, in each case, subject to the Debtors' right to use the proceeds of the DIP Loans (and Cash Collateral in accordance with the Cash Collateral Order) during the Remedies Notice Period as set forth above, and pending the outcome of the Stay Relief Hearing;<br><br>iv.    the first business day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto;<br><br>v.    the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code unless otherwise consented to in writing (which may be e-mail) by the DIP Lender;<br><br>vi.    the dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing (which may be e-mail) by the DIP Lender; or<br><br>vii.    the repayment in full in cash of all obligations and termination of all commitments under the DIP Facility<br><br>(each, a "<u>Termination Date</u>"), unless extended with the prior written consent (which may be by e-mail) of the DIP Lender.<br><br>DIP Term Sheet, at p. 18; Interim Order, at ¶ 20(d). |
| **Conditions to Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Orders and DIP Term Sheet include standard and customary conditions of borrowing, the satisfaction of which are conditions precedent to the obligations of each DIP Lender to provide the DIP Facility.<br><br>DIP Term Sheet, at p. 5-6. |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Loans shall accrue interest at 8.00%, with a default interest rate of an additional 2.00%, each of which shall be payable monthly in kind and added to the principal balance of the DIP Facility.<br><br>DIP Term Sheet, at p. 2. |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Use of DIP Facility**<br>Bankruptcy Rule<br>4001(b)(1)(B)(ii) | The DIP Loans may be used only for:<br><br>i.    Post-petition working capital and maintenance capital expenditure purposes of the Debtors;<br><br>ii.   Current fees, and expenses under the DIP Facility;<br><br>iii.  The allowed administrative costs and expenses of the Chapter 11 Cases, including professional fees and expenses;<br><br>iv.   Payment of prepetition claims and expenses as authorized by the Bankruptcy Court;<br><br>v.    Any forecasted cash outlays included in any Approved Budget; or<br><br>vi.   As otherwise agreed<br><br>in each case, other than iii. above, solely in accordance with the Approved Budget and the applicable DIP Order incorporating the terms hereof.<br><br>DIP Term Sheet, at p. 2; Interim Order, at ¶ G(iv). |
| **Limitations on Use of DIP Facility**<br>Bankruptcy Rule<br>4001(b)(1)(B)(ii)<br>Complex Case<br>Procedures ¶ 8(g) | None of the Carve-Out, the DIP Loans, or the DIP Collateral may be used to challenge the amount, validity, perfection, priority or enforceability of, or assert any defense, counterclaim or offset to, the DIP Facility, this DIP Term Sheet, or the DIP Documents, or the security interests and liens securing any of the DIP Obligations, or to fund prosecution or assertion of any claims, or to otherwise litigate against the DIP Lender, provided that up to $25,000 shall be made available to the Committee (if any) for investigation costs in respect of the stipulations contemplated below or otherwise set forth in the DIP Orders.<br><br>DIP Term Sheet, at 21; Interim Order, at ¶ 11.<br><br>Justification: These limitations are usual and customary.  The Debtors, having engaged in arm's length negotiations with the DIP Lenders, agreed to limit the Debtors' use of proceeds of the DIP Loans as consideration for, among other things, the provision of new money within the broader context of the Debtors' value-maximizing chapter 11 process. The limitation is reasonable given the facts and circumstances of the Chapter 11 Cases. |
| **Fees**<br>Bankruptcy Rule<br>4001(c)(1)(B) | The DIP Facility shall provide for a commitment fee of 1.5% percent of the DIP Facility Commitment (the "Commitment Fee"), which shall be added to the principal balance of the DIP Facility on the Closing Date and thereafter shall be treated as DIP Facility Loans.<br><br>The DIP Facility shall provide for an exit fee of 1.5% percent of the DIP Facility Commitment (the "Exit Fee").  The Exit Fee shall be due and payable in cash upon the earlier of (i) the DIP Termination Date (as defined below) or (ii) payment in full of the DIP Obligations (as defined below), provided, however, |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | if the DIP Termination Date has occurred solely as a result of the occurrence and continuation of an Event of Default under the DIP Documents, then the Exit Fee shall not be payable until the DIP Obligations have been accelerated by the DIP Lender.<br><br>The Debtors agree to pay reasonable and documented expenses of the DIP Lenders' professionals.<br><br>DIP Term Sheet, at p. 2. |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B) | The Debtors shall prepare for the DIP Lender's review and approval a thirteen-week (13-week) detailed rolling cash projection similar in form to the 13-week cash projection attached as <u>Exhibit 1</u> to the DIP Term Sheet (the "<u>Initial Approved Budget</u>"),[3] which shall be thereafter updated, as necessary, not later than March 2, 2025 (each, a "<u>Proposed Budget</u>," together with the Initial Approval Budget, the "<u>Budget</u>").<br><br>Upon the Debtors' receipt of the DIP Lender's approval (in its sole discretion and in writing, with e-mail notice being sufficient) of a Proposed Budget, such budget shall become an "<u>Approved Budget</u>" and shall replace the then-operative Approved Budget for all purposes.<br><br>DIP Term Sheet, at p. 9-10; Interim Order, at ¶ 4. |
| **Reporting Information**<br>Bankruptcy Rule 4001(c)(1)(B) | Reporting requirements usual and customary for financings of this type, including, without limitation, the requirement that the Borrowers provide the DIP Lender, with reasonable promptness, such information regarding the operations, business affairs and financial condition of the Debtors as the DIP Lender may reasonably request in writing from time to time.<br><br>DIP Term Sheet, at p. 9; Interim Order, at ¶ 6. |
| **Variance Covenant**<br>Bankruptcy Rule 4001(c)(1)(B) | The Initial Approved Budget shall be the Approved Budget until such time as a new Proposed Budget is approved, following which such Proposed Budget shall constitute the Approved Budget until a subsequent Proposed Budget is approved. The Debtors shall operate in accordance with the Approved Budget and all disbursements shall be consistent with the provisions of the Approved Budget (subject to the Permitted Variance (as defined below)). The Debtors may submit additional Proposed Budgets to the DIP Lender, but until the DIP Lender approves such Proposed Budget in writing, it shall not become an Approved Budget and the Debtors shall continue to comply with the then-operative Approved Budget. The DIP Lender's failure to respond to any submitted Proposed Budget within two (2) business days following submission thereof shall be deemed to be the DIP Lender's approval of the same, |

---

[3] A copy of the Initial Approved Budget will be filed with the Court in advance of the interim hearing on this Motion.

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | whereupon such Proposed Budget shall constitute an Approved Budget; however, DIP Lender's written notice within two (2) business days following submission of the submitted Proposed Budget that such submitted Proposed Budget is still under consideration shall not be considered a "failure to respond."<br><br>Subject to the schedule below, and beginning on Monday, January 6, 2024 (the "Initial Reporting Date," and with each subsequent Monday, collectively and individually, each a "Reporting Date"), the Debtors shall deliver to the DIP Lender, in a form consistent with the form of the Approved Budget, a variance report describing in reasonable detail, by line item (including capital expenditures and professional fees, excluding the fees of DIP Lender's professionals), (i) the actual disbursements of the Debtors and actual receipts during the applicable Testing Period (as defined below); (ii) any variance (whether positive or negative, expressed as a percentage) between the actual receipts or disbursements, as applicable, during such Testing Period against the estimated receipts or disbursements, as applicable, for the applicable Testing Period, as  set forth in the applicable Approved Budget (each a "Variance Report"); and (iii) comments relating to any variances between budgeted and actual disbursements/receipts (the "FA Reports").<br><br>As used herein, "Testing Period" shall mean the cumulative period from the beginning date of the Approved Budget through the Sunday that is eight calendar days prior to the applicable Reporting Date. The last day of each Testing Period shall be a "Testing Date".<br><br>The FA Report provided no later than the Initial Reporting Date shall report on the Testing Period ended December 15, 2024 (such Testing Period to be referred to as "Week 1").  The FA Reports for the two Testing Periods ended December 22, 2024 and December 29, 2024 (referred to as "Week 2" and "Week 3," respectively) shall be provided to the DIP Lender on January 13, 2025.  The FA Report for the Testing Period ended January 5, 2025 (referred to as "Week 4")  shall be provided to the DIP Lender on January 21, 2025. Beginning with the Testing Period ended January 12, 2025 (referred to as "Week 5") and for each subsequent Testing Period thereafter, each FA Report shall be provided on a weekly basis no later than the Monday of the week that is a full week after the week for which the FA Reports relate.<br><br>As of any applicable Testing Date, actual cumulative disbursements (excluding DIP Lender professional fees) on an aggregate basis (the "Actual Disbursement Variance") shall not exceed budgeted cumulative disbursements (excluding DIP Lender's professional fees) on an aggregate basis as reflected in the Approved Budget for such period, by more than 15.0% (the "Permitted Disbursement Variance"); *provided that* the actual cumulative Cash receipts on an aggregate basis (the "Actual Cash Variance," together with the Actual Disbursement Variance, the "Actual Variances") shall not exceed budgeted cumulative Cash receipts on an aggregate basis as reflected in the Approved Budget for such period, by more than 50.0% (the "Permitted Cash Variance," |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | together with the Permitted Disbursement Variance, the "Permitted Variances"). |
| | If the Actual Variances for such period are less than or equal to the Permitted Variances, the amount by which each Actual Variance is less than the Permitted Variance shall be carried forward to the next Testing Date and added to the Permitted Variance for such next Testing Date. |
| | The Debtors shall be deemed to be in compliance with the Approved Budget for all purposes under this DIP Term Sheet and the DIP Financing Orders unless, as of any Testing Date, the Debtors' actual disbursements or actual Cash receipts vary from the Approved Budget by more than the applicable Permitted Variances as measured on any Testing Date (the "Variance Covenant"). |
| | The financial advisor for the DIP Lender and the financial advisor for the Debtors shall hold weekly calls to discuss the Budget and relevant portions of the Chapter 11 Cases, including actual performance against the Approved Budget, status of the Sale process, and receive a business update. |
| | The Investment Banker shall provide weekly process reporting to the financial advisor for the DIP Lender and shall hold weekly calls with the financial advisor to the DIP Lender. |
| | DIP Lender may, in its sole discretion, waive or extend any of the foregoing Approved Budget or Variance reporting or approval procedures, provided such procedure change is not more onerous or otherwise adverse to the Debtor. |
| | For the avoidance of doubt, the terms of the financial reporting package, Budget, and FA Reports may be re-negotiated prior to the hearing on the Final DIP Financing Order. |
| | DIP Term Sheet, at p. 9-10; Interim Order, at ¶ 4. |
| **Chapter 11 Milestones** Bankruptcy Rule 4001(c)(1)(B) Complex Case Procedures ¶ 8(a) | The DIP Documents require that the Debtors comply with the following milestones: |
| |    i.   The Bankruptcy Court shall have entered the Interim Order by December 10, 2024. |
| |    ii.   The Debtors shall have sought the retention of an investment banker (the "Investment Banker") reasonably acceptable to the DIP Lender by the date that is no later than ten (10) days following the filing of the DIP Motion. |
| |    iii.   The Bankruptcy Court shall have entered the Final Order by the date that is no later than thirty (30) days after the filing of the DIP Motion. |
| |    iv.   The Debtors shall file, by the date that is no later than forty-five (45) days after the Petition Date, a motion to sell all or substantially all of the Debtors' |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | assets through a sale pursuant to section 363 of the Bankruptcy Code in form and substance reasonably acceptable to the DIP Lender (the "Sale Motion").<br><br>v.   The Bankruptcy Court shall have entered an order approving the bidding procedures of the sale contemplated by the Sale Motion (the "Sale") by the date that is no later than sixty-five (65) days after the Petition Date.<br><br>vi.   The Bankruptcy Court shall have entered an order approving the Sale by the date that is no later than one-hundred and ten (110) days after the Petition Date.<br><br>vii.   The Sale shall be consummated by the date that is no later than one-hundred and twenty (120) days after the Petition Date.<br><br>viii.   A liquidating chapter 11 plan shall be consummated by the date that is no later than ninety (90) days after consummation of the Sale.<br><br>DIP Term Sheet, at p. 7-8; Interim Order, at ¶ 7.<br><br>Justification: These milestones are appropriate given the amount of funding the DIP Lender are willing to make available to the Debtors to fund the chapter 11 cases. The Debtors believe that the DIP Lender would not have otherwise provided the DIP Loans. |
| **Liens and Priorities**<br>Bankruptcy Rule<br>4001(c)(1)(B)(i) | As security for the DIP Obligations, the Debtors shall grant to the DIP Lender, upon entry of the Interim Order, automatically perfected first priority DIP Liens and superpriority claims in the DIP Collateral, subject only to the Carve-Out and Permitted Prior Liens. The DIP Obligations shall constitute senior secured debt for all purposes and shall benefit from a first priority senior secured priming lien on the DIP Collateral.<br><br>DIP Term Sheet, at p. 3-4; Interim Order, at ¶ 2(e)-(f). |
| **Carve-Out**<br>Bankruptcy Rule<br>4001(c)(1)(B) | The Interim Order and DIP Term Sheet provide a "Carve-Out" for certain statutory fees and allowed professional fees of the Debtors and, if appointed, the Committee pursuant to sections 327, 328, 363, and/or 1103 of the Bankruptcy Code, and for certain amounts incurred following the delivery of a Carve-Out Notice.<br><br>DIP Term Sheet, at p. 18-19; Interim Order, at ¶ 12. |
| **Adequate Protection**<br>Bankruptcy Rules<br>4001(b)(1)(B)(iv),<br>4001(c)(1)(B)(ii) | Subject to the Carve-Out, the Prepetition Lenders (as defined in the Cash Collateral Motion [ECF No. 29]) shall receive adequate protection for the Debtors' use of the collateral securing the Prepetition Loans as set forth in the Interim Cash Collateral Order [ECF No. 47].<br><br>DIP Term Sheet, at p. 4. |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Events of Default** Bankruptcy Rule 4001(c)(1)(B) | The DIP Term Sheet contain events of default that are usual and customary for debtor-in-possession financings, including without limitation, failure to comply with certain covenants in the DIP Documents and will allow for remedies by the DIP Lender following the occurrence of an Event of Default, subject to providing written notice of the default and prior to the exercise or enforcement of certain rights. DIP Term Sheet, at p. 14-16; Interim Order, at ¶ 20. |
| **Waiver/Modification of Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) Complex Case Procedures ¶ 8(e) | The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is modified as necessary to effectuate all of the terms and provisions of the Interim Order, including, without limitation, to (a) permit the Debtors to grant the DIP Liens and the Superpriority Claims, (b) permit the Debtors to perform such acts as the DIP Lender may reasonably request to assure the perfection and priority of the liens granted herein, (c) permit the Debtors to incur all liabilities and obligations to the DIP Lender under the DIP Documents, the DIP Facility, and this Interim Order, as applicable, and (d) to pay, and for the DIP Lender to retain and apply, payments made in accordance with the terms of the Interim Order. In addition, upon the occurrence and during the continuance of any Event of Default, and without further application to the Bankruptcy Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to take any of the following actions, at the same or different time: <ol type="i"><li>issue a written notice (the "Remedies Notice") (which may be by e-mail) to the Debtors and their counsel, counsel for any Committee, and the U.S. Trustee (the "Remedies Notice Parties") declaring the occurrence of the Termination Date (as defined below);</li><li>issue a Carve-Out Notice (as defined below);</li><li>declare all DIP Obligations to be immediately due and payable without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Debtors;</li><li>declare the suspension or termination of the DIP Facility as to any further liability or obligation of the DIP Lender thereunder, but without affecting the DIP Liens or DIP Obligations (the "Termination Notice"); and</li><li>charge the default rate of interest under the DIP Facility.</li></ol> During the five business (5) days immediately following the date the DIP Lender delivers a Remedies Notice to the Remedies Notice Parties (the "Remedies Notice Period"), the DIP Lender and/or Debtors may seek an emergency hearing (a "Stay Relief Hearing") to determine whether an Event of Default has occurred, and the filing of any such motion shall toll the Remedies Notice Period.  In the event the Bankruptcy Court determines during a Stay Relief Hearing that an Event of Default has occurred, the Court may fashion an |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | appropriate remedy, which may include the exercise of any and all rights available to the DIP Lender under this DIP Term Sheet, the DIP Credit Agreement, the Interim DIP Financing Order, and/or the Final DIP Financing Order, as applicable.<br><br>Upon expiration of the Remedies Notice Period, if a motion seeking emergency relief has not been filed or unless ordered otherwise by the Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified without further order of the Bankruptcy Court to the extent necessary to permit the DIP Lender to exercise any and all remedies against the DIP Collateral permitted under state law.<br><br>DIP Term Sheet, at p. 16-17; Interim Order, at ¶20.<br><br>Justification: These default provisions and remedies appropriately balance, in the Debtors' view, the DIP Lender's need for protection and the Debtors' need for debtor-in-possession financing. In addition, the DIP Lender must provide five (5) business days' prior written notice prior to exercising its rights under the DIP Documents and during that time the Debtors have the ability to file a motion seeking a determination as to whether an Event of Default has occurred. Until such time as the emergency motion has been adjudicated by the Court, the Debtors may use the proceeds of the DIP Loans (and Cash Collateral in accordance with the Cash Collateral Order) to fund operations in accordance with the DIP Documents. |
| **Waiver/Modification of Applicability of Non-Bankruptcy Law Relating to Perfection or Enforceability of Liens**<br>Bankruptcy Rule 4001(c)(1)(B)(vii) | No obligation, payment, transfer or grant of security under the DIP Documents or the Interim Order shall be stayed, restrained, voided, voidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment, or counterclaim.<br><br>Interim Order, at ¶ 2(a). |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors shall agree to indemnify and hold harmless the DIP Lender (solely in its capacity as DIP Lender) and its affiliates and each of their officers, directors, employees, agents, advisors, attorneys and representatives (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable and documented fees and out-of-pocket expenses of counsel), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), arising out of or in connection with or by reason of the DIP Facility, or any of transactions contemplated hereby, except to the extent arising from an Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any of the Debtors, any of their respective directors, security holders or creditors, an Indemnified Party or any other person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. DIP Term Sheet, at p. 21; Interim Order, at ¶ G(x). |
| **Waiver of 506(c) and 552** Bankruptcy Rule 4001(c)(1)(B)(x) | Subject to entry of the Final Order, the DIP Lender is entitled to a waiver of the provisions of sections 506(c) and 552 of the Bankruptcy Code. DIP Term Sheet, at p. 20; Interim Order, at ¶ G(vi). |
| **Liens on Avoidance Actions** Bankruptcy Rule 4001(c)(1)(B)(xi); Complex Case Procedures ¶ 8(d) | Upon entry of the Final Order, the DIP Collateral shall include the proceeds of avoidance actions pursuant to chapter 5 or section 724(a) of the Bankruptcy Code or applicable state law equivalents but shall exclude the actual claims and causes of action. DIP Term Sheet, at p. 3; Interim Order, at ¶ 2(d). Justification: Granting DIP Liens and DIP Superpriority Claims on proceeds and property recovered in respect of Avoidance Actions is appropriate because the DIP Facility provides the Debtors with necessary liquidity to fund the Debtors' Chapter 11 Cases and ensure the Debtors are able to maximize value for their estates. Moreover, the liens were required by the DIP Lender as a condition to extending credit. |
| **Non-Consensual Priming Liens** Complex Case Procedures ¶ 8(h) | The DIP Documents provide for priming of the Prepetition Collateral. *however*, the Prepetition Lenders have affirmatively consented to the priming of the Prepetition Collateral. DIP Term Sheet, at p. 3-4; Interim Order, at ¶ 2(d). |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | <u>Justification</u>: It is appropriate to provide priming liens to the DIP Lender to secure the DIP Obligations because there are no alternative financing sources available, the Prepetition Senior Lender is receiving adequate protection through monthly payments, in addition to adequate protection liens and superpriority claims, and the Prepetition Junior Lenders have consented to the priming of their prepetition liens. |
| **Releases**<br>Complex Case<br>Procedures ¶ 8(f) | Effective as of the date of entry of the Final Order, the Debtors and their estates hereby forever and irrevocably release, discharge, and acquit the former, current and future (a) DIP Lender, (b) the Related Parties, (c) Affiliates of the DIP Lender, and (d) officers, employees, directors, agents, representatives, owners, members, partners, financial and other advisors and consultants, legal advisors, shareholders, managers, consultants, accountants, attorneys, investment committee members, sub advisors and predecessors and successors in interest of the DIP Lender and its Affiliates, in each case acting in their respective capacities as such (collectively, the "<u>Releasees</u>") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the DIP Facility, the DIP Documents (including the DIP Term Sheet), and/or the transactions contemplated hereunder or thereunder including, without limitation, (x) any so-called "lender liability" or equitable subordination claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection, or avoidability of the liens or claims of the DIP Lender (the "<u>Releases</u>"); provided that nothing in this paragraph is intended to limit or release any commitments and obligations of the DIP Lender under the DIP Term Sheet or this Interim Order.  The Debtors further waive and release any defense, right of counterclaim, right of setoff or deduction to the payment of the DIP Obligations which the Debtors now have or may claim to have against the Releasees arising out of, connected with, or relating to any and all acts, omissions, or events occurring prior to the entry of the Interim Order by the Court.<br><br>Interim Order, at at ¶ G (xiii) |

## DEBTORS' PREPETITION CAPITAL STRUCTURE

8.    As of the Petition Date, the Debtors had approximately $6.73 million of secured debt outstanding.

9.    As set forth in greater detail in greater detail below and in the First Day Declaration, the Debtors are party to prepetition secured financing arrangements with each of Washington Trust Company (the "Prepetition Senior Lender"), Michael L. Howe (the "Prepetition Second Lien Lender"), and Cosmed Group of the Dominican Republic, Inc. (the "Prepetition Third Lien Lender," and together with the Second Lien Lender, the "Junior Lenders"; the Junior Lenders together with Prepetition Senior Lender, the "Prepetition Lenders").

### A.    The Washington Trust Prepetition Senior Loans

10.    Over the years, the Debtors, as borrowers, and Prepetition Senior Lender, as lender, entered into various loan agreements and attendant security documents (collectively, the "Prepetition Senior Lender Loan Documents").  Pursuant to the Senior Lender Loan Documents, the Debtors' obligations under the Prepetition Senior Lender Loan Documents are secured by substantially all of the Debtors' assets (the "Senior Lender Prepetition Collateral") and guarantees from various non-debtor affiliates.  As of the Petition Date, approximately $5 million is due and owing under the Prepetition Senior Lender Loan Documents (the "Prepetition Senior Lender Prepetition Obligations").

### B.    The Michael L. Howe Prepetition Second Lien Loan

11.    Cosmed Group, as borrower, and the Prepetition Second Lien Lender, as lender, entered into a loan agreement and attendant security documents dated March 1, 2024 (collectively, the "Prepetition Second Lien Loan Documents").  Cosmed Group's obligations under the Prepetition Second Lien Loan Documents are secured by substantially all of Cosmed Group's assets ("Second Lien Lender Prepetition Collateral").  As of the Petition Date, approximately

16

$500,000 is due and owing under the Second Lien Loan Documents (the "Second Lien Lender Prepetition Obligations"). The Prepetition Second Lien Lender and Prepetition Senior Lender are parties to a subordination agreement pursuant to which the Second Lien Lender Prepetition Obligations are subordinated in all respects to the Senior Lender Prepetition Obligations.

C.      **The Cosmed Dominican Republic Prepetition Third Lien Loan**

12.      Cosmed Group, as borrower, and the Prepetition Third Lien Lender, as lender, entered into a loan agreement and attendant security documents dated November 13, 2024 (collectively, the "Prepetition Third Lien Loan Documents"). Cosmed Group's obligations under the Prepetition Third Lien Loan Documents are secured by substantially all of Cosmed Group's assets ("Third Lien Lender Prepetition Collateral," and together with the Second Lien Lender Prepetition Collateral and the Senior Lender Prepetition Collateral, the "Prepetition Collateral"). The Prepetition Third Lien Lender perfected its security interest by filing a UCC statement. As of the Petition Date, approximately $1.23 million is due and owing under the Prepetition Third Lien Loan Documents (the "Third Lien Lender Prepetition Obligations"). The Prepetition Third Lien Lender has acknowledged that its lien position on the Prepetition Collateral is junior to the Prepetition Senior Lender and Prepetition Second Lien Lender.

**DEBTORS' NEED FOR DEBTOR-IN-POSSESSION FINANCING**

13.      As described in the DIP Declaration, the Debtors require access to the proceeds of the DIP Facility. The Debtors' business is cash intensive, with significant daily costs required to satisfy obligations to vendors and employees, and the Debtors anticipate incurring additional expenses related to the chapter 11 cases. As of the date hereof, the Debtors' total unrestricted cash balance is insufficient to operate their enterprise and continue paying their debts as they come due, especially when layering in the additional costs of these chapter 11 cases. Even with the use of

17

cash collateral, the Debtors do not have the funds necessary to continue to operate their businesses and fund these chapter 11 cases.  The DIP Facility will allow the Debtors to access immediate and necessary critical funding throughout these chapter 11 cases in connection with and pursuant to a weekly budget, subject to reasonable variances.  The proceeds of the DIP Facility are, therefore, essential to the Debtors' reorganization efforts.

14.     The Debtors require immediate access to the DIP Facility, so that they can instill confidence in the marketplace and their employees, vendors and customers, reassuring them that these chapter 11 cases are adequately capitalized and that the Debtors are continuing to operate their businesses in the ordinary course and able to continue sterilizing customers' products.  This assurance to preserve the Debtors' going concern value.  The DIP Facility covers the Debtors' imminent financing needs and will provide the working capital necessary to allow the Debtors to, among other things, continue operating their business and fund a sale process in these chapter 11 cases.  Approval and implementation of the DIP Facility is essential to the continued functioning of the Debtors and successful chapter 11 cases.

## ALTERNATIVE SOURCES OF FINANCING ARE NOT AVAILABLE

15.     As described in the First Day Declaration, there was significant uncertainty regarding the Debtors' ongoing business operations given the significant number of litigation claims against the Debtors and the mounting defense costs.  Once it became apparent that the Debtors would need to file these chapter 11 cases, the Debtors and their advisors were faced with a compressed timeframe within which to attempt to obtain a financing commitment.  In addition, the Debtors' capital structure, business and legal challenges made attracting outside capital difficult.

16.     Immediately following the commencement of these chapter 11 cases, several of the Debtors' medical device and products customers and the Debtors' regulators expressed concerns to the Debtors about the negative consequences that would result from a sudden closure of the Debtors' critical sterilization operations.  Due to regulatory restrictions and current supply chain limitations, the Debtors' customers have limited options to get products sterilized in the immediate future if the Debtors were to close operations in the next thirty days.  To avoid the imminent disruption of the Debtors' medical device and products sterilization operations and the resulting public health consequences and commercial harm to customers, the Debtors and their advisors engaged in an expedited marketing effort to obtain postpetition debtor-in-possession financing from their customers.  The Debtors and their advisors contacted multiple customers to solicit their interest in providing the Debtors with debtor-in-possession financing.  As a result of those efforts, the Debtors received proposals for secured financing on a priming basis from certain customers, including the DIP Lender.

17.     Given the immediate need for liquidity to fund these chapter 11 cases and preserve value for all stakeholders, the Debtors advanced negotiations with the DIP Lender to provide the DIP Facility on terms favorable to the Debtors.

## BASIS FOR RELIEF

**I.     The Debtors Should be Authorized to Obtain Postpetition Financing Through the DIP Documents.**

**A.     Entering into the DIP Documents is an Exercise of the Debtors' Sound Business Judgement.**

18.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents and obtain access to the DIP Facility.  Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so

long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g., In re Estrada*, No. 16-80003-G3-11, 2016 WL 745536, at *3 (Bankr. S.D. Tex. Feb. 24, 2016) ("In determining whether to approve a motion to obtain credit, courts generally permit debtors in possession to exercise their basis business judgment consistent with their fiduciary duties."); *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (Docket No. 21) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment).

19.     The Fifth Circuit has described the business judgment standard as a flexible one, which will be satisfied if a debtor articulates a business justification, and the decision furthers the interests of the Debtor and other parties in interest. *See ASARCO, Inc. v. Elliott Mgmt.* (*In re ASARCO, L.L.C.*), 650 F.3d 593, 601 (5th Cir. 2011) (in the context of section 363 of the Bankruptcy Code); *see also Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc.* (*In re Cont'l Air Lines, Inc.*), 780 F.2d 1223, 1226 (5th Cir. 1986). Courts generally will not second-guess a debtor's business decisions when those decisions involve the appropriate level of care in arriving at the decision on an informed basis, in good faith, and in the honest belief that the action was taken in the best interest of the debtor. *See also In re L. A. Dodgers LLC*, 457 B. R. 308, 313 (Bankr. D. Del. 2011). Further, in considering whether the terms of postpetition financings are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855–86 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Tr. Co. of Escanaba* (*In re Ellingsen MacLean Oil Co., Inc.*), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

20.     The Debtors' determination to move forward with the DIP Facility from the DIP Lender is a sound exercise of their sound business judgment.  The Debtors require access to the DIP Facility.  Immediately prior to and following the commencement of these chapter 11 cases, the Debtors and their advisors engaged in an expedited process to obtain postpetition debtor-in-possession financing.  The Debtors negotiated the DIP Documents with the DIP Lender in good faith, at arm's length, and with the assistance of their advisors.  The Debtors are confident that they have obtained the best financing available.  As discussed, the DIP Facility is the only viable option available for postpetition financing, and new capital cannot be obtained from another source on more favorable terms, particularly given the exigent circumstances leading up to these chapter 11 cases and the lack of unencumbered assets to pledge as collateral.  Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

**B.      The Debtors Should Be Authorized to Grant Priming Liens and Superpriority Claims to the DIP Lender.**

21.     The Debtors propose to obtain financing under the DIP Facility by providing super-priority claims and liens pursuant to section 364(c) and (d) of the Bankruptcy Code.  Specifically, the Debtors propose to provide the DIP Lenders with:

  (i)    pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority administrative expense claims against the Debtors' estates to the DIP Lender with respect to the DIP Obligations over any and all administrative expenses of any kind or nature subject only to the Carve-Out (the "Superpriority Claims");

  (ii)   pursuant to section 364(c)(2) of the Bankruptcy Code, first priority perfected liens on all of the DIP Collateral that is not otherwise encumbered; and

  (iii)  pursuant to section 364(c)(3) of the Bankruptcy Code, perfected liens on/ all DIP Collateral that is subject to validly perfected, non-avoidable security interests or liens as of the Petition Date (the "Permitted Prior Liens"); and

(iv)   pursuant to section 364(d) of the Bankruptcy Code, valid, enforceable, priming first priority, fully perfected security interests in and liens upon all of the Debtors' rights in property of the Debtors' estates as of the Petition Date, and all of the Debtors' rights in property acquired post-petition (and proceeds thereof), whether now existing or hereafter acquired or arising, that secure the Prepetition Debt (such lien, together with the liens described in clauses (i) through (iii) above, and in each case subject to the Carve-Out, the "DIP Liens" and the collateral described in clauses (i)-(iv) above, collectively, the "DIP Collateral").

**(I)     *Financing Under Section 364(c) is Appropriate***

22.     The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c).   *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

   i.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, i.e., by allowing a lender only an administrative claim;

   ii.   the credit transaction is necessary to preserve the assets of the estate; and

   iii.  the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

23.     To show financing required cannot be obtained on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code.  *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900

(Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *Sky Valley, Inc.*, 100 B.R. at 113; *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that the refusal of two national banks to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

24.     As explained above, the Debtors conducted a process that produced discussions with multiple potential post-petition financing sources.  After evaluating the terms of the DIP Facility, considering the Debtors' liquidity position and immediate need for financing, and accounting for the discussions with other potential lenders—all of which were only willing to lend on a senior secured basis—the Debtors determined that the DIP Facility is the best option available to fund these chapter 11 cases.  The Debtors, therefore, submit that the entry of the Interim Order is in the bests interests of the Debtors' estate, is necessary to preserve the value of estate assets, is an exercise of the Debtors' sound and reasonable business judgment, and satisfies the requirements of section 364(c) of the Bankruptcy Code.

### *(II)     Financing Under Section 364(d) is Appropriate*

25.     Courts may also authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on encumbered property if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected.  *See* 11 U.S.C. § 364(d)(1).  Specifically, section 364(d)(1) of the Bankruptcy Code provides:

(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

26.     When determining whether to authorize a debtor to obtain credit secured by priming liens as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtor's assets.  Courts consider a number of factors, including: (i) whether the party subject to priming has consented to such treatment; (ii) whether alternative financing is available on any other basis (i.e., whether any better offers or timely proposals are before the court); (iii) whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business; (iv) whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); and (v) whether the proposed financing agreement was negotiated in good faith and at arms' length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors. *See, e.g., Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 879–80.  "Section 364(d) 'does not require that debtors seek alternative financing from every possible lender. However, the debtor must make an effort to obtain credit without priming a senior lien.'" *In re Republic Airways Holdings Inc.*, 2016 WL 2616717, at *11.  Consent by the secured creditors to priming obviates the need to show adequate protection.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R.

pos

117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

27.    As described above and as set forth in the DIP Declaration, the Debtors are in need of an immediate capital infusion, and the parties contacted by the Debtors and their professionals were unwilling to provide financing on an unsecured, non-priming or *pari passu* basis.  The Debtors also lack any material unencumbered assets to serve as security for an alternative financier.  Without postpetition financing, the Debtors will lack the funds needed to operate their business and fund the projected costs of these chapter 11 cases and the value of the Debtors' estates will be significantly impaired to the detriment of all stakeholders.

28.    Having determined that postpetition financing would only be feasible under section 364(d) of the Bankruptcy Code, the Debtor negotiated with the DIP Lender to secure the DIP Facility on the terms described herein.

29.    The advances under the DIP Facility will be secured by a postpetition priming lien on the Debtors' assets, which will prime the liens of the Prepetition Lenders.  The Prepetition Lenders are adequately protected as contemplated by section 364(d) of the Bankruptcy Code. What constitutes adequate protection is decided on a case-by-case basis.  *See In re First S. Sav. Ass'n*, 820 F.2d 700, 710 (5th Cir. 1987) ("…with respect to adequate protection: 'Its application is left to the vagaries of each case ... but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process.'", *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)); *In re NJ Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("The term 'adequate protection' is intended to be a flexible concept.").

30.     Pursuant to the DIP Orders, the Prepetition Lenders are receiving adequate protection in the form of adequate protection liens and superpriority claims, and the Prepetition Senior Lender is receiving adequate protection payments in accordance with the Interim Cash Collateral Order.   [ECF No. 47].   The proposed adequate protection is customary for DIP financings of this kind and appropriate under the circumstances of these chapter 11 cases.

31.     For these reasons, granting the priming liens is reasonable, appropriate, and permissible under the Bankruptcy Code.  Accordingly, the Debtors submit that they have satisfied the standard for obtaining postpetition financing as set forth in the DIP Orders and the DIP Documents.

## II.     The Debtors Should be Authorized to Pay Certain Fees Required by the DIP Lender under the DIP Documents.

32.     Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  To do so, "the debtor must articulate some business justification, other than the mere appeasement of major creditors."  *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification).  In addition, under section 1107(a) of the Bankruptcy Code, a debtor in possession has, among other things, the "implied duty . . . to 'protect and preserve the estate, including an operating business' going-concern value.'"  *In re CEI Roofing, Inc*., 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting CoServ, 273 B.R. at 497); *In re Equalnet Commc'ns Corp*., 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation).

33.     Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lender pursuant to the DIP Documents.  Specifically, the Debtors have agreed to pay the reasonable fees and expenses of the DIP Lenders' professionals (subject to certain notice requirements under the DIP Orders).  Payment of the DIP Lenders' professionals' fees is an integral component of the overall terms of the DIP Facility, is required by the DIP Lender as consideration for the extension of postpetition financing and is reasonable and customary for similar transactions.  *See, e.g., In re Studio Movie Grill Holdings, LLC*, No. 20-32633 (SGJ) (Bankr. N.D. Tex. Oct. 27, 2020); *In re Tuesday Morning Corp.*, No. 20-31476 (HDH) (Bankr. N.D. Tex. May 28, 2020).  Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Documents in connection with entering into those agreements.

## III.    The DIP Lender Should be Afforded Good-Faith Protection Under Section 364(e) of the Bankruptcy Code.

34.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

35.     The DIP Facility is the result of (i) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital

postpetition financing, and (ii) extensive arm's-length, good-faith negotiations between the Debtors and the DIP Lender. The Debtors submit that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, the Debtors market-tested the terms of the DIP Facility before determining that the DIP Facility provided the best terms available. Accordingly, the Court should find that the obligations arising under the DIP Facility and other financial accommodations made to the Debtors have been extended by the DIP Lender in "good faith" within the meaning of section 364(e) of the Bankruptcy Code, and that, therefore, the DIP Lender are entitled to all of the protections afforded thereby.

**IV.     The Automatic Stay Should be Modified on a Limited Basis.**

36.     The DIP Orders provide that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified under certain circumstances, including to permit the Debtors to (a) grant the DIP Liens and the Superpriority Claims, and to perform such acts as the DIP Lender may request in its sole discretion to assure the perfection and priority of the DIP Liens and, (b) incur all liabilities and obligations to the DIP Lender as contemplated under the DIP Documents and the DIP Orders, (c) pay all amounts referred to, required under, in accordance with, and subject to the DIP Orders and the DIP Documents, and (d) the implementation of the terms of the and the DIP Orders.

37.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases. *See, e.g.*, *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) (modifying automatic stay as necessary to

effectuate the terms of the order); *In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Mar. 27, 2014) (same).

**V.      Failure to Obtain Immediate Interim Access to the DIP Facility Would Cause Immediate and Irreparable Harm.**

38.      Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.   Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.   Furthermore, the Complex Case Procedures provide that "on motion by the Debtors, a hearing will routinely be conducted within three business days to consider . . . cash collateral use[.]"   Complex Case Procedures, ¶ 4.A.

39.      In addition, pursuant to Bankruptcy Rule 6003, the Court may grant relief within 21 days after the filing of the petition regarding a motion to "use, sell, lease, or otherwise incur an obligation regarding property of the estate" only if such relief is necessary to avoid immediate and irreparable harm.   Fed. R. Bankr. P. 6003(b).   Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern.   *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

40.      As described herein and in the First Day Declaration and the DIP Declaration, the Debtors will suffer immediate and irreparable harm without authorization for the relief requested herein.   Accordingly, the Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order.   The Debtors require authority to obtain funds under the DIP Facility prior to the Final Hearing and entry of the Final Order to continue operating, pay its

administrative expenses, implement the relief requested in the Debtors' other "first day" motions and fund the administrative expenses of these chapter 11 cases.   This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to its estate and all parties in interest, pending the Final Hearing.

41.      Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code and Bankruptcy Rule 4001(b), the Debtors request that the Court conduct an expedited hearing on this Motion, and enter the proposed Interim Order authorizing the Debtors to obtain access to the DIP Facility and use the Cash Collateral.

**REQUEST FOR FINAL HEARING**

42.      Pursuant to Rules 4001(b)(2) and 4001(c)(2) of the Bankruptcy Rules, the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

**EMERGENCY CONSIDERATION**

43.      Pursuant to Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003, which provides that the Court may grant relief within the first twenty-one days after the Petition Date to the extent such relief is necessary to avoid immediate and irreparable harm.   As described herein and in the First Day Declaration and DIP Declaration, the relief requested is essential to avoid the immediate and irreparable harm that would be caused by the Debtors' inability to transition smoothly into chapter 11.   Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

**REQUEST FOR WAIVER OF BANKRUPTCY RULES 6004(a) AND (h)**

44.      The Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under

30

Bankruptcy Rule 6004(h).   As explained above and in the First Day Declaration and DIP Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## RESERVATION OF RIGHTS

45.      Nothing contained herein is intended or shall be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of any of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for or validity of any claim against the Debtors, (c) a waiver of any claims or causes of action which may exist against any creditor or interest holder, or (d) an approval, assumption, adoption or rejection of any agreement, contract, lease, program or policy between any Debtor and any third party under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of any of the Debtors' rights to dispute such claim.

## NOTICE

46.      Notice of this Motion has been provided by email, facsimile, or overnight courier to: (a) the Office of the U.S. Trustee for the Southern District of Texas; (b) parties listed on the modified Official Form 204 filed with the Debtors' petitions; (c) the United States Attorney's Office for the Southern District of Texas; (d) the Internal Revenue Service; (e) the state attorneys general for states in which the Debtors conduct business; (f) the Prepetition Lenders; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors respectfully submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **NO PRIOR REQUEST**

47.     No previous application for the relief sought herein has been made to this or any

other court.

*[Remainder of Page Intentionally Left Blank]*

**WHEREFORE**, the Debtors request that the Court (a) enter the Interim Order, (b) at the Final Hearing, enter the Final Order, and (c) grant such other and further relief as it may deem just and appropriate.

Date: December 3, 2024                Respectfully submitted,

                                      **GREENBERG TRAURIG, LLP**

                                      */s/ David R. Eastlake*
                                      David R. Eastlake (Texas Bar No. 24074165)
                                      Emily Nasir (Texas Bar No. 24118477)
                                      1000 Louisiana St., Suite 6700
                                      Houston, Texas 77002
                                      Telephone: (713) 374-3500
                                      Facsimile: (713) 374-3505
                                      Emails: EastlakeD@gtlaw.com
                                              Emily.Nasir@gtlaw.com

                                      -and-

                                      Nancy A. Peterman (admitted *pro hac vice*)
                                      Joseph P. Davis III (admitted *pro hac vice*)
                                      Danny Duerdoth (admitted *pro hac vice*)
                                      Greenberg Traurig, LLP
                                      77 West Wacker Drive, Suite 3100
                                      Chicago, Illinois 60601
                                      Telephone: (312) 456-8400
                                      Facsimile: (312) 456-8435
                                      Emails: PetermanN@gtlaw.com
                                              Davisjo@gtlaw.com
                                              DuerdothD@gtlaw.com

                                      *Proposed Counsel to the Debtors*
                                      *and Debtors in Possession*


## CERTIFICATION UNDER BANKRUPTCY LOCAL RULE 9013-1(i)

Pursuant to Bankruptcy Local Rule 9013-1(i), the undersigned counsel certifies that the basis for emergency relief set forth herein is accurate.

                                      */s/ David R. Eastlake*
                                      David R. Eastlake

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2024, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ David R. Eastlake
David R. Eastlake