**<u>Exhibit B</u>**

(DIP Term Sheet)

**COSMED GROUP, INC.**
**SPICEY PARTNERS REAL ESTATE HOLDINGS, LLC**

**Secured Superpriority Debtor in Possession Financing**
**Summary of Terms and Conditions**
**December 3, 2024**

The following is a summary of proposed terms and conditions by Zimmer, Inc. and/or one or more of its affiliates ("Zimmer" or the "DIP Lender") for the establishment of a senior secured term loan facility (the "DIP Facility") in favor of Cosmed Group, Inc. and Spicey Partners Real Estate Holdings, LLC, in their capacity as debtors-in-possession (collectively, the "Borrowers") in the chapter 11 cases (the "Chapter 11 Cases") commenced in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court").

This term sheet (together with the exhibits hereto, the "Term Sheet") shall be a binding agreement from and after, and subject to, the entry of the Interim DIP Financing Order with respect to the DIP Facility Loans (as defined below) but does not purport to summarize all of the terms, conditions, representations and other provisions with respect to the DIP Facility, which will be set forth in the DIP Documents (as defined below). The obligation of the DIP Lender to provide financing pursuant to this Term Sheet is conditioned upon the execution and delivery of signature pages to this Term Sheet by each of the parties hereto and shall be subject to the conditions precedent and other terms and conditions set forth herein. In the event of any conflict between this Term Sheet and the terms of the Interim DIP Financing Order or the Final DIP Financing Order (as defined below), the terms of the Interim DIP Financing Order or the Final DIP Financing Order (as applicable) shall govern.

| | |
|---|---|
| **Borrowers**: | Cosmed Group, Inc. ("Cosmed") and Spicey Partners Real Estate Holdings, LLC ("SPRE," and together with Cosmed, the "Borrowers"). |
| **DIP Lender**: | Zimmer, Inc. and/or one or more of its affiliates (the "DIP Lender"). |
| **DIP Facility**: | The DIP Lender will provide to the Borrowers a priming, senior secured, superpriority debtor-in-possession credit facility (the "DIP Facility") consisting of a multiple-draw delayed draw term loan facility in the aggregate maximum principal amount of up to $7.5 million (the "DIP Facility Commitment" and the portion thereof drawn by the Debtors, the "DIP Facility Loans"). |
| | The DIP Facility will be made available to the Borrowers through an initial maximum aggregate amount of up to $2 million (the "Interim Advance") following the entry of the Interim DIP Financing Order (defined below). The balance of the DIP Facility ($5.5 million) will be available only upon and after entry of the Final DIP Financing Order, with draws no more frequently, than bi-weekly absent exigent circumstances demonstrated by the Borrowers, and in accordance with the latest Approved Budget (as defined below). |

1

| | |
|---|---|
| | Pending the entry of the Final DIP Financing Order, the DIP Lender shall be afforded all of the protections contained in the Interim DIP Financing Order. |
| **Use of Proceeds**: | The DIP Facility Loans may be used only for:<br><br>i. Post-petition working capital and maintenance capital expenditure purposes of the Debtors;<br><br>ii. Current fees, and expenses under the DIP Facility;<br><br>iii. The allowed administrative costs and expenses of the Chapter 11 Cases, including professional fees and expenses;<br><br>iv. Payment of prepetition claims and expenses as authorized by the Bankruptcy Court;<br><br>v. Any forecasted cash outlays included in any Approved Budget; or<br><br>vi. As otherwise agreed;<br><br>in each case, other than iii. above, solely in accordance with the Approved Budget and the applicable DIP Financing Order incorporating the terms hereof. |
| **DIP Facility Interest Rate and Fees**: | The DIP Facility Loans shall accrue interest at 8.00%, with a default interest rate of an additional 2.00%, each of which shall be payable monthly in kind and added to the principal balance of the DIP Facility.<br><br>The DIP Facility shall provide for a commitment fee of 1.5% percent of the DIP Facility Commitment (the "Commitment Fee"), which shall be added to the principal balance of the DIP Facility on the Closing Date and thereafter shall be treated as DIP Facility Loans.<br><br>The DIP Facility shall provide for an exit fee of 1.5% percent of the DIP Facility Commitment (the "Exit Fee"). The Exit Fee shall be due and payable in cash upon the earlier of (i) the DIP Termination Date (as defined below) or (ii) payment in full of the DIP Obligations (as defined below), provided, however, if the DIP Termination Date has occurred solely as a result of the occurrence and continuation of an Event of Default under the DIP Documents, then the Exit Fee shall not be payable until the DIP Obligations have been accelerated by the DIP Lender. |

| Priority and Security: | Subject to the Carve-Out (as defined below), all obligations of the Borrowers under the DIP Facility (the "<u>DIP Obligations</u>") shall be: |
|---|---|
| | i.    entitled to superpriority claim status under section 364(c)(1) of the Bankruptcy Code with priority over all administrative expense claims now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113, 1114 and any other provision of the Bankruptcy Code, subject only to the Carve-Out (as defined below) (the "<u>DIP Superpriority Claims</u>").  The DIP Superpriority Claims may be repaid from any cash of the Debtors, including without limitation, Cash Collateral and, following entry of the Final Order, the proceeds of any of the estate's causes of action under Chapter 5 of the Bankruptcy Code ("<u>Avoidance Actions</u>") and property received or recovered thereby (the "<u>Avoidance Action Proceeds</u>"); |
| | ii.    secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by valid, enforceable, first priority, fully perfected security interests in and liens on all of the Debtors' rights in property of the Debtors' estates as of the Petition Date that, as of the Petition Date, were unencumbered (and do not become perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) (including, following entry of the Final DIP Financing Order, Avoidance Action Proceeds) (such liens, subject only to the Carve-Out); |
| | iii.    secured, pursuant to section 364(c)(3) of the Bankruptcy Code, by valid, enforceable, fully perfected security interests in and liens on all of the Debtors' rights in property of the Debtors' estates as of the Petition Date that, as of the Petition Date, were subject to valid, perfected and non-avoidable liens and unavoidable liens in existence immediately prior to the Petition Date, if any, that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (the "<u>Permitted Prior Liens</u>"),[1] which security interests and liens shall be junior and subordinate only to such Permitted Prior Liens and the Carve-Out; |
| | iv.    secured, pursuant to section 364(d)(1) of the Bankruptcy Code, by valid, enforceable, priming first priority, fully perfected security interests in and liens upon all of the |

---

[1]    The DIP Documents shall include a schedule of Permitted Prior Liens.

|  | Debtors' rights in property of the Debtors' estates as of the Petition Date, and all of the Debtors' rights in property acquired post-petition (and proceeds thereof), whether now existing or hereafter acquired or arising, that secure the Prepetition Debt (such lien, together with the liens described in clauses (i) through (iii) above, the "<u>DIP Liens</u>" and the collateral described in clauses (i)(iv) above, collectively, the "<u>DIP Collateral</u>"), which liens shall be subject to the Carve-Out.

The DIP Collateral shall also include any and all rents, issues, products, offspring, proceeds and profits generated by any item of DIP Collateral.

The DIP Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of any Debtor and their estates under section 551 of the Bankruptcy Code, (ii) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of any Debtor, or (iii) any intercompany or affiliate liens of any Debtor.

The DIP Collateral will be free and clear of other liens, claims and encumbrances, except valid, perfected, enforceable and unavoidable liens, rights of recoupment enforceable in bankruptcy, and rights of setoff permissible under section 553 of the Bankruptcy Code, in each case except as otherwise agreed by the applicable creditor or lienholder, as applicable, in existence as of the Petition Date and permitted pursuant to the Prepetition Loan Documents, if any, and any other Permitted Prior Liens.

The DIP Liens will automatically attach to the DIP Collateral and become valid and perfected immediately upon entry of the Interim DIP Financing Order without the requirement of any further action by the DIP Lender; *provided that* if the DIP Lender determines to file any financing statements, notice of liens or similar instruments, the Debtors will cooperate and assist in any such filings and the automatic stay shall be modified to allow such filing. |
| **Adequate Protection**: | Subject in all cases to the Carve-Out (as defined below), the Prepetition Lenders (as defined in the Cash Collateral Motion [ECF No. 29]) shall receive adequate protection for the Debtors' use of the collateral securing the Prepetition Loans as set forth in the Interim Cash Collateral Order [ECF No. 47]. |

4

| | |
|---|---|
| **Closing Date**: | The first business date on which the DIP Conditions Precedent below shall have been satisfied and the making of the Interim Advance shall have occurred (the "Closing Date"), which is expected to be within one (1) business day of entry of the Interim DIP Financing Order. |
| **DIP Conditions Precedent**: | The closing of the DIP Facility will be subject to the satisfaction of all conditions precedent to be set forth in this DIP Term Sheet deemed necessary or appropriate by the DIP Lender, including but not limited to: |

<table>
<tr><td></td><td></td><td>

i.     no later than two (2) days prior to the filing of the DIP Motion (as defined below), the DIP Lender shall have received a cash forecast for the period from the filing of the DIP Motion through the following 13-weeks setting forth projected cash flows and disbursements that is acceptable to the DIP Lender (the "Initial Approved Budget");

ii.     orders (which may be interim orders) approving all "first day" motions shall have been entered (including, without limitation, the cash management order);

iii.     other than as set forth herein, the Debtors shall not have executed, entered into or otherwise committed to any plan or restructuring support agreement or any other agreement or understanding concerning the terms of a chapter 11 plan or other exit strategy without the consent of the DIP Lender;

iv.     an interim debtor-in-possession financing order, substantially on the terms contemplated in this DIP Term Sheet (and otherwise acceptable to the DIP Lender in its sole discretion) (the "Interim DIP Financing Order"), shall have been entered by the Bankruptcy Court on or before December 10, 2024 and shall not have been vacated, reversed or stayed, appealed, or modified or amended without the prior written consent of the DIP Lender. Notwithstanding anything to the contrary contained herein, funding of the Interim Advance shall be subject to entry of the Interim DIP Financing Order, and funding of the balance of the DIP Facility Commitments shall be subject to entry, within thirty (30) days following the filing of the motion seeking authorizing to enter into the DIP Facility (the "DIP Motion"), of a final debtor-in-possession financing order, substantially on the terms contemplated by this DIP Term Sheet and in form and substance acceptable to the DIP Lender (the "Final DIP Financing Order" and, together with the Interim Order, collectively, the "DIP Financing Orders"), which shall not have been vacated, reversed or stayed, appealed (and for which the appeal period has expired or has

</td></tr>
</table>

<table>
<tr><td></td><td>

been waived), or modified or amended without the prior written consent of the DIP Lender;

v.   reimbursement in full in cash of the DIP Lender's reasonable and documented out-of-pocket costs and expenses; and

vi.   such other deliverables as the DIP Lender may reasonably require.

Modification of the DIP Financing Orders shall require the consent of the DIP Lender, in its sole discretion.  With the exception of condition v. (entry of Interim DIP Financing Order), DIP Lender may, in its sole discretion, waive any of the above conditions precedent.

</td></tr>
<tr><td>

**Conditions Precedent to DIP Facility Loans**:

</td><td>

The obligations of the DIP Lender to make any DIP Facility Loan will be subject to conditions precedent customarily found in loan documents for similar debtor-in-possession financings, including, but not limited to:

i.   (a) with regard to the Interim Advance, the Interim DIP Financing Order shall have been entered in a form acceptable to the DIP Lender in its sole and exclusive discretion and shall be in full force and effect, shall not have been vacated or reversed, and shall not be subject to any stay and (b) with regard to the balance of the DIP Facility Loans, the Final DIP Financing Order shall have been entered in a form acceptable to the DIP Lender in its sole and exclusive discretion and shall be in full force and effect, shall not have been vacated or reversed, and shall not be subject to any stay;

ii.   With regard to all DIP Facility Loans other than the Interim Advance, a definitive credit agreement (the "<u>DIP Credit Agreement</u>") and related security agreement(s),  security documents, and other agreements, instruments and documents required by the DIP Lender (collectively, and together with the DIP Credit Agreement, the "<u>DIP Documents</u>") shall have been executed and delivered by the Debtors to the DIP Lender, in form and substance acceptable to the DIP Lender in its sole and exclusive discretion;

iii.   The Borrowers shall be in compliance with the terms of the Interim DIP Financing Order or the Final DIP Financing Order, as applicable;

iv.   the Approved Budget shall demonstrate a need for the funds to be advanced under such credit extension within the next two weeks, there shall be at least two (2) weeks between each drawing, and the Borrowers shall have delivered at least three (3) business days prior to the applicable draw date (or such shorter period as the DIP Lender may agree in its sole

</td></tr>
</table>

<table>
<tr><td></td><td>

discretion) a borrowing notice showing the proposed use of such funds within the next two (2) weeks in accordance with an Approved Budget that was approved within the last week;

v.   the Debtor shall have provided a certificate confirming that all of the representations and warranties of the Debtors in this DIP Term Sheet or the DIP Documents, as applicable, remain true and correct, unless otherwise agreed by the DIP Lender;

vi.   there shall be no defaults or Events of Default under the terms of this DIP Term Sheet or the DIP Documents, as applicable, or any defaults or Events of Default shall have been waived by the DIP Lender; and

vii.   the Borrowers shall be in compliance with the Milestones (as set forth below).

With the exception of condition i. above (entry of Interim DIP Financing Order and entry of Final DIP Financing Order), DIP Lender may, in its sole discretion, waive any of the above conditions precedent.

</td></tr>
<tr><td>

**Milestones:**

</td><td>

Subject to Bankruptcy Court availability, each of the Debtors will agree to comply with the following deadlines (each of which may be extended or waived with the prior written consent of the DIP Lender, which may be by e-mail, without further order of the Bankruptcy Court) (collectively, the "Milestones"):

i.   The Bankruptcy Court shall have entered the Interim DIP Financing Order on or before December 10, 2024.

ii.   The Debtors shall have sought the retention of an investment banker reasonably acceptable to the DIP Lender (the "Investment Banker") by the date that is no later than ten (10) days following the filing of the DIP Motion.

iii.   The Bankruptcy Court shall have entered the Final Order by the date that is no later than thirty (30) days after the filing of the DIP Motion.

iv.   The Debtors shall file, by the date that is no later than forty-five (45) days after the Petition Date, a motion to sell all or substantially all of the Debtors' assets through a sale pursuant to section 363 of the Bankruptcy Code in form and substance reasonably acceptable to the DIP Lender (the "Sale Motion").

v.   The Bankruptcy Court shall have entered an order approving the bidding procedures of the sale contemplated by the Sale Motion (the "Sale") by the date that is no later than sixty-five (65) days after the Petition Date.

</td></tr>
</table>

7

| | |
|---|---|
| | vi.      The Bankruptcy Court shall have entered an order approving the Sale by the date that is no later than one-hundred and ten (110) days after the Petition Date. |
| | vii.     The Sale shall be consummated by the date that is no later than one-hundred and twenty (120) days after the Petition Date. |
| | viii.    A liquidating chapter 11 plan shall be consummated by the date that is no later than ninety (90) days after consummation of the Sale. |
| | The extension of any Milestone is subject to the consent of the DIP Lender at its sole discretion.  For the avoidance of doubt, the DIP Lender reserves the right to amend the dates set forth for each of the Milestones in a proposed Final DIP Financing Order to be filed with the Court no later than seven (7) days before any such hearing to consider entry of the Final DIP Financing Order (the "Final DIP Hearing"). |
| **Representations and Warranties**: | The DIP Documents will contain representations and warranties customary for debtor-in-possession facilities of this size, type and purpose. |
| **Prepayments**: | The Borrowers may voluntarily, at any time, prepay any of the DIP Obligations and/or reduce the commitments under the DIP Facility at par plus accrued interest.<br><br>Until the DIP Facility has been repaid in full, and subject to the Carve-Out, the following mandatory prepayments will be required to be made toward the DIP Facility within three (3) business days of receipt by any Debtor:  (i) 100% of any net cash proceeds from any asset disposition; (ii) 100% of any proceeds received (x) under any insurance policy on account of the damage or destruction of any assets or property of any Debtor and (y) due to any taking or condemnation of any assets or property; (iii) 100% of the net cash proceeds of the incurrence or issuance of any indebtedness or equity by any Debtor; *provided that* no Debtor shall incur or issue any additional postpetition superpriority indebtedness or liens unless such amount shall be sufficient to prepay the DIP Facility in cash in full; (iv) 100% of any proceeds received or any cash received by or paid to or for the account of any Debtor not in the ordinary course of business, including but not limited to tax refunds, pension plan reversions, indemnity payments and any purchase price adjustments (other than casualty and condemnation event proceeds) and (v) the consummation of the Sale. |

ACTIVE 704688173v1

| | |
|---|---|
| **Reporting and Information:** | Reporting requirements usual and customary for financings of this type, including, without limitation, the requirement that the Borrowers provide the DIP Lender, with reasonable promptness, such information regarding the operations, business affairs and financial condition of the Debtors as the DIP Lender may reasonably request in writing from time to time. |
| **Budget; Variance Covenant; Other Financing Covenants**: | The Debtors shall prepare for the DIP Lender's review and approval a thirteen-week (13-week) detailed rolling cash projection similar in form to the 13-week cash projection attached hereto as **Exhibit A** (the "Initial Approved Budget"), which shall be thereafter updated, as necessary, not later than March 2, 2025 (each, a "Proposed Budget," together with the Initial Approval Budget, the "Budget"). |
| | Upon the Debtors' receipt of the DIP Lender's approval (in its sole discretion and in writing, with e-mail notice being sufficient) of a Proposed Budget, such budget shall become an "Approved Budget" and shall replace the then-operative Approved Budget for all purposes. |
| | The Initial Approved Budget shall be the Approved Budget until such time as a new Proposed Budget is approved, following which such Proposed Budget shall constitute the Approved Budget until a subsequent Proposed Budget is approved.  The Debtors shall operate in accordance with the Approved Budget and all disbursements shall be consistent with the provisions of the Approved Budget (subject to the Permitted Variance (as defined below)).  The Debtors may submit additional Proposed Budgets to the DIP Lender, but until the DIP Lender approves such Proposed Budget in writing, it shall not become an Approved Budget and the Debtors shall continue to comply with the then-operative Approved Budget.  The DIP Lender's failure to respond to any submitted Proposed Budget within two (2) business days following submission thereof shall be deemed to be the DIP Lender's approval of the same, whereupon such Proposed Budget shall constitute an Approved Budget; however, DIP Lender's written notice within two (2) business days following submission of the submitted Proposed Budget that such submitted Proposed Budget is still under consideration shall not be considered a "failure to respond." |
| | Subject to the schedule below, and beginning on Monday, January 6, 2024 (the "Initial Reporting Date, and with each subsequent Monday, collectively and individually, each a "Reporting Date"), the Debtors shall deliver to the DIP Lender, in a form consistent with the form of the Approved Budget, a variance report describing in reasonable detail, by line item (including capital expenditures and professional fees, excluding the fees of Lender's professionals), (i) the actual |

ACTIVE 704688173v1

disbursements of the Debtors and actual receipts during the applicable Testing Period (as defined below); (ii) any variance (whether positive or negative, expressed as a percentage) between the actual receipts or disbursements, as applicable, during such Testing Period against the estimated receipts or disbursements, as applicable, for the applicable Testing Period, as set forth in the applicable Approved Budget (each a "Variance Report"); and (iii) comments relating to any variances between budgeted and actual disbursements/receipts (the "FA Reports").

As used herein, "Testing Period" shall mean the cumulative period from the beginning date of the Approved Budget through the Sunday that is eight calendar days prior to the applicable Reporting Date. The last day of each Testing Period shall be a "Testing Date".

The FA Report provided no later than the Initial Reporting Date shall report on the Testing Period ended December 15, 2024 (such Testing Period to be referred to as "Week 1"). The FA Reports for the two Testing Periods ended December 22, 2024 and December 29, 2024 (referred to as "Week 2" and "Week 3," respectively) shall be provided to the DIP Lender on January 13, 2025. The FA Report for the Testing Period ended January 5, 2025 (referred to as "Week 4") shall be provided to the DIP Lender on January 21, 2025.[2] Beginning with the Testing Period ended January 12, 2025 (referred to as "Week 5") and for each subsequent Testing Period thereafter, each FA Report shall be provided on a weekly basis no later than the Monday of the week that is a full week after the week for which the FA Reports relate.

As of any applicable Testing Date, actual cumulative disbursements (excluding DIP Lender professional fees) on an aggregate basis (the "Actual Disbursement Variance") shall not exceed budgeted cumulative disbursements (excluding DIP Lender professional fees) on an aggregate basis as reflected in the Approved Budget for such period, by more than 15.0% (the "Permitted Disbursement Variance"); *provided that* the actual cumulative Cash receipts on an aggregate basis (the "Actual Cash Variance," together with the Actual Disbursement Variance, the "Actual Variances") shall not exceed budgeted cumulative Cash receipts on an aggregate basis as reflected in the Approved Budget for such period, by more than 50.0% (the "Permitted Cash Variance," together with the Permitted Disbursement Variance, the "Permitted Variances").

---

[2]   To account for the holiday on Monday, Jan. 20.

ACTIVE 704688173v1

| | |
|---|---|
| | If the Actual Variances for such period are less than or equal to the Permitted Variances, the amount by which each Actual Variance is less than the Permitted Variance shall be carried forward to the next Testing Date and added to the Permitted Variance for such next Testing Date.

The Debtors shall be deemed to be in compliance with the Approved Budget for all purposes under this DIP Term Sheet and the DIP Financing Orders unless, as of any Testing Date, the Debtors' actual disbursements or actual Cash receipts vary from the Approved Budget by more than the applicable Permitted Variances as measured on any Testing Date (the "Variance Covenant").

The financial advisor for the DIP Lender and the financial advisor for the Debtors shall hold weekly calls to discuss the Budget and relevant portions of the Chapter 11 Cases, including actual performance against the Approved Budget, status of the Sale process, and receive a business update.

The Investment Banker shall provide weekly process reporting to the financial advisor for the DIP Lender and shall hold weekly calls with the financial advisor to the DIP Lender.

DIP Lender may, in its sole discretion, waive or extend any of the foregoing Approved Budget or Variance reporting or approval procedures, provided such procedure change is not more onerous or otherwise adverse to the Debtor.

For the avoidance of doubt, the terms of the financial reporting package, Budget, and FA Reports may be re-negotiated prior to the hearing on the Final DIP Financing Order. |
| **Affirmative Covenants**: | The DIP Documents will contain affirmative covenants customary for debtor-in-possession facilities of this size, type and purpose including, but not limited, to the following as reasonably determined by the DIP Lender:

   i.     Compliance with the Milestones.

   ii.    The Borrowers shall at all times, (a) comply with the DIP Financing Orders and each other order entered by the Bankruptcy Court in the Chapter 11 Cases and all applicable laws, rules and regulations, (b) comply with the Approved Budget, subject to the Permitted Variances, (c) provide reasonable access to the DIP Lender to the Borrowers' financial advisors, management team and books and records and other information (including historical information), in all |

| | |
|---|---|
| | cases, including with respect to strategic planning, cash, and liquidity management, and operational and restructuring activities (subject to customary exceptions) during normal business hours, and (d) operate in the ordinary course of business. |
| | iii.  Compliance with the Approved Budget, including delivery of each Proposed Budget and Variance Report. |
| | DIP Lender may, in its sole discretion, waive any of the above affirmative covenants. |
| **Negative Covenants:** | The DIP Documents will contain negative covenants customary for debtor-in-possession facilities of this size, type and purpose including, but not limited to, the following as reasonably determined by the DIP Lender: |
| | i.  The Borrowers will not seek any other debtor-in-possession financing with liens senior or *pari passu* to the DIP Lender's liens during the pendency of its bankruptcy proceedings unless such financing is sufficient in amount and is actually used to fully repay all DIP Obligations and all other post-petition indebtedness of the Borrowers to the DIP Lender. |
| | ii.  The Borrowers shall not use any funds or the proceeds of the DIP Facility in a manner or for a purpose other than in accordance the Approved Budget, or on such other terms as the DIP Lender may agree. |
| | iii.  Without the prior written consent of the DIP Lender, the Borrowers will not sell, lease or otherwise transfer or dispose of any material assets of the Borrowers, other than in the ordinary course of business, or otherwise in accordance with the Approved Budget. |
| | iv.  The Borrowers shall not open any new deposit or securities accounts; *provided however*, the Borrowers may open deposit or securities accounts if such account is pledged to the DIP Lender and the DIP Lender has received an account control agreement in form and substance reasonably acceptable to the DIP Lender. |
| | v.  No Borrower shall do, cause to be done, and agree to do or cause to be done any of the following: (a) create, incur, assume or permit to exist any indebtedness or liens, other than in respect of the DIP Facility, other than Permitted Liens (as defined in the applicable documents); (b) purchase, hold or acquire (including pursuant to any merger, consolidation or amalgamation with a person that is not a wholly owned subsidiary immediately prior to such merger, consolidation or amalgamation) any equity interests, evidences of indebtedness |

or other securities of, make or permit to exist any loans or advances to or guarantees of the obligations of, or make or permit to exist any investment or any other interest in any other person other than the subsidiaries of the Borrowers as of the petition date; (c) merge into, or consolidate or amalgamate with, any other person, or permit any other person to merge into or consolidate with it, or sell, transfer, license, lease or otherwise dispose of (in one transaction or in a series of transactions) all or any part of its assets, or issue, sell, transfer or otherwise dispose of any equity interests of any Borrower or any subsidiary of any Borrower, or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or any substantial part of the assets of any other person or any division, unit or business of any other person, other than (i) asset sales approved by an order of the Bankruptcy Court that is in form and substance acceptable to the DIP Lender in its reasonable discretion or is otherwise in accordance with the Approved Budget, (ii) asset sales in the ordinary course of business and consistent with past practice and (iii) dispositions of obsolete, worn out, used or surplus property in the ordinary course of business and consistent with past practice; (d) incur or make any dividend or distribution (whether in cash, property, securities or otherwise), investment, loan or other payment without the prior written consent of the DIP Lender, other than as expressly contemplated under the Approved Budget; (e) modify or alter (i) in any material manner the nature and type of its business or the manner in which such business is conducted or (ii) its organizational documents, except as required by the Bankruptcy Code or a plan of reorganization and otherwise acceptable to the DIP Lender; (f) subject to the DIP Lender's discretion, not to be unreasonably withheld, assume or reject any executory contract or unexpired lease; (g) engage in any activities that would result in any Borrower becoming an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940; or (h) transfer any cash or cash equivalents that constitute DIP Collateral to a subsidiary of any Borrower without the prior written approval of the DIP Lender (other than as expressly contemplated under the Approved Budget).

vi.   Such additional covenants as the DIP Lender and the Borrowers may agree.

DIP Lender may, in its sole discretion, waive any of the above negative covenants.

| Events of Default: | "<u>Events of Default</u>" under the DIP Facility shall contain events of default usual and customary for debtor-in-possession facilities of this size, type and purpose including, but not limited to, the following as determined by the DIP Lender: |
|---|---|
| | i.     the Interim DIP Financing Order at any time ceases to be in full force and effect, or shall be vacated, reversed or stayed, or modified or amended, or shall not have been entered on or before December 10, 2024; |
| | ii.     the Final DIP Financing Order at any time ceases to be in full force and effect, or shall be vacated, reversed or stayed, modified or amended, or shall not have been entered within thirty (30) days after the DIP Motion is filed; |
| | iii.     failure of the Debtors to comply in any material respect with the terms of the applicable DIP Financing Order; |
| | iv.     the failure of any Debtor to (a) comply with the Variance Covenant, (b) have an Approved Budget; (c) comply with any negative covenant or certain other customary affirmative covenants in the DIP Term Sheet or with any other covenant or agreement contained in the DIP Financing Orders or DIP Documents in any respect or (d) comply with any other covenant or agreement contained in this DIP Term Sheet subject, in the case of the foregoing clause (d), to a grace period of five (5) business days; |
| | v.     other than payments authorized by the Bankruptcy Court and which are set forth in the Approved Budget to the extent authorized by one or more "first day" or other orders reasonably satisfactory to the DIP Lender, any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables; |
| | vi.     any of the Chapter 11 Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; a Chapter 11 trustee or an examiner (other than a fee examiner) with enlarged powers relating to the operation of the business of any Debtor (powers beyond those expressly set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed, (b) any other superpriority claim or grant of any other lien (including any adequate protection lien) other than as provided for herein which is *pari passu* with or senior to the claims and liens of the DIP Lender shall be granted in any of the Chapter 11 Cases, or (c) the filing of any pleading by any Debtor seeking or |

|  |  | otherwise consenting to or supporting any of the matters set forth in clause (a) or clause (b) of this subsection (vi); |
|  | vii. | the Bankruptcy Court shall enter one or more orders during the pendency of the Chapter 11 Cases granting relief from the automatic stay to the holder or holders of any lien evidencing indebtedness in excess of $200,000 to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on assets of any Debtor; |
|  | viii. | the Debtors petition the Bankruptcy Court to obtain additional financing *pari passu* or senior to the DIP Facility; |
|  | ix. | the Debtors' "exclusive period" under section 1121 of the Bankruptcy Code for the filing of a plan of reorganization terminates; |
|  | x. | the consummation of a sale of any material portion of the DIP Collateral without the DIP Lender's prior written consent (other than through the contemplated Sale or a sale in the ordinary course of business that is contemplated by the Approved Budget); |
|  | xi. | the confirmation of a plan of reorganization or liquidation that does not provide for payment in full in cash of the DIP Facility Loans or such other treatment acceptable to DIP Lender, or any Debtor proposes or supports, or fails to contest in good faith, the entry of such a plan of reorganization or liquidation; |
|  | xii. | any Debtor (A) engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of the DIP Facility or the liens on or security interest in the assets of the Debtors securing the DIP Obligations, including without limitation seeking to equitably subordinate or avoid the liens securing such indebtedness or (B) engages in or supports any investigation or asserts any claims or causes of action (or directly or indirectly support assertion of the same) against the DIP Lender; |
|  | xiii. | the entry of an order by the Bankruptcy Court in favor of any statutory committee appointed in these Cases by the U.S. Trustee (each, a "Committee"), any ad hoc committee, or any other party in interest, (i) sustaining an objection to claims of the DIP Lender, or (ii) avoiding any liens held by the DIP Lender; |
|  | xiv. | the allowance of any claim or claims under section 506(c) of the Bankruptcy Code against any of the DIP Collateral; |

|  |  |
|---|---|
|  | xv.      the inaccuracy in any material respect of any representation of any Debtor when made or deemed made; |
|  | xvi.      the failure to meet any Milestone; |
|  | xvii.      entry of an order by the Bankruptcy Court in favor of any Committee, any ad hoc committee, or any other party in interest, (i) granting such party standing to pursue any claims against the DIP Lender, (ii) sustaining an objection to claims of the DIP Lender, or (iii) avoiding any liens held by the DIP Lender; and |
|  | xviii.      the Termination Date (as defined below) shall have occurred. |
| **Remedies**: | Upon the occurrence and during the continuance of any Event of Default, and without further application to the Bankruptcy Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to take any of the following actions, at the same or different time: |
|  | i.      issue a written notice (the "<u>Remedies Notice</u>") (which may be by e-mail) to the Debtors and their counsel, counsel for any Committee, and the U.S. Trustee (the "<u>Remedies Notice Parties</u>") declaring the occurrence of the Termination Date (as defined below); |
|  | ii.      issue a Carve-Out Notice (as defined below); |
|  | iii.      declare all DIP Obligations to be immediately due and payable without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Debtors; |
|  | iv.      declare the suspension or termination of the DIP Facility as to any further liability or obligation of the DIP Lender thereunder, but without affecting the DIP Liens or DIP Obligations (the "<u>Termination Notice</u>"); and |
|  | v.      charge the default rate of interest under the DIP Facility. |
|  | During the five business (5) days immediately following the date the DIP Lender delivers a Remedies Notice to the Remedies Notice Parties (the "<u>Remedies Notice Period</u>"), the DIP Lender and/or Debtors may seek an emergency hearing (a "<u>Stay Relief Hearing</u>") to determine whether an Event of Default has occurred, and the filing of any such motion shall toll the Remedies Notice Period. In the event the Bankruptcy Court determines during a Stay Relief Hearing that an Event of Default has occurred, the Court may fashion an appropriate remedy, which may include the exercise of any and all rights available to the DIP Lender under this DIP Term Sheet, the DIP Credit |

ACTIVE 704688173v1

| | Agreement, the Interim DIP Financing Order, and/or the Final DIP Financing Order, as applicable.<br><br>Upon expiration of the Remedies Notice Period, if a motion seeking emergency relief has not been filed or unless ordered otherwise by the Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified without further order of the Bankruptcy Court to the extent necessary to permit the DIP Lender to exercise any and all remedies against the DIP Collateral permitted under state law.<br><br>During the Remedies Notice Period, the Borrowers shall be authorized to use cash collateral in accordance with the Approved Budget. |
|---|---|

17

| | |
|---|---|
| **Maturity/Termination Date**: | The DIP Facility shall automatically terminate without further notice or court proceedings on the earliest to occur of: |
| |     i.    six (6) months after entry of the Interim DIP Financing Order (the "<u>Scheduled Maturity Date</u>"); |
| |     ii.    the effective date of a plan of reorganization or liquidation for the Debtors confirmed in the Chapter 11 Cases; |
| |     iii.    the date of termination of the commitments under the DIP Facility and/or acceleration of any outstanding borrowings under the DIP Facility, in each case, by the DIP Lender following the occurrence of an Event of Default and upon the delivery of a Termination Notice to the Remedies Notice Parties, in each case, subject to the Debtors' right to use Cash Collateral during the Remedies Notice Period as set forth above, and pending the outcome of the Stay Relief Hearing; |
| |     iv.    the first business day on which the Interim DIP Financing Order expires by its terms or is terminated, unless the Final DIP Financing Order has been entered and become effective prior thereto; |
| |     v.    the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code unless otherwise consented to in writing (which may be e-mail) by the DIP Lender; |
| |     vi.    the dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing (which may be e-mail) by the DIP Lender; or |
| |     vii.    the repayment in full in cash of all obligations and termination of all commitments under the DIP Facility |
| | (each, a "<u>Termination Date</u>"), unless extended with the prior written consent (which may be by e-mail) of the DIP Lender. |
| **Carve-Out**: | Notwithstanding anything to the contrary in this DIP Term Sheet, or the DIP Financing Orders, the DIP Facility shall be subject and subordinate to the Carve-Out. |
| | The Carve-Out shall include (a) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the Carve-Out Notice), (b) all reasonable fees and expenses up to $10,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the Carve-Out Notice), (c) to the extent allowed by the Bankruptcy Court at any time, unpaid fees and expenses ("<u>Allowed Professional Fees</u>") |

ACTIVE 704688173v1

|  | of estate professionals incurred through the date of delivery of a Carve-Out Notice (defined below) up to the amounts for such professional included in the Approved Budget through the date of the Carve-Out trigger notice, and (d) to the extent allowed by the Bankruptcy Court at any time, up to $500,000 of fees and expenses incurred by persons or firms retained by (i) the Debtors pursuant to Sections 327, 328, or 363 of the Bankruptcy Code or (ii) any committee appointed in the cases ((i) and (ii) together, the "<u>Estate Professionals</u>") after the first business day following delivery of a Carve-Out Notice (excluding, for the avoidance of doubt, any success fee, transaction fee, deferred fee or other similar fee set forth in any professional's engagement letter, the amounts set forth in this clause (d) being the "<u>Post Carve-Out Notice Cap</u>").

"<u>Carve-Out Notice</u>" means a written notice (which may be by e-mail) by the DIP Lender to the Debtors, Debtors' counsel, the U.S. Trustee, and counsel to any Committee stating that the Post Carve-Out Notice Cap has been invoked, which notice may be delivered only following the occurrence and during the continuation of an Event of Default.

Delivery of a Carve-Out Notice shall constitute a demand to the Debtors to utilize all cash on hand (including the proceeds of DIP Facility Loans) to fund a reserve in an amount equal to the Carve-Out, which shall be earmarked and held in trust to pay unpaid fees and expenses incurred by Estate Professionals, to the extent allowed by the Bankruptcy Court at any time, prior to any and all other claims in the Cases (the "<u>Carve-Out Reserve</u>").

All funds in the Carve-Out Reserve shall be used first to pay the obligations set forth in clauses (a)-(d) in the above definition of "Carve-Out" until paid in full, and second, to pay the DIP Lender until paid in full.  Notwithstanding anything to the contrary in this DIP Term Sheet or the DIP Financing Orders, the failure of the Carve-Out Reserve to satisfy in full the fees of Estate Professionals shall not affect the priority of the Carve-Out. |
|---|---|
| **Credit Bidding**: | The Final DIP Financing Order shall provide that the DIP Lender shall have the right to credit bid (pursuant to section 363(k) of the Bankruptcy Code and/or applicable law) the DIP Facility Loans in whole or in part, in connection with any sale or disposition of assets by the Debtors in the Chapter 11 Cases and shall not be prohibited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code. |
| **DIP Facility Amendments**: | In order to amend, waive, or modify provisions related to this DIP Term Sheet or any of the DIP Documents, the express written consent of the DIP Lender shall be required. |

19

| | |
|---|---|
| **Section 506(c) Waiver**: | The Final DIP Financing Order shall include a ruling that, except to the extent of the Carve-Out, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from any DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender; and the Debtors shall irrevocably waive and shall be prohibited from asserting any claim described in this paragraph, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender upon the DIP Collateral. |
| **No Marshaling**: | The Final DIP Financing Order shall provide that the DIP Lender may exercise all remedies available under this DIP Term Sheet and the DIP Documents, as applicable, without any requirement first to look to exercise any of its or their rights against any particular collateral or party or to exhaust any remedies available to it or them against any particular collateral or party or to resort to any other source or means of obtaining payment of any of such obligations or to elect any other remedy.  Subject to entry of the Final DIP Financing Order, in no event shall any of the DIP Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the collateral securing the DIP Facility Loans. |
| **Section 552(b)**: | The Final DIP Financing Order shall provide that the DIP Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, the "equities of the case" exception under sections 552(b)(i) and (ii) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, products, rents, issues or profits of any of their collateral, and no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the collateral under section 552(b) of the Bankruptcy Code.<br><br>Furthermore, subject to entry of the Final DIP Financing Order, the Debtors and their estates shall be deemed to have irrevocably waived and have agreed not to assert any claim or right under sections 552 or 726 of the Bankruptcy Code to avoid the imposition of the liens of the DIP Lender on any property acquired by any of the Debtors or any of their estates or to seek to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by, the DIP Lender upon the DIP Collateral. |

20

| **Restrictions on Use of DIP Facility Loans**: | None of the Carve-Out, the DIP Facility Loans, or the DIP Collateral may be used to challenge the amount, validity, perfection, priority or enforceability of, or assert any defense, counterclaim or offset to, the DIP Facility, this DIP Term Sheet, or the DIP Documents, or the security interests and liens securing any of the DIP Obligations, or to fund prosecution or assertion of any claims, or to otherwise litigate against the DIP Lender, provided that up to $25,000 shall be made available to the Committee (if any) for investigation costs in respect of the stipulations contemplated below or otherwise set forth in the DIP Financing Orders. |
|---|---|
| **Payment of Expenses**: | The reasonable and documented fees and out-of-pocket expenses incurred or accrued by the DIP Lender and its counsel, Faegre Drinker Biddle & Reath LLP and any financial advisor retained by the DIP Lender in connection with the Chapter 11 Cases (the foregoing to include all unpaid reasonable and documented prepetition fees, out-of-pocket costs and expenses incurred by the DIP Lender in connection with the DIP Facility) in connection with any and all aspects of the Debtors' Chapter 11 Cases shall be timely paid upon receipt of an invoice or other request for payment in accordance with the DIP Financing Orders. |
| **Indemnification**: | The Debtors shall agree to indemnify and hold harmless the DIP Lender (solely in its capacity as DIP Lender) and its affiliates and each of their officers, directors, employees, agents, advisors, attorneys and representatives (each, an "<u>Indemnified Party</u>") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable and documented fees and out-of-pocket expenses of counsel), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), arising out of or in connection with or by reason of the DIP Facility, or any of transactions contemplated hereby, except to the extent arising from an Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any of the Debtors, any of their respective directors, security holders or creditors, an Indemnified Party or any other person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. |

21

| **Fiduciary Duties**: | Notwithstanding anything to the contrary in this DIP Term Sheet or the DIP Financing Orders, or any other document, order, or instrument, nothing in the DIP Term Sheet or the DIP Financing Orders shall require the Debtors, the Debtors' board of directors, or any similar governing body of the Debtors, after consulting with counsel, to take any action or to refrain from taking any action with respect to any alternative financing transaction to the extent taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under applicable law.  To extent of any conflict between this provision and any other provision in this DIP Term Sheet, this provision will control. |
|---|---|
| **Miscellaneous**: | This summary of terms and conditions does not purport to summarize all of the conditions, covenants, representations, warranties and other provisions that would be contained in definitive credit documentation for the DIP Facility contemplated hereby, all of which shall be acceptable to the DIP Lender. |
| **Governing Law**: | The laws of the State of New York (excluding the laws applicable to conflicts or choice of law), except as governed by the Bankruptcy Code. |

ACTIVE 704688173v1

IN WITNESS WHEREOF, this DIP Term Sheet is duly executed as of the date first set forth above.

**COSMED GROUP, INC.**
**SPICEY PARTNERS REAL ESTATE HOLDINGS, LLC**

By: _____
　　　Name: David G. Howe
　　　Title: Chief Operating Officer

**ZIMMER, INC.**

By: _____
　　　Name: _____
　　　Title: _____

*[Signature Page to DIP Term Sheet]*

# **EXHIBIT A**

## **Initial Approved Budget**

ACTIVE 704524941v2

ACTIVE 704688173v1

**Cosmed Group Inc and Subsidiary**
**13 Week Cash Flow Projections**

| | 1 | 2 | 3 | 4 | 5 | 6 | Post Petition 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Estimate 11/14/24 to 11/17/24 | Estimate Wk Ended 11/24/24 | Projected Wk Ended 12/1/24 | Projected Wk Ended 12/8/24 | Projected Wk Ended 12/15/24 | Projected Wk Ended 12/22/24 | Projected Wk Ended 12/29/24 | Projected Wk Ended 1/5/25 | Projected Wk Ended 1/12/25 | Projected Wk Ended 1/19/25 | Projected Wk Ended 1/26/25 | Projected Wk Ended 2/2/25 | Projected Wk Ended 2/9/25 | total 13 Weeks |
| **Cash Receipts** | | | | | | | | | | | | | | |
| AR Collections- Sterilization | 340,250 | 340,250 | 288,813 | 288,813 | 288,813 | 288,813 | 288,813 | 288,813 | 288,813 | 288,813 | 288,813 | 304,563 | 304,563 | 3,888,938 |
| AR Collections - Chamber | - | - | - | - | - | - | - | - | - | - | - | - | 720,000 | 720,000 |
| total Collections | 340,250 | 340,250 | 288,813 | 288,813 | 288,813 | 288,813 | 288,813 | 288,813 | 288,813 | 288,813 | 288,813 | 304,563 | 1,024,563 | 4,608,938 |
| **Cash Disbursements:** | | | | | | | | | | | | | | |
| **Operating:** | | | | | | | | | | | | | | |
| Purchases | - | 93,355 | - | - | - | 93,355 | - | - | - | - | 81,219 | - | - | 267,928 |
| Supplies | - | 47,025 | - | - | - | 47,025 | - | - | - | - | 47,025 | - | - | 141,076 |
| Lab Services | - | 9,521 | - | - | - | 9,521 | - | - | - | - | 9,521 | - | - | 28,563 |
| Cost of Sales -Other | - | 8,430 | - | - | - | 8,430 | - | - | - | - | 8,430 | - | - | 25,289 |
| Chamber Production | - | - | - | - | 232,031 | 7,031 | 7,031 | 7,031 | 7,031 | 232,031 | 7,031 | 7,031 | 7,031 | 513,281 |
| Wages & Payroll Taxes | 70,627 | 70,627 | 193,080 | 70,627 | 310,964 | 70,627 | 70,627 | 200,931 | 70,627 | 70,627 | 70,627 | 200,931 | 70,627 | 1,541,548 |
| Employee Benefits | - | 85,600 | - | - | - | - | 85,600 | - | - | - | 85,600 | - | - | 256,800 |
| Repair & Maintenance | - | 65,914 | - | - | - | 65,914 | - | - | - | - | 65,914 | - | - | 197,743 |
| Rent | - | - | 211,802 | - | - | - | - | 211,802 | - | - | - | 211,802 | - | 635,406 |
| Property Taxes | - | - | 18,944 | - | - | - | 18,944 | - | - | - | - | 18,944 | - | 56,833 |
| Utilities | - | 83,424 | - | - | - | 83,424 | - | - | - | - | 83,424 | - | - | 250,271 |
| Insurance | - | - | 222,190 | - | - | - | 22,777 | - | - | - | - | 25,277 | 58,016 | 328,260 |
| Professional Fees - OCP | - | - | - | - | - | - | 125,000 | - | - | - | - | 125,000 | - | 250,000 |
| Office Expense | - | 36,744 | - | - | - | 36,744 | - | - | - | - | 36,744 | - | - | 110,232 |
| T&E | - | 3,379 | - | - | - | 3,379 | - | - | - | - | 3,379 | - | - | 10,136 |
| Automobile Expense | - | 6,028 | - | - | - | 6,028 | - | - | - | - | 6,028 | - | - | 18,083 |
| SG&A-Other | - | 53,073 | - | - | - | 53,073 | - | - | - | - | 53,073 | - | - | 159,218 |
| Contingency | - | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| | | | | | | | | | | | | | | - |
| total - Operating Disbursements | 70,627 | 568,119 | 651,016 | 75,627 | 547,995 | 489,550 | 316,035 | 443,709 | 82,658 | 307,658 | 563,014 | 593,986 | 140,674 | 4,850,667 |
| Oper. Cash Flow | 269,623 | (227,869) | (362,204) | 213,186 | (259,182) | (200,737) | (27,222) | (154,896) | 206,154 | (18,846) | (274,201) | (289,423) | 883,888 | (241,730) |
| **Debt Service:** | | | | | | | | | | | | | | |
| First Lienholder-P&I | - | - | 91,466 | - | - | - | - | 91,466 | - | - | - | 91,466 | - | 274,398 |
| DIP Financing - costs | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| total debt service | - | - | 91,466 | - | - | - | - | 91,466 | - | - | - | 91,466 | - | 274,398 |
| **Cash flow before Bk expenses** | **269,623** | **(227,869)** | **(453,670)** | **213,186** | **(259,182)** | **(200,737)** | **(27,222)** | **(246,362)** | **206,154** | **(18,846)** | **(274,201)** | **(380,889)** | **883,888** | **(516,128)** |

**Cosmed Group Inc and Subsidiary**
**13 Week Cash Flow Projections**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Post Petition | | | | | | | |
| | *Estimate* | *Estimate* | *Projected* | *Projected* | *Projected* | *Projected* | *Projected* | *Projected* | *Projected* | *Projected* | *Projected* | *Projected* | *Projected* | total |
| | 11/14/24 to | Wk Ended | Wk Ended | Wk Ended | Wk Ended | Wk Ended | Wk Ended | Wk Ended | Wk Ended | Wk Ended | Wk Ended | Wk Ended | Wk Ended | 13 Weeks |
| | 11/17/24 | 11/24/24 | 12/1/24 | 12/8/24 | 12/15/24 | 12/22/24 | 12/29/24 | 1/5/25 | 1/12/25 | 1/19/25 | 1/26/25 | 2/2/25 | 2/9/25 | |
| **Bankruptcy Related expenses** | | | | | | | | | | | | | | |
| Legal Fees - Bk Counsel-Debtor | | | | | | | | | | | - | | 1,250,000 | 1,250,000 |
| Financial Advisor- Debtor | | | | | | | | | | | - | | 125,000 | 125,000 |
| Claims Agent fees | | | | | | - | | | | | | | 75,000 | 75,000 |
| Investment Banker | | | | | 62,500 | | | | | | 62,500 | | 62,500 | 187,500 |
| Utilities Adequate Assurance | | | 43,820 | 16,819 | | | | | | | | | | 60,640 |
| US Trustee Fees | | | | | | | | | | 23,829 | | | | 23,829 |
| Critical Vendor Payments | | | | | | 45,000 | | | | | | | | 45,000 |
| Professional Fees-Committee | - | - | | | | | | 75,000 | | | - | | 75,000 | 150,000 |
| total restructuring related fees | - | - | 43,820 | 16,819 | 62,500 | 45,000 | - | 75,000 | - | 23,829 | 62,500 | - | 1,587,500 | 1,916,968 |
| Net Cash Flow | 269,623 | (227,869) | (497,490) | 196,367 | (321,682) | (245,737) | (27,222) | (321,362) | 206,154 | (42,674) | (336,701) | (380,889) | (703,612) | (2,433,096) |
| Beginning Cash | *100,000* | 369,623 | 141,755 | (355,736) | (159,369) | (481,052) | (726,789) | (754,011) | (1,075,374) | (869,219) | (911,893) | (1,248,595) | (1,629,484) | 100,000 |
| Net Cash Flow | 269,623 | (227,869) | (497,490) | 196,367 | (321,682) | (245,737) | (27,222) | (321,362) | 206,154 | (42,674) | (336,701) | (380,889) | (703,612) | (2,433,096) |
| Ending Cash | 369,623 | 141,755 | (355,736) | (159,369) | (481,052) | (726,789) | (754,011) | (1,075,374) | (869,219) | (911,893) | (1,248,595) | (1,629,484) | (2,333,096) | (2,333,096) |