United States Bankruptcy Court
Southern District of Texas
**ENTERED**
December 10, 2024
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SPICEY PARTNERS REAL ESTATE | ) | Case No. 24-90572 (CML) |
| HOLDINGS, LLC, *et al.*,[1] | ) |  |
|  | ) | (Jointly Administered) |
| Debtors. | ) |  |
|  | ) | **Re: Docket Nos. 70, 71 & 73** |

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION
FINANCING, (II) GRANTING PRIMING LIENS AND PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING AUTOMATIC STAY, (IV)
SCHEDULING FINAL HEARING, AND (III) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "Motion")[2] of the above-captioned debtors and

debtors in possession (the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11

Cases"), pursuant to sections 105, 362, 363, 364, 364, 503, 506, 507 and 552 of chapter 11 of title

11 of the United States Code (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004

and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules")

and Rules 2002-1, 4001-1(b), 4002-1, and 9013-1 of the Bankruptcy Local Rules of the United

States Bankruptcy Court for the Southern District of Texas and the Procedures for Complex

Chapter 11 Bankruptcy Cases (the "Local Bankruptcy Rules") promulgated by the United States

Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court"), seeking

entry of an interim order (this "Interim Order") authorizing, among other things:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Spicey Partners Real Estate Holdings, LLC (6459) and Cosmed Group, Inc. (8781). The location of the Debtors' service address is: 28 Narragansett Ave., Jamestown, RI 02835.

[2] Each capitalized term that is not defined herein shall have the meaning ascribed to such term in the Motion or DIP Term Sheet (each as defined below), as applicable.

(i)      the Debtors Cosmed Group, Inc. ("Cosmed") and Spicey Partners Real Estate Holdings, LLC ("SPRE"), as borrowers (Cosmed and SPRE, together, the "Borrowers"), to obtain a senior secured superpriority debtor-in-possession financing facility (the "DIP Facility") pursuant to the terms and conditions herein, the terms and conditions set forth in that certain *Secured Superpriority Debtor in Possession Financing Summary of Terms and Conditions* (as may be amended, restated, supplemented or otherwise modified from time to time, in each case with the consent of the DIP Lender (as defined below), the "DIP Term Sheet," substantially in the form attached to this Interim Order as **Exhibit 1**), the Approved Budget (as defined below), and all other agreements, documents, and instruments delivered or executed in connection therewith to the extent that the DIP Lender determines there is a need for such other agreements, documents, and instruments (in each case, as amended, restated, supplemented, or otherwise modified from time to time, the "DIP Documents") provided by Zimmer, Inc., as lender (in such capacity, together with any successors and assigns permitted under the DIP Documents, the "DIP Lender," and together with the Borrowers, the "DIP Loan Parties"), which DIP Facility shall be available, subject to the terms and conditions set forth in this Interim Order and the other DIP Documents, (1) during the period (the "Interim Period") from the date hereof through and including the date of entry of the Final Order by this Court in the amount of $2,000,000 (the "Interim Advance") and (2) upon entry of the Final Order, in the amount of an additional $5,500,000 (the "Final Advances") (the Interim Advance and Final Advances, collectively, the "DIP Facility Loans") for a total DIP Facility of $7,500,000;

(ii)      the DIP Loan Parties to (i) execute, deliver, and perform under the DIP Term Sheet and each of the other DIP Documents, (ii) incur all loans, advances, extensions of credit, financial accommodations, indemnification and reimbursement obligations and other

obligations, and pay all principal, interest, premiums, fees, costs, expenses, charges (including the reasonable and documented fees and expenses of the attorneys and financial advisor to the DIP Lender and all other amounts payable under the DIP Documents, including without limitation, all obligations set forth in the DIP Term Sheet) (collectively, the "DIP Obligations"),  whenever the same shall become due or payable, whether at stated maturity, by prepayment, declaration, acceleration or otherwise, in each case, in accordance with the DIP Documents and this Interim Order, and (iii) perform such other and further acts as may be necessary, required or desirable to implement and effectuate the terms of this Interim Order, the DIP Documents and the transactions contemplated hereunder and thereunder;

(iii)      the Debtors to use proceeds of the DIP Facility Loans solely in accordance with the Approved Budget and cash flow forecast prepared by the Debtors and annexed hereto as **Exhibit 2** (as updated from time to time in accordance with the terms of the DIP Term Sheet and the other DIP Documents, subject to the prior approval of the DIP Lender in its sole discretion, the "Initial Approved Budget"), subject to the variances permitted under the DIP Term Sheet and as otherwise provided herein and in the other DIP Documents;

(iv)      the Debtors to grant to the DIP Lender, in respect of the DIP Obligations, a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code and first priority priming liens on and security interests in substantially all assets and property of the Debtors (now owned or hereafter acquired) pursuant to 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code, in each case as and to the extent, set forth more fully below and in the DIP Documents;

(v)      certain stipulations waivers, and releases by the Debtors with respect to, *inter alia*, the DIP Lender, the DIP Documents, the DIP Liens, the DIP Obligations and the DIP Collateral, in each case, subject to the terms and provisions of this Interim Order;

(vi)     subject to entry of the Final Order, the Debtors' waiver of (a) the right to surcharge the DIP Collateral as to the DIP Lender, pursuant to section 506(c) of the Bankruptcy Code or otherwise, (b) the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral as to the DIP Lender, and (c) the "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to the DIP Collateral as to the DIP Lender and the DIP Obligations, in each case, upon the terms set forth in this Interim Order;

(vii)    the modification or waiver by the Court of the automatic stay imposed by section 362 of the Bankruptcy Code and any other applicable stay (including Bankruptcy Rule 6004) to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility and this Interim Order and the other DIP Documents, and to provide for the immediate effectiveness of this Interim Order; and

(viii)   the scheduling by the Court of a final hearing (the "<u>Final Hearing</u>") to consider entry of an order (the "<u>Final Order</u>") granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing and the transactions contemplated by the Motion.

The Court having considered the Motion, the terms of the DIP Facility and the DIP Documents (including the DIP Term Sheet), the *Declaration of David G. Howe in Support of Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing, (II) Granting Priming Liens and Providing Superpriority Administrative Expense Claims, (III) Modifying Automatic Stay, (IV) Scheduling Final Hearing, and (V) Granting*

*Related Relief* (the "DIP Declaration"), the *Declaration of David G. Howe, of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), and the evidence submitted at the hearing held before this Court on December 10, 2024, to consider entry of this Interim Order (the "Interim Hearing"), and upon the record of the Chapter 11 Cases; and due and proper notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014 and all applicable Local Bankruptcy Rules; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and is otherwise fair and reasonable and in the best interests of the Debtors, their creditors, and their estates, and essential for the continued operation of the Debtors' businesses and maximization of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Term Sheet and DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration; and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A.   **Petition Date**.  On November 14, 2024, (the "Petition Date"), the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code in this Court.

B.   **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and property as debtors in possession pursuant to sections 1107(a)

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following conclusions of law constitutes finding of fact, they are adopted as such. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.

and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

C.      **Jurisdiction and Venue**.  The Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Chapter 11 Cases and the proceeding on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      **Committee Formation**.  As of the date hereof, no official committee of unsecured creditors has been appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

E.      **Notice**.  The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Proper, timely, adequate, and sufficient notice of the Interim Hearing and the relief requested in the Motion has been provided to (a) the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee"), (b) counsel to the DIP Lender, (c) all other parties asserting a lien on or a security interest in the assets of the Debtors to the extent reasonably known to the Debtors, (d) the United States Attorney's Office for the Southern District of Texas, (e) the Internal Revenue Service, (f) those creditors holding the 30 largest unsecured claims against the Debtors' estates (excluding insiders), (g) the state attorneys general for states in which the Debtors conduct business;, and (h) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002 (the "Notice Parties").  Under the circumstances, such notice of the Interim Hearing and the relief requested in the Motion constitutes due, sufficient, and appropriate notice and complies with the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(b),

(c), and (d), and the Local Bankruptcy Rules, and no other or further notice need be provided for entry of this Interim Order.

        F.      **<u>Findings Regarding Corporate Authority</u>**.  The Debtors have all requisite corporate power and authority to enter into, ratify, and perform all of their obligations under the DIP Documents (including the DIP Term Sheet) to which they are a party.

        G.      **<u>Findings Regarding the DIP Facility</u>**.

        (i)      **Good Cause**.  Good and sufficient cause has been shown for the entry of this Interim Order and for the Debtors to obtain postpetition financing pursuant to the terms hereof and the DIP Documents.

        (ii)      **Immediate Need for Postpetition Financing**.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2).  An immediate need exists for the Debtors to obtain credit in an amount up to the Interim Advance pursuant to this Interim Order and the DIP Term Sheet in order to, among other things, enable the orderly continuation of their operations and to administer and preserve the value of their estates.  In the absence of the immediate availability of such funds and liquidity in accordance with the terms hereof, the ability of the Debtors to maintain business relationships with their vendors, suppliers, licensors, licensees, and customers, to retain and pay their employees and otherwise finance their operations, including to continue to operate as a going concern, would not be possible, and immediate and irreparable harm to the Debtors and their estates and creditors would occur.  Thus, the ability of the Debtors to preserve and maintain the value of their assets and maximize returns for creditors requires the availability of working capital from the DIP Facility Loans.

        (iii)      **No Credit Available on More Favorable Terms**.  The DIP Facility is the best source of debtor-in-possession financing available to the Debtors.  Given their current

financial condition, financing arrangements, and capital structure, the Debtors have been unable to obtain credit on more favorable terms and conditions than those provided in this Interim Order, including for (a) adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense, (b) credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, (c) credit for money borrowed secured by a lien on property of the estates that is not otherwise subject to a lien, or (d) credit for money borrowed secured by a junior lien on property of the estates which is subject to a lien.  The Debtors are unable to obtain credit for borrowed money without granting the DIP Liens and the DIP Superpriority Claims to (or for the benefit of) the DIP Lender and without granting the adequate protection as set forth herein (in each case, subject to the Carve Out (as defined below)).

(iv)     **Use of Proceeds of the DIP Facility**.  As a condition to providing the DIP Facility, the DIP Lender requires, and the Debtors have agreed, that all proceeds of the DIP Facility Loans shall be used or applied solely for the purposes expressly permitted in, and in a manner consistent with, the Approved Budget (subject to Permitted Variances) and the other DIP Documents, including (i) to pay post-petition working capital and maintenance capital expenditure purposes of the Debtors, (ii) to pay current fees and expenses under the DIP Facility, (iii) to pay allowed administrative costs and expenses of the Chapter 11 Cases, including professional fees and expenses, (iv) to pay prepetition claims and expenses as authorized by the Court (v) to pay any forecasted cash outlays included in any Approved Budget (as defined below), and (vi) as otherwise agreed, in each case, other than (iii) above, subject to the terms and conditions of this Interim Order and the DIP Documents.

(v)      **Approved Budget**.  The Debtors have prepared and delivered to the DIP Lender the initial itemized cash flow forecast set forth on **Exhibit 2** attached hereto, which has been approved by the DIP Lender (the "Initial Approved Budget", as amended, supplemented or updated by the Debtors, and approved by the DIP Lender, in writing, from time to time in accordance with the terms of this Interim Order and the DIP Term Sheet, the "Approved Budget"). The Initial Approved Budget is an integral part of this Interim Order, and the DIP Lender is relying, in part, upon the Debtors' agreement to comply with the Approved Budget (subject to Permitted Variances) in determining to enter into the DIP Facility and to allow the Debtors' use of proceeds of the DIP Facility in accordance with the terms of this Interim Order and the DIP Documents.

(vi)      **Section 506(c), Section 552(b), and Marshaling**.  In light of and in exchange for (i) the DIP Lender's willingness to provide the DIP Facility to the extent set forth herein, (ii) the DIP Lender's agreement that its liens and superpriority claims shall be subject and subordinate to the Carve Out, as set forth herein, (iii) the consensual use of proceeds of the DIP Facility consistent with the Approved Budget (subject to the Permitted Variance) and the terms of this Interim Order, and (iv) the DIP Lender's agreement to the payment, in a manner consistent with the Approved Budget (subject to permitted variances as provided in the DIP Term Sheet and subject to the terms and conditions of this Interim Order), of certain expenses of administration of these Chapter 11 Cases, subject to entry of the Final Order, the DIP Lender is entitled to a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code and a waiver of the provisions of section 506(c) of the Bankruptcy Code and of the equitable doctrine of marshaling and other similar doctrines upon entry of the Final Order.

(vii)      **Extension of Financing**.  The DIP Lender has indicated a willingness to provide financing to the Debtors in accordance with the DIP Documents (including the DIP Term

Sheet and the Approved Budget) and subject to (i) the entry of this Interim Order and the Final Order, (ii) approval of the terms and provisions of this Interim Order and the DIP Documents (including the DIP Term Sheet), including the milestones set forth in the DIP Term Sheet (the "Milestones") and the waivers set forth herein, and (iii) findings by this Court that such financing is essential to the Debtors' estates, that the DIP Lender is a good faith financier, and that the reversal or modification on appeal of the authorization hereunder for the Debtors to incur the debt under the DIP Facility, or the grant hereunder of the priority of the DIP Liens, does not affect the validity of such debt or any priority of any such lien so granted as provided in section 364(e) of the Bankruptcy Code.

(viii)   **Limitation of Liability**.  The Debtors stipulate and, subject to paragraph 11, this Court finds that in making decisions to advance loans to the Debtors, in administering any loans, in accepting the Approved Budget, or in taking any other actions permitted by this Interim Order or the DIP Documents (including the DIP Term Sheet), the DIP Lender shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors.

(ix)   **Business Judgment and Good Faith Pursuant to Section 364(e)**.

(i)   The terms and conditions of the DIP Facility, and the interest and fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent business judgment, consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration;

(ii)   all obligations incurred, payments made, and transfers or grants of security set forth in this Interim Order and the other DIP Documents (including the DIP Term Sheet) by the Debtors are granted to or for the benefit of the DIP Lender for fair consideration and

reasonably equivalent value and are granted contemporaneously with the making of the loans and commitments and other financial accommodations secured thereby;

(iii)    the DIP Facility was negotiated in good faith and at arm's length among the Debtors and the DIP Lender; and

(iv)    the use of the proceeds to be extended under the DIP Facility will be so extended in good faith and for valid business purposes and uses, as a consequence of which the DIP Lender is entitled to the protection and benefits of section 364(e) of the Bankruptcy Code.

(x)    **Indemnity**.  The DIP Lender and its Related Parties (as defined below) have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Facility, including in respect of the granting of the DIP Liens, the DIP Superpriority Claims, and any of the other rights, privileges, remedies, and protections granted hereunder or under the DIP Documents (including the DIP Term Sheet), any challenges or objections to the DIP Facility, and all documents related to and all transactions contemplated by the foregoing.  Accordingly, without limitation to any other right to indemnification, the DIP Lender and each of its respective affiliates, officers, directors, fiduciaries, employees, agents, advisors, attorneys, and representatives (collectively, the "Related Parties") shall be and hereby are indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto.  No exception or defense in contract, law, or equity exists as to any obligation set forth, as the case may be, in this paragraph G(x), or in the DIP Documents, to indemnify and/or hold harmless the DIP Lender and any Related Party, as the case may be, and any such defenses are hereby waived.

(xi)    **No Control**.  The DIP Lender is not a control person or insider of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the DIP Facility and the DIP Documents (including the DIP Term Sheet).

(xii)    **No Claims, Causes of Action**.  As of the date hereof, there exist no claims or causes of action against the DIP Lender or its Related Parties with respect to, in connection with, related to, or arising from the DIP Documents (including the DIP Term Sheet) that may be asserted by the Debtors or any other person or entity.

(xiii)    **Release**.  Effective as of the date of entry of the Final Order, the Debtors and their estates hereby forever and irrevocably release, discharge, and acquit the former, current and future (a) DIP Lender, (b) the Related Parties, and predecessors and successors in interest of the DIP Lender and its affiliates, in each case acting in their respective capacities as such (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the DIP Facility, the DIP Documents (including the DIP Term Sheet), and/or the transactions contemplated hereunder or thereunder including, without limitation, (x) any so-called "lender liability" or equitable subordination claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with

respect to the validity, priority, perfection, or avoidability of the liens or claims of the DIP Lender (the "<u>Releases</u>"); *provided* that nothing in this paragraph is intended to limit or release any commitments and obligations of the DIP Lender under the DIP Term Sheet or this Interim Order. The Debtors further waive and release any defense, right of counterclaim, right of setoff or deduction to the payment of the DIP Obligations, which the Debtors now have or may claim to have against the Releasees arising out of, connected with, or relating to any and all acts, omissions, or events occurring prior to the entry of this Interim Order by the Court.

       (xiv)   **Sale and Credit Bidding**.  The DIP Lender shall have the right to credit bid up to the full amount of the applicable outstanding DIP Obligations including, without limitation, any accrued interest and fees, in a sale of any DIP Collateral (as defined below), and whether such sale is effectuated through sections 363 or 1129 of the Bankruptcy Code, or otherwise.

       (xv)   **Relief Essential; Best Interest**.  The relief requested in the Motion (and provided in this Interim Order) is necessary, essential, and appropriate for the continued operation of the Debtors' businesses and the management and preservation of the Debtors' assets and property and satisfies the requirements of Bankruptcy Rule 6003.  It is in the best interest of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties that the Debtors are allowed to enter into the DIP Facility, incur the DIP Obligations, grant the liens and claims contemplated herein and under the DIP Documents (including the DIP Term Sheet) to the DIP Lender.

       (xvi)   **Immediate Entry**.  The Debtors have requested, and the Court hereby finds that sufficient cause exists for, the immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules.

NOW, **THEREFORE**, on the Motion of the Debtors and the record before this Court with respect to the Motion, including the record made during the Interim Hearing, and with the consent of the Debtors and the DIP Lender, and good and sufficient cause appearing therefor,

<p align="center">**IT IS HEREBY ORDERED THAT**:</p>

1. <u>**Motion Granted**</u>. The Motion is granted on an interim basis in accordance with the terms and conditions set forth in this Interim Order. Any objections to the Motion with respect to entry of this Interim Order, to the extent not withdrawn, waived, settled, or otherwise resolved, and all reservation of rights included therein, are hereby denied and overruled. This Interim Order shall become effective and enforceable immediately upon its entry.

2. <u>**DIP Facility**</u>.

(a) **DIP Obligations**. The Debtors are expressly and immediately authorized and empowered to enter into the DIP Facility and to incur and to perform the DIP Obligations in accordance with and subject to this Interim Order (and, upon its entry, a Final Order) and the other DIP Documents, to execute and deliver all DIP Documents and all other related instruments, certificates, agreements, and documents, and to take all actions which may be reasonably required or otherwise necessary for the performance by the Debtors under the DIP Facility, including the creation and perfection of the DIP Liens described and provided for herein. The Debtors are hereby authorized and directed to pay all DIP Obligations, as such shall accrue and become due hereunder or thereunder, subject to paragraph 2(h) hereof. The DIP Term Sheet, the other DIP Documents, and all DIP Obligations shall represent, constitute, and evidence, as the case may be, valid and binding obligations of the Debtors, enforceable against the Debtors, their estates, and any successor thereto in accordance with their terms. All obligations incurred, payments made, and transfers or grants of security set forth in this Interim Order and in the other DIP Documents

<p align="center">14</p>

by any DIP Loan Party are granted to or for the benefit of the DIP Lender for fair consideration and reasonably equivalent value and are granted contemporaneously with the making of the loans and commitments and other financial accommodations secured thereby.  No obligation, payment, transfer, or grant of security under the DIP Documents as approved under this Interim Order shall be voided, voidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment, or counterclaim.  The term of the DIP Facility shall commence on the date of entry of this Interim Order and end on the Termination Date (as defined below), subject to the terms and conditions set forth herein and in the DIP Documents.

(b)     **Authorization to Borrow**.  In order to continue to operate its business, subject to the terms and conditions of this Interim Order and the DIP Documents, the Debtors are hereby authorized to borrow under the DIP Facility and incur DIP Obligations during the Interim Period.

(c)     **Conditions Precedent**.  The DIP Lender shall have no obligation to make the DIP Facility Loans or any other financial accommodation hereunder or under the DIP Documents (and the Debtors shall not make any request therefor) unless all conditions precedent to making DIP Facility Loans under the DIP Term Sheet have been satisfied or waived in accordance with the terms of the DIP Term Sheet.

(d)     **DIP Collateral**.  As used herein, "DIP Collateral" shall mean all assets, interests, rights, and property of any nature whatsoever of the Debtors, including, without limitation, all property in which the Debtors and their estates have an interest (whether tangible, intangible, real, personal or mixed), whether now owned or hereafter acquired and wherever located, before or after the Petition Date, including, without limitation, all accounts, proceeds of leases, inventory, equipment, equity interests or capital stock in subsidiaries, investment property, instruments,

chattel paper, contracts, patents, copyrights, trademarks and other general intangibles, commercial litigation claims, cash, any investment of such cash, inventory, accounts receivable, including intercompany accounts (and all rights associated therewith), other rights to payment whether arising before or after the Petition Date, any deposit accounts, "cash collateral accounts", and, in each case all amounts on deposit therein from time to time, the proceeds of all claims or causes of action, and all rents, products, offspring, profits, proceeds, and substitutions thereof (including, without limitation, and subject to the entry of the Final Order, all claims or causes of action of the Borrowers arising under sections 502(d), 542, 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code (the "Avoidance Actions") *provided that* the lien on Avoidance Actions shall be limited to the proceeds and property recovered in connection therewith); *provided, however,* that the DIP Collateral shall not include, and the DIP Liens shall not encumber, any claims or causes of action of the Borrowers asserted against, or that could be asserted against, an "insider" as defined in Section 101(31) of the Bankruptcy Code or, if any such insider is an individual, any trust associated with that insider.

(e)    **DIP Liens**.  Effective immediately upon the entry of this Interim Order and subject to the Carve Out, as set forth more fully in this Interim Order, the DIP Lender is hereby granted the following security interests and liens, which shall immediately be valid, binding, perfected, continuing, enforceable, and non-avoidable without the need for execution by the Borrowers or the recordation or other filing by the DIP Lender of security agreements, control agreements, pledge agreements, financing statements, or other similar documents or the possession or control by the DIP Lender of any DIP Collateral (all liens and security interests granted to the DIP Lender pursuant to this Interim Order, any Final Order, and the DIP Term Sheet, the "DIP Liens"):

(i)    pursuant to section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected

first-priority liens on and security interests in all DIP Collateral that is not subject to any liens or encumbrances immediately prior to the Petition Date, subject only to the Carve Out; and

(ii)    pursuant to section 363(c)(3) and 364(d)(1) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected first priority, priming liens on and security interests in all other DIP Collateral, which liens and security interests shall be subject only to (a) any valid, enforceable, perfected, and non-avoidable lien or security interest in favor of any person other than the Prepetition Lenders[4] that was in existence immediately prior to the Petition Date or that is perfected as permitted by Section 546(b) of the Bankruptcy Code, in each case, with respect to any DIP Collateral comprised of Prepetition Collateral, solely to the extent such lien is senior to the Prepetition Liens (a "Permitted Prior Lien")[5] and (b) the Carve Out, and senior to all other liens and encumbrances in respect of the DIP Collateral.

(f)    **Other Provisions Relating to the DIP Liens**.  Effective immediately upon entry of this Interim Order, the DIP Liens shall secure all of the DIP Obligations, to the extent and subject to the priorities set forth herein, and such liens (and any superpriority claims and other senior liens, including adequate protection liens, granted hereunder) shall at all times have a higher priority and shall remain senior to the rights of the Debtors, any chapter 7 or chapter 11 trustee, and any secured, administrative priority, unsecured or other claims of any party in these Chapter 11 Cases under the Bankruptcy Code (except as (and solely to the extent) expressly provided herein), and the DIP Liens and the DIP Superpriority Claims granted herein shall not be made or become subject, junior, or subordinated to any "priming" or other liens, nor made *pari passu* with any other lien, security interest, or claim heretofore or hereafter granted under section 364 of the Bankruptcy Code or otherwise, in these Chapter 11 Cases (except as (and solely to the extent) expressly provided herein) or any Successor Case (as defined below), including to (i) any lien or

---

[4]   The defined term "Prepetition Lenders" shall have the meaning ascribed to such defined term in the DIP Motion.

[5]   Nothing herein shall constitute a finding or ruling by this Court that any such Permitted Prior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing shall prejudice the rights of any party in interest, including but not limited to the Debtors, the DIP Lender, the Prepetition Lenders, or Committee (if any), to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Lien and/or security interest.

security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (ii) any lien or security interest existing on or arising on or after the Petition Date, including, without limitation, any lien or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, (iii) any intercompany or affiliate lien or claim; or (iv) any other lien, claim, or security interest under sections 361, 363, or 364 of the Bankruptcy Code or otherwise, in each case other than as (and solely to the extent) expressly set forth herein.  The DIP Liens shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (each such case or proceeding, a "Successor Case"), and/or upon the dismissal of the Chapter 11 Cases.  Subject to the entry of the Final Order, the DIP Liens shall not be subject to section 510 of the Bankruptcy Code, to the "equities of the case" exception of section 552 of the Bankruptcy Code, or to section 506(c) of the Bankruptcy Code, or sections 549, 550, or 551 of the Bankruptcy Code.

(g)    **Superpriority Administrative Claim Status**.  The DIP Obligations shall, pursuant to section 364(c)(1) of the Bankruptcy Code, at all times constitute allowed superpriority administrative expense claims (the "DIP Superpriority Claims") of the DIP Lender against the Debtors, and be payable from and have recourse to all assets and properties of the Debtors, with priority over any and all other administrative expenses, adequate protection claims, diminution in value claims, and all other claims asserted against the Debtors now existing or hereafter arising of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other

administrative expenses or other claims arising under any other provisions of the Bankruptcy Code, including sections 105, 326, 327, 328, 330, 331, 363, 364, 365, 503, 506(b), 506(c), 507(a), 507(b), 507(d), 546, 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment, subject only to the Carve Out, which DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered an administrative expense allowed under section 503(b) of the Bankruptcy Code and shall be payable from and have recourse to all pre- and postpetition assets and property, whether existing on the Petition Date or thereafter acquired, of the Debtors and all proceeds thereof.  The DIP Superpriority Claims shall be subject and subordinate only to the Carve Out.  Other than as expressly provided herein, including in paragraph 12 hereof with respect to the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these Chapter 11 Cases or in any Successor Case and no priority claims are or will be senior to, prior to, or *pari passu* with the DIP Liens, the DIP Superpriority Claims, or any of the DIP Obligations or with any other claims of the DIP Lender arising hereunder or under the DIP Documents (including the DIP Term Sheet), or otherwise in connection with the DIP Facility.

(h)    **Professional Fees and Expenses**.  The Debtors are authorized and directed to pay, as adequate protection, all accrued and unpaid fees and reasonable and documented disbursements incurred, whether accrued before, on, or after the Petition Date, by the legal and financial advisors to the DIP Lender (the "DIP Lender Advisors").  The DIP Lender Advisors shall not be required to file applications seeking compensation for services or reimbursement of expenses with the Court or comply with the U.S. Trustee fee guidelines; *however*, any time that such professionals seek

payment of fees and expenses from the Debtors, each professional shall provide summary copies of its fee and expense statements or invoices (which shall include a general description of the nature of the matters for which services were performed, a list of professionals who worked on the matter, their hourly rate (if such professionals bill at an hourly rate) and the number of hours each professional billed and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work-product doctrine) to the U.S. Trustee and counsel to the Committee (if appointed), contemporaneously with the delivery of such fee and expense statements to the Debtors.  After delivery of a fee and expense statement or invoice, the Debtors, the U.S. Trustee, and the Committee (if appointed) shall have ten (10) calendar days to raise an objection thereto.  Any objection to the payment of such fees or expenses shall be made only on the basis of "reasonableness," and shall specify in writing the amount of the contested fees and expenses and the detailed basis for such objection.  To the extent an objection only contests a portion of an invoice, the undisputed portion thereof shall be promptly paid.  If any such objection to payment of an invoice (or any portion thereof) is not otherwise resolved between the objecting party and the issuer of the invoice, either party may submit such dispute to the Court for a determination as to the reasonableness of the relevant disputed fees and expenses set forth in the invoice.  This Court shall resolve any dispute as to the reasonableness of any fees and expenses.  For the avoidance of doubt and without limiting any of the foregoing or any other provision of this Interim Order, the DIP Lender Advisors' fees are, upon entry of this Interim Order and irrespective of any subsequent order approving or denying the DIP Facility or any other financing pursuant to section 364 of the

Bankruptcy Code, entitled to all of the protections of section 364(e) of the Bankruptcy Code that may apply to such fees, and are deemed fully earned, indefeasibly paid, non-refundable, irrevocable and non-avoidable as of the date of this Interim Order.

3.     **Authorization and Approval to Use Proceeds of DIP Facility**.  Subject to the terms and conditions of this Interim Order and the other DIP Documents, the Debtors are authorized during the Interim Period (and not beyond) to request and use proceeds of the DIP Facility Loans, as set forth in the Approved Budget (subject to variances permitted under the DIP Documents) and in accordance with this Interim Order the other DIP Documents (including the DIP Term Sheet).  Notwithstanding anything herein to the contrary, subject only to the Debtors' rights under paragraph 20(b) hereof and the Carve Out, the Debtors' right (a) to request proceeds of the DIP Facility Loans shall terminate on the earlier of (i) the date the DIP Facility Loans are fully funded or reduced to zero and (ii) the Termination Date (as defined below) and (b) to use proceeds of the DIP Facility Loans shall terminate on the Termination Date.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates or proceeds resulting therefrom outside the ordinary course of business except as expressly permitted herein and in the other DIP Documents (subject to any required Court approval).

4.     **The Approved Budget**.

(a)     The Approved Budget attached hereto as **Exhibit 2** constitutes an "Approved Budget" under the DIP Term Sheet and will be considered the "Initial Approved Budget".  The Initial Approved Budget shall be thereafter updated, as necessary, not later than March 2, 2025 (each a "Proposed Budget, and together with the Initial Approved Budget, the "Budget").  Each Proposed Budget shall be subject to the written approval of the DIP Lender in its sole discretion (each such approved budget, an "Approved Budget"); *provided* that until such time as the DIP

Lender approves in writing (for which email from counsel to the DIP Lender to counsel to the Debtors shall suffice) any Proposed Budget, the Borrowers shall be subject to and be governed by the terms of the Initial Approved Budget or the latest Approved Budget, as applicable, then in effect in accordance with this Interim Order.   The Approved Budget may only be amended, supplemented, modified, restated, replaced, or extended in accordance with this Interim Order and the other DIP Documents (including the DIP Term Sheet).   Any such amendment, supplement, modification, restatement, replacement, or extension in accordance with the DIP Term Sheet may be effected without further order of the Court, so long as approved by the DIP Lender with notice to the Committee (if any).   The Approved Budget is an integral part of this Interim Order and has been relied upon by the DIP Lender to provide the DIP Facility and consent to this Interim Order.

(b)      Pursuant to the terms of the DIP Documents, beginning on Monday, January 6, 2024 (the "Initial Reporting Date, and with each subsequent Monday, collectively and individually, each a "Reporting Date"), the Borrowers shall deliver to the DIP Lender, in a form consistent with the form of the Approved Budget, a variance report describing in reasonable detail, by line item (including capital expenditures and professional fees, excluding the fees of Lender's professionals), (i) the actual disbursements of the Debtors and actual receipts during the applicable Testing Period (as defined below); (ii) any variance (whether positive or negative, expressed as a percentage) between the actual receipts or disbursements, as applicable, during such Testing Period against the estimated receipts or disbursements, as applicable, for the applicable Testing Period, as set forth in the applicable Approved Budget (each a "Variance Report"); and (iii) comments relating to any variances between budgeted and actual disbursements/receipts (the "FA Reports").   The term "Testing Period" shall mean the cumulative period from the beginning date of the Approved Budget through the Sunday that is eight calendar

days prior to the applicable Reporting Date.  The last day of each Testing Period shall be a "<u>Testing Date</u>".

(c)     As of any applicable Testing Date, actual cumulative disbursements (excluding DIP Lender professional fees) on an aggregate basis (the "<u>Actual Disbursement Variance</u>") shall not exceed budgeted cumulative disbursements (excluding DIP Lender professional fees) on an aggregate basis as reflected in the Approved Budget for such period, by more than 15.0% (the "<u>Permitted Disbursement Variance</u>"); *provided that* the actual cumulative Cash receipts on an aggregate basis (the "<u>Actual Cash Variance</u>," together with the Actual Disbursement Variance, the "<u>Actual Variances</u>") shall not exceed budgeted cumulative Cash receipts on an aggregate basis as reflected in the Approved Budget for such period, by more than 50.0% (the "<u>Permitted Cash Variance</u>," together with the Permitted Disbursement Variance, the "<u>Permitted Variances</u>").  If the Actual Variances for such period are less than or equal to the Permitted Variances, the amount by which each Actual Variance is less than the Permitted Variance shall be carried forward to the next Testing Date and added to the Permitted Variance for such next Testing Date.

(d)     The Borrowers shall be deemed to be in compliance with the Approved Budget for all purposes under this Interim Order and the DIP Documents unless, as of any Testing Date, the Borrowers' actual disbursements or actual Cash receipts vary from the Approved Budget by more than the applicable Permitted Variances as measured on any Testing Date (the "<u>Variance Covenant</u>").

(e)     The DIP Lender shall have no obligation to permit the use of proceeds of DIP Facility Loans, and the Borrowers shall have no authority to use proceeds of DIP Facility Loans, other than in accordance with the latest Approved Budget, subject to the Permitted Variance and the Variance Covenant, and as set forth in the Interim Order.

5.      **Monitoring of Collateral**.  The DIP Lender and its consultants and advisors shall be given reasonable access to the Debtors' books, records, assets, and properties for purposes of monitoring and inspecting the Debtors' businesses and the value of the DIP Collateral at the Debtors' cost and expense during normal business hours and upon reasonable notice.

6.      **Financial Reporting**.  Without limitation of the requirements of the DIP Documents, the Debtors shall provide to the DIP Lender, with a copy to the Committee, if any, (and, in each case, its consultants, advisors, and professionals) all financial information required under the DIP Documents.  The Debtors shall also provide such reports and information required to be provided in the DIP Documents and reasonably cooperate, discuss with, and provide to the DIP Lender (and, in each case, its professionals) all such information as may be reasonably requested.  In addition, the Debtors hereby authorizes their accountants, attorneys, financial advisors, bankruptcy professionals, and consultants to cooperate, consult with, and provide to the DIP Lender (and its consultants, advisors and professionals) all such information as may be reasonably requested with respect to the business, results of operations and financial condition of the Debtors consistent with the requirements set forth in the DIP Documents.

7.      **Milestones**.  It is a condition to the DIP Facility that the Debtors shall comply with the Milestones.  The failure to comply with any Milestone shall constitute an Event of Default (as defined in the DIP Term Sheet) in accordance with the DIP Term Sheet.

8.      **Subordination of Intercompany, Affiliate Liens**.  All intercompany or affiliate liens of the Debtors, if any (other than any liens granted to the DIP Lender), will be contractually subordinated to the DIP Liens granted pursuant to this Interim Order and under the DIP Term Sheet, on terms satisfactory to the DIP Lender.

9.       **DIP Lien Perfection**.  Automatically upon entry of this Interim Order, the DIP Liens shall be deemed to be valid, binding, perfected, enforceable, non-avoidable, and effective by operation of law, and not subject to challenge, without the need of any further action of any kind.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein.  Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, file such financing statements, deeds of trust, mortgages, security agreements, notices of liens, and other similar documents and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, deeds of trust, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been filed or recorded at the time and on the date of the filing of the DIP Motion.  The Debtors shall execute and deliver to the DIP Lender all such financing statements, mortgages, security agreements, notices and other documents as the DIP Lender may reasonably request to evidence, confirm, validate, or perfect or to insure the contemplated priority of the DIP Liens, and the Debtors shall take all such further actions that may be required under any applicable law or that the DIP Lender, as applicable, may reasonably request in order to grant, preserve, protect or perfect the DIP Liens granted pursuant to this Interim Order.  The DIP Lender, in its sole discretion, may file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtors have real or personal property and, in such event,

the subject filing or recording officer shall be authorized to file or record such copy of this Interim Order.

10. **Stipulations and Admissions**.

(a)     The Debtors' stipulations, admissions, agreements, releases, and waivers contained in this Interim Order are and shall be irrevocably binding upon the Debtors and any and all of the Debtors' successors in interest and assigns in all circumstances and for all purposes.

(b)     (b) The Stipulations and all other admissions, agreements, releases, and waivers set forth in this Interim Order also are and shall be binding upon all other persons and entities (including any Committee) and each of their respective successors in interest and assigns in all circumstances and for all purposes, subject to the entry of the Final Order.

11. **Limitations on Use of DIP Facility**.   Notwithstanding anything herein to the contrary, no portion of the proceeds of the DIP Facility, the DIP Collateral, and no disbursements set forth in the latest Approved Budget may be used, in any way, directly or indirectly (a) for any investigation, adversary action, suit, arbitration, proceeding, application, motion, objection, defense, other contested matter, or other litigation of any type  adverse to the interests of the DIP Lender or their respective rights and remedies under the DIP Facility, this Interim Order, the Final Order, or the DIP Documents, including without limitation (i) any action arising under the Bankruptcy Code, (ii) any so-called "lender liability" claims and causes of action, (iii) any action with respect to the validity and extent of the DIP Obligations or the validity, extent, perfection and priority of the DIP Liens, (iv) any action seeking to invalidate, set aside, avoid, reduce, set off, offset, recharacterize, subordinate (whether equitable, contractual, or otherwise), recoup against, disallow, impair, raise any defenses, cross-claims, or counterclaims, or raise any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation against

or with respect to the DIP Liens, in whole or in part, or (v) appeal or otherwise challenge this Interim Order or the Final Order; *provided* that no more than $25,000 in the aggregate of the proceeds of the DIP Facility and the DIP Collateral (including any proceeds of the DIP Facility or the DIP Collateral used to fund the Carve Out) may be used by a Committee (if any) appointed in these Chapter 11 Cases to investigate (but not prosecute or challenge, or commence, or initiate the prosecution of, any challenge, including the preparation of any complaint or motion on account of, or objection to) the stipulations in this Interim Order before entry of the Final Order, (b) for any other action, which with the giving of notice or passing of time, would result in an Event of Default under the DIP Facility, (c) for any purpose that is prohibited under the Bankruptcy Code, DIP Documents, this Interim Order, or the Final Order or that is not in accordance with the latest Approved Budget (subject to the Permitted Variance), (d) to make any payment, advance, intercompany advance or transfer, or any other remittance or transfer whatsoever (including any intercompany loans and investments) that is not in accordance with the express terms of the latest Approved Budget, (e) to make any payment in settlement of any claim, action, or proceeding without Bankruptcy Court approval, (f) to prevent, hinder, impede, or delay the DIP Lender's enforcement or realization upon or exercise of rights in respect of any of the DIP Collateral in accordance with the DIP Documents and this Interim Order, or (g) to seek to amend or modify any of the rights or interests granted to the DIP Lender under this Interim Order or the DIP Documents, in a manner adverse to the DIP Lender, without the prior written consent of the DIP Lender.

12. **Carve Out**.

(a)    <u>Priority of Carve Out</u>.  Each of the DIP Liens and the DIP Superpriority Claims shall be subject and subordinate to payment of the Carve Out.  The Carve Out shall be senior to

all claims and liens over all assets of the Debtors, including any DIP Collateral, as set forth in this Interim Order.

(b)     <u>Carve Out</u>.  As used in this Interim Order, the "<u>Carve Out</u>" means the sum of (a) all statutory fees payable to the Clerk of the Court and the U.S. Trustee pursuant to section 1930(a)(6) of title 28 of the United States Code, (b) all Court-allowed fees and expenses of a trustee appointed under section 726(b) or section 1104 of the Bankruptcy Code in an amount not to exceed $50,000,[6] (c) to the extent allowed by the Court at any time, whether by interim order, final order, or other order, all accrued but unpaid fees and expenses (excluding any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) (the "<u>Allowed Estate Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Official Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>," and together with the Debtor Professionals, the "<u>Estate Professionals</u>") at any time on or before the date of delivery by the DIP Lender of a Carve Out Notice, whether allowed by the Court prior to or after delivery of a Carve Out Notice (the amounts set forth in the foregoing clauses (i), (ii) and (iii), the "<u>Pre-Carve Out Notice Amount</u>"), and (iv) Allowed Estate Professional Fees of Estate Professionals incurred after the date of delivery by the DIP Lender of the Carve Out Notice, to the extent allowed at any time, whether by interim order, final order, or other court order, in an aggregate amount not to exceed $500,000 incurred by (i) Debtor Professionals or (ii) Committee Professionals (the amount set forth in this clause (iii) being the "<u>Post-Carve Out Notice Amount</u>", and together with the Pre-Carve Out Notice Amount, the "<u>Carve Out Amount</u>"); provided, however, that nothing herein shall be construed to impair the ability of any party-in-interest to

---

[6] This $50,000 amount is inclusive of, and not in addition to, any similar Carve Out amount for a chapter 7 trustee authorized under any interim or final order approving the Debtors' use of cash collateral.

object to the fees, expenses, reimbursement, or compensation described herein on any grounds. For purposes of this Interim Order, the "Carve Out Notice" shall mean a written notice (which may be via electronic mail) delivered by the DIP Lender to the Remedies/Carve Out Notices Parties, which notice may be delivered only following the occurrence and during the continuation of an Event of Default, stating that the Post-Carve Out Notice Amount has been invoked.

(c)     Pre-Carve Out Notice.  Prior to the delivery of a Carve Out Notice, starting with the first full calendar week following the entry of this Interim Order, each Estate Professional shall deliver to the Debtors, the DIP Lender, and their respective advisors a weekly statement (each, a "Weekly Statement") setting forth a good-faith estimate of the amount of accrued but unpaid fees and expenses incurred by such Estate Professional during the preceding week (the "Weekly Estimated Fees and Expenses"), and the Debtors shall, on a weekly basis, transfer cash proceeds from amounts previously drawn under the DIP Facility into a segregated account held in trust for and exclusively available for the payment of fees and expenses of the Estate Professional (the "Estate Professional Fees Escrow Account") in an amount equal to the aggregate amount of Weekly Estimated Fees and Expenses based on the Weekly Fee Estimates submitted by each Estate Professional (and if no such estimate is provided in a given week, then the amount forecasted for such Estate Professional in the latest Approved Budget) that remain unpaid (and that were not previously funded to the Estate Professional Fees Escrow Account).  The Debtors shall use funds held in the Estate Professional Fees Escrow Account exclusively to pay Allowed Estate Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, in accordance with any interim or final orders of the Court; *provided*, *however*, that the Debtors' obligations to pay Allowed Estate Professional

Fees shall not be limited or be deemed limited to funds held in the Estate Professional Fees Escrow Account.

(d)     Post-Carve Out Notice.  On the date on which a Carve Out Notice is delivered in accordance with this paragraph 12 of this Interim Order, (the "Carve Out Trigger Date"), the Carve Out Notice shall constitute a demand to the Debtors to utilize all cash on hand (including the proceeds of DIP Facility Loans) to fund into the Estate Professional Fees Escrow Account an amount equal to (i) the Pre-Carve Out Notice Amount (to the extent not previously funded to the Estate Professional Fees Escrow Account), and (ii) the Post-Carve Out Notice Amount.  No later than two (2) Business Days after the delivery of a Carve Out Notice, each Estate Professional shall deliver one (1) additional statement to the Debtors, the DIP Lender, and their respective advisors setting forth a good-faith estimate of the amount of accrued but unpaid fees and expenses incurred by such Estate Professional during the period following the period covered by the most recent Weekly Statement previously delivered by such Estate Professional through and including the Carve Out Trigger Date (as defined below), and the Debtors shall transfer such amounts to the Estate Professional Fees Escrow Account (as defined herein).

(e)     Notwithstanding anything to the contrary in this Interim Order or the DIP Documents, following delivery of a Carve Out Notice, the DIP Lender shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Estate Professional Fees Escrow Account has been fully funded in an amount equal to all respective obligations benefitting from the Carve Out as set forth herein.  The Estate Professional Fees Escrow Account shall not be subject to the control of the DIP Lender, and the funds transferred to the Estate Professional Fees Escrow Account shall not be subject to the DIP Liens, nor constitute DIP Collateral; *provided*, *however*, that the DIP Liens shall automatically

attach to any residual interest in the Estate Professional Fees Escrow Account (which liens shall be deemed automatically perfected senior first priority liens as of entry of this Interim Order), with any excess paid to the DIP Lender for application to the DIP Obligations in accordance with the DIP Documents until the DIP Obligations are Paid in Full (unless the DIP Lender has otherwise agreed to in writing), and any excess remaining thereafter shall be applied in accordance with this Interim Order.

(f)      Notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Estate Professional Fees Escrow Account shall not constitute loans or indebtedness under the DIP Documents or otherwise increase or reduce the DIP Obligations, (ii) the failure of the Estate Professional Fees Escrow Account to satisfy in full the Allowed Estate Professional Fees shall not affect the priority of the Carve Out, and (iii) nothing contained herein shall constitute a cap or limitation on the amount that the Estate Professionals may assert as administrative expense claims against the Debtors on account of Allowed Estate Professional Fees incurred by such Estate Professionals.

(g)      Payment of Carve Out on or After the Carve Out Trigger Date.  Any payment or reimbursement made on or after the occurrence of the Carve Out Trigger Date in respect of any Allowed Estate Professional Fees incurred after the occurrence of the Carve Out Trigger Date shall permanently reduce the Carve Out Amount on a dollar-for-dollar basis.

(h)      No Direct Obligation to Pay Allowed Estate Professional Fees.  The DIP Lender shall not be responsible for the payment or reimbursement of any fees or disbursements of any Estate Professional incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code, regardless of whether such fees or expenses have been allowed by the Court.  Nothing in this Interim Order or otherwise shall be construed to obligate

the DIP Lender, in any way, to pay compensation to, or to reimburse expenses of, any Estate Professional or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

13.     **Payment of Compensation**.  Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any of the Debtors or the Committee (if any) or shall limit or otherwise affect the right of the DIP Lender or any other party in interest to object to the allowance and payment of any such fees and expenses.  No professional fees shall be paid absent a Court order allowing such payment, pursuant to a fee application or fee statement on notice, or other procedure permitted by any Court order allowing interim compensation or the payment of fees of ordinary course professionals.

14.     **Section 506(c) Claims**.  As a further condition of the DIP Facility, and subject to entry of the Final Order, any obligation of the DIP Lender to make DIP Loans and the consent of the DIP Lender to the payment of the Carve Out to the extent provided herein, the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Chapter 11 Cases or any Successor Case) shall be deemed to have waived any rights, benefits, or causes of action under section 506(c) of the Bankruptcy Code as they may relate to or be asserted against the DIP Lender, the DIP Liens, and the DIP Collateral and, except to the extent of the Carve Out, nothing contained in this Interim Order, the Final Order, or the DIP Documents shall be deemed a consent by the DIP Lender to any charge, lien, assessment, or claim against or in respect of the DIP Collateral under sections 105 or 506(c) of the Bankruptcy Code or otherwise, and no such consent shall be implied from any other action, inaction, or acquiescence by any by any such parties.

15.    **Collateral Rights; Limitations in Respect of Subsequent Court Orders**. Without limiting any other provisions of this Interim Order, unless the DIP Lender has provided its prior written consent, no credit shall be obtained, or indebtedness incurred that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral or entitled to priority administrative status which is superior to or *pari passu* with those granted pursuant to this Interim Order to or for the benefit of the DIP Lender.  Further, the proceeds of the DIP Facility shall not be used for any purpose other than as permitted under the DIP Documents and consistent with this Interim Order and the latest Approved Budget.

16.    **Proceeds of Subsequent Financing**.  Without limiting the provisions and protections of paragraph 15 hereof, if at any time prior to the Termination Date, the Debtors, the Debtors' estates, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed shall obtain credit or incur debt in violation of this Interim Order and the other DIP Documents (including the DIP Term Sheet), then all of the cash proceeds derived from such credit or debt in the amount necessary to satisfy all DIP Obligations then outstanding shall immediately be turned over to the DIP Lender for the indefeasible repayment and satisfaction in full in cash of all DIP Obligations then outstanding.  For the avoidance of doubt, if the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Case shall obtain credit or incur debt pursuant to section 364(d) of the Bankruptcy Code at any time prior to the Termination Date, the DIP Lender's rights to object to the Debtors' use of proceeds from the DIP Facility shall be fully preserved.

17.    **Cash Management**.  Until such time as all DIP Obligations are Paid in Full, the Debtors shall maintain the cash management system in accordance with the applicable "first day"

order, which shall be in form and substance acceptable to the DIP Lender.  Except as expressly provided herein, the Debtors shall not open any new deposit or securities account that is not subject to the liens and security interests of the DIP Lender (in which case they shall be subject to the lien priorities and other provisions set forth in this Interim Order).

18.     **Disposition of DIP Collateral**.  It shall constitute an Event of Default (as defined in the DIP Term Sheet) if the Debtors sell (including, without limitation, any sale and leaseback transaction), transfer (including any assignment of rights), lease, encumber or otherwise dispose of any portion of the DIP Collateral other than in the ordinary course of business, except as permitted under the DIP Term Sheet.

19.     **Survival of Certain Provisions**.  In the event of the entry of any order converting any of these Chapter 11 Cases into a Successor Case, the DIP Liens, the DIP Superpriority Claims, and the Carve Out shall continue in this proceeding and in any Successor Case, and such DIP Liens, DIP Superpriority Claims, and Carve Out shall maintain their respective priorities as provided by this Interim Order.

20.     **Events of Default; Termination Date; Rights and Remedies Upon Event of Default**.

(a)     Any automatic stay otherwise applicable to the DIP Lender, whether arising under sections 105 or 362 of the Bankruptcy Code or otherwise, is hereby modified so that, upon the occurrence and during the continuance of an Event of Default, the DIP Lender, in its sole and absolute discretion, but subject to the terms and conditions of this Interim Order (and the Default Notice Period), may immediately deliver a Termination Notice (as defined below).  Immediately following the giving of notice by the DIP Lender to counsel to the Debtors, the U.S. Trustee, and counsel to the Committee, if any, of the occurrence of an Event of Default under the DIP

Documents (the "Termination Notice") (i) the DIP Lender may issue a Carve Out Notice; (ii) the DIP Lender may declare all DIP Obligations to be immediately due and payable and the Debtors shall have no right to request or use any proceeds of any DIP Facility Loans or DIP Collateral, other than towards the satisfaction of the DIP Obligations and the Carve Out, as provided in this Interim Order and the DIP Documents (including the DIP Term Sheet); *provided* that, during the Default Notice Period (as defined below), the Debtors shall be permitted solely to continue to use drawn proceeds of the DIP Facility, in accordance with the Approved Budget, for any critical business-related expenses necessary to operate the Debtors' businesses and preserve the DIP Collateral as determined by the Debtors in their reasonable discretion and in good faith; *provided, further* that the only basis on which the Debtors, a Committee (if any), or any other party in interest shall have the right to contest a Termination Notice shall be with respect to the validity of the Event of Default giving rise to such Termination Notice (i.e., whether or not such Event of Default has occurred or not), (iii) the DIP Lender may declare the suspension or termination of the DIP Facility as to any further liability or obligation of the DIP Lender thereunder, but without affecting the DIP Liens or DIP Obligations; and (iv) the DIP Lender may charge the default rate of interest under the DIP Facility, as provided for in the DIP Term Sheet.

(b)     The Debtors and the Committee (if any) shall be entitled to an emergency hearing before this Court within five (5) business days after the Termination Notice is sent by the DIP Lender to the Debtors, the U.S. Trustee, and counsel to the Committee (if any) (such 5-calendar-day period, the "Default Notice Period").  If the Debtors, the Committee (if any), or any other party in interest does not contest the occurrence of the Event of Default within the Default Notice Period or if there is a timely contest of the occurrence of an Event of Default and the Court after notice and a hearing declines to stay the enforcement thereof, the Termination Date (as defined below)

shall be deemed to have occurred for all purposes and the automatic stay shall be modified to permit the DIP Lender to exercise all remedies under this Interim Order, the Final Order, the other DIP Documents (including the DIP Term Sheet), and applicable law, including, without limitation, to (i) set-off any and all amounts in accounts maintained by the Debtors with the DIP Lender against the DIP Obligations, (ii) to otherwise enforce any and all rights against the DIP Collateral, including, without limitation, disposition of the DIP Collateral solely for application towards the DIP Obligations; and (iii) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the Final Order, the other DIP Documents (including the DIP Term Sheet), or applicable law to effect the repayment of the DIP Obligations.  Nothing herein shall preclude the DIP Lender from seeking an order from the Court upon written notice (which may be sent by e-mail) to the U.S. Trustee, counsel to the Debtors, and counsel to the Committee (if any) authorizing the DIP Lender to exercise any enforcement rights or remedies with respect to the DIP Collateral on less than five (5) business days' notice or the Debtors' right to contest such relief.

(c)     After delivery of a Termination Notice and expiration of the Default Notice Period, the DIP Lender, in its sole and absolute discretion, may immediately (i) (x) terminate any pending DIP Facility Loans; (y) sweep all cash in any controlled accounts, and (z) terminate the DIP Facility and all commitments thereunder and (ii) upon and after the occurrence of the Termination Date, the DIP Lender shall, without further notice to, hearing of, or order from this Court, to the extent necessary to permit the DIP Lender to take any or all of the foregoing actions, at the same time or different times, unless the Court orders otherwise, and subject only to subparagraph (b) of this paragraph 20, as applicable, be immediately entitled to exercise all of their rights and remedies in respect of the DIP Collateral, in accordance with this Interim Order and the DIP Documents, as applicable.

(d)     The term "Termination Date" shall mean the date which is the earliest of (a) the Scheduled Maturity Date (as defined in the DIP Term Sheet), (b) the effective date of a plan of reorganization or liquidation for the Debtors confirmed in the Chapter 11 Cases, (c) the occurrence of any Event of Default (as defined in the DIP Term Sheet), after delivery of a Termination Notice and expiration of the Default Notice Period, (d) the first business day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto, (e) the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code unless otherwise consented to in writing (which may be e-mail) by the DIP Lender, (f) the dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing (which may be e-mail) by the DIP Lender; or (g) the repayment in full in cash of all obligations and termination of all commitments under the DIP Facility.

(e)     The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to this Interim Order and the DIP Documents as necessary to (i) permit the Debtors to grant the DIP Liens and to incur all DIP Obligations and all liabilities and obligations to the DIP Lender hereunder and under the DIP Documents, as the case may be, and (ii) authorize the DIP Lender to retain and apply payments and otherwise enforce their respective rights and remedies hereunder, subject to the provisions of paragraphs 20(a), (b) and (c) hereof.

(f)     The Debtors shall reasonably cooperate with the DIP Lender in its efforts to enforce their liens and security interests in the DIP Collateral in accordance with this Interim Order and (other than the right to contest whether a Termination Event has occurred and is continuing) the Debtors shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such party from enforcing its rights or remedies in the DIP Collateral.

(g)     Nothing included herein shall prejudice, impair, or otherwise affect the DIP Lender's rights to seek any other or supplemental relief in respect of the Debtors (including, as the case may be, other or additional adequate protection).

21.     **Applications of Proceeds of Collateral, Payments and Collections**.

(a)     As a condition to the DIP Loans and the authorization to use Cash Collateral, the Debtors have agreed that proceeds of any DIP Collateral and Prepetition Collateral, any amounts held on account of the DIP Collateral or Prepetition Collateral, and all payments and collections received by the Debtors with respect to all proceeds of DIP Collateral and Prepetition Collateral shall be used and applied in accordance with the DIP Documents (including repayment and reduction of the DIP Obligations), the Budget (subject to variances permitted under the DIP Documents) and this Interim Order.

(b)     Subject to the Debtors' rights under paragraph 20(b) hereof and the funding of the Carve Out, upon and after the occurrence of the Termination Date, all proceeds of DIP Collateral and Prepetition Collateral, whenever received, shall be paid and applied as follows: (i) *first*, to permanently and indefeasibly repay and reduce the DIP Obligations then due and owing in accordance with the DIP Documents, until paid and satisfied in full in cash; and (ii) *second*, to the Debtors' estates.  For avoidance of doubt, nothing in this Interim Order shall be construed to limit the voluntary and mandatory repayment provisions set forth in the DIP Documents.

22.     **Proofs of Claim, etc**.  The DIP Lender shall not be required to file a proof of claim in the Chapter 11 Cases or any Successor Case for any claim described herein.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date in the Chapter 11 Cases or any Successor Case to the contrary, the DIP Lender is hereby authorized and entitled, in its sole and absolute discretion but not required, to file (and amend or supplement, as each sees fit) a proof

of claim or aggregate proofs of claim in  the Chapter 11 Cases or any Successor Case for any claim described herein.  Any order entered by the Court in relation to the establishment of a bar date for any claim (including without limitation administrative claims) in the Chapter 11 Cases or any Successor Case shall not apply to the DIP Lender.

23.    **Payments Free and Clear**.  Any and all payments or proceeds remitted to the DIP Lender pursuant to the provisions of this Interim Order, the DIP Documents (including the DIP Term Sheet) or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability.

24.    **Other Rights and Obligations**.

(a)    **Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order**.  The DIP Lender has acted in good faith in connection with the DIP Facility, the DIP Facility Loans, the DIP Documents (including the DIP Term Sheet), and this Interim Order and is entitled to rely upon the protections granted herein and by section 364(e) of the Bankruptcy Code.  Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility as approved by this Interim Order, and notwithstanding any modification, amendment, reversal, vacatur, or stay of any or all of this Interim Order by a subsequent order of the Court or any other court, the DIP Lender is entitled to the protections provided in section 364(e) of the Bankruptcy Code, and no such appeal, modification, amendment, reversal, vacatur, or stay shall affect the validity and enforceability of any DIP Obligation, DIP Lien, DIP Superiority Claim or any other advances made hereunder or the claims, liens, security interest, or priority authorized or created hereby or pursuant to the DIP Documents (including the DIP Term Sheet).  Notwithstanding any such modification, amendment, reversal, vacatur, or stay, any claim granted to the DIP Lender

hereunder arising prior to the effective date of such modification, amendment, reversal vacatur, or stay of any DIP Liens or of the DIP Superpriority Claims granted to or for the benefit of the DIP Lender shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender shall be entitled to all of the rights, remedies, privileges, and benefits, including the DIP Liens and the DIP Superpriority Claims granted herein, with respect to any such claim.

(b)      **Credit Bid**.  The DIP Lender shall have the right to credit bid (either directly or through one or more acquisition vehicles) up to the full amount of the DIP Obligations (as to the DIP Collateral) in connection with any sale of all or any portion of the DIP Collateral, including (without limitation) any sale occurring pursuant to section 363 of the Bankruptcy Code or included as part of any chapter 11 plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code, by the Debtors, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, without the need for further court order authorizing the same.  The Debtors shall not object to any such credit bidding up to the full amount of the applicable outstanding DIP Obligations, in each case including any accrued interest, fees, and expenses, in any sale of any DIP Collateral, as applicable, whether such sale is effectuated through sections 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise. If the DIP Lender (either directly or through one or more affiliates) makes a credit bid in connection with any auction or other sale process relating to the sale or other disposition of any DIP Collateral, then for purposes of such auction or sale process or any applicable order of this Court, the DIP Lender (or one or more of its affiliates) shall be deemed to be a "qualified bidder" and its bid shall be a "qualified bid" regardless of whether any qualified bidder or qualified bid requirements are satisfied.  In connection with the foregoing, the DIP Lender shall have the right

to assign its respective rights to "credit bid" all or any portion of the applicable outstanding DIP Obligations to a newly formed acquisition vehicle.

(c)     **DIP Lenders Not Responsible Persons**.  In (i) making the decision to make the DIP Loans, (ii) administering the DIP Facility and the DIP Loans, (iii) extending other financial accommodations to the Debtors under the DIP Documents, and (iv) making the decision to collect the indebtedness and obligations of the Debtors, the DIP Lender shall not be considered to (x) owe any fiduciary obligation to the Debtors or any other party with respect to their exercise of any consent or other rights afforded them under the DIP Documents or this Interim Order or (y) be exercising control over any operations of the Debtors or acting in any way as a responsible person, or as an owner or operator under any applicable law, including without limitation, any environmental law (including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601, *et seq.*, and the Resource Conservation and Recovery Act, 42 U.S.C. 6901, *et seq.*, as either may be amended from time to time, or any similar federal or state statute).

(d)     **Binding Effect**.  The provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Lender, the Debtors, and their successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors) whether in the Chapter 11 Cases, in any Successor Case, or upon dismissal of any such Chapter 11 or Chapter 7 case.

(e)     **No Waiver**.

(xvii)   The failure of the DIP Lender to seek relief or otherwise exercise their rights and remedies under this Interim Order or the other DIP Documents, as applicable, shall not constitute a waiver of any of the DIP Lender's rights hereunder, thereunder, or otherwise.

Notwithstanding anything herein, the entry of this Interim Order is without prejudice to and does not constitute a waiver of, expressly or implicitly, or otherwise impair any of the rights, claims, privileges, objections, defenses, or remedies of the DIP Lender under the Bankruptcy Code or under non-bankruptcy law against any other person or entity in any court, including without limitation, the rights of the DIP Lender (1) to request conversion of the Chapter 11 Cases to a case under Chapter 7, dismissal of the Chapter 11 Cases, or the appointment of a trustee in the Chapter 11 Cases, (2) to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Plan, or (3) to exercise any of the rights, claims or privileges (whether legal, equitable, or otherwise).

(xviii)  The failure or delay on the part of the DIP Lender to seek relief or otherwise exercise their rights and remedies under this Interim Order, the other DIP Documents (including the DIP Term Sheet), or applicable law, as the case may be, shall not constitute a waiver of any of their respective rights hereunder, thereunder, or otherwise.  No delay on the part of any party in the exercise of any right or remedy under this Interim Order shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy.  None of the rights or remedies of any party under this Interim Order shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the party against whom such amendment, modification, suspension, or waiver is sought.  No consents required hereunder by the DIP Lender shall be implied by any inaction or acquiescence by the DIP Lender.

(f)  **No Third-Party Rights**.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, third party, or incidental beneficiary.

(g)     **Limitation on Surcharge**.  Without limiting the terms of the Carve Out and subject to the entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any Successor Case at any time shall be surcharged against, and no person may seek to surcharge any costs or expenses of administration against the DIP Lender, the Carve Out (other than parties entitled to assert a right to be paid under the Carve Out), the DIP Collateral, pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lender (and the beneficiaries of the Carve Out in the case of a surcharge against the Carve Out).  No action, inaction or acquiescence by the DIP Lender shall be deemed to be or shall be considered evidence of any alleged consent to a surcharge against the DIP Lender or the DIP Collateral.

(h)     **No Marshaling**.  Subject to entry of the Final Order, the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

(i)     **Section 552(b)**.  The DIP Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code; and, subject to the entry of the Final Order, to the extent provided therein, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender with respect to proceeds, product, offspring, or profits of any of the DIP Collateral.

(j)     **Amendment**.  The Debtors and the DIP Lender may amend, modify, supplement, or waive any provision of the DIP Term Sheet or DIP Document (a "DIP Loan Amendment") without further approval of the Court; *provided* that (i) such DIP Loan Amendment is not material (for purposes hereof, a "Material DIP Loan Amendment" shall mean any modification or amendment that (1) increases the interest rate (other than as a result of the imposition of the default

43

rate) or fees charged in connection with the DIP Facility, (2) increases the commitments of the DIP Lender to make DIP Loans under the DIP Documents, or (3) changes the Termination Date) and is undertaken in good faith by the DIP Lender and (ii) the Debtors provide written notice of the DIP Loan Amendment on the docket.  Any Material DIP Loan Amendment to any DIP Document must be set forth in writing, signed by, or on behalf of the Debtors and the DIP Lender and approved by the Court on five (5) days' notice to parties in interest in order to be effective, *provided* that the DIP Lender and the Debtors reserve the right to seek approval of any Material DIP Loan Amendment on an expedited basis.

(k)     **Priority of Terms**.  To the extent of any conflict between or among (i) the express terms or provisions of any of the DIP Documents, the Motion, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "defined in" or "as set forth in" the DIP Documents, the terms and provisions of this Interim Order prevail.

(l)     **Survival of Interim Order**.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any plan in the Chapter 11 Cases, (ii) converting of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, (iii) to the extent authorized by applicable law, dismissing the Chapter 11 Cases, (iv) withdrawing of the reference of the Chapter 11 Cases from this Court, or (v) providing for abstention from handling or retaining of jurisdiction of the Chapter 11 Cases in this Court.  The terms and provisions of this Interim Order, including the DIP Liens and DIP Superpriority Claims granted pursuant to this Interim Order, and the DIP Documents and any priorities and protections granted to or for the benefit of the DIP Lender hereunder and thereunder shall continue in full force and effect to the fullest extent provided by section 364(e) of the Bankruptcy Code.

(m) **Enforceability**.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

(n) **No Waivers or Modification of Interim Order**.  The Debtors irrevocably waive any right to seek any modification or extension of this Interim Order without the prior written consent of the DIP Lender, and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Lender.  The Debtors may not seek to modify or to alter relative lien priority of the DIP Liens or DIP Superpriority Claims set forth in this Interim Order.

(o) **Waiver of any Applicable Stay**.  Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Interim Order.

25. **Reservations to Final Order**.  Notwithstanding language in this Interim Order that provides that certain relief is subject to or conditioned upon entry of a Final Order, such provisions are without prejudice to rights of parties in interest to object to the relief on a final basis and the Court's authority to determine the final relief.

26. **Final Hearing**.

(a) The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled on **January 7, 2025 at 1:00 p.m.** (prevailing Central Time) at the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

(b) On or before two (2) business days after entry of this Interim Order, the Debtors shall cause to be served a notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order and the Motion, on any known party affected by the terms of this Interim Order, and to any other party that has filed a request for

notices with this Court prior thereto.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than **January 3, 2025 at at 4:00 p.m.**  (prevailing Central Time), which objections shall be served on (i) proposed counsel for the Debtors, Greenberg Traurig, LLP, 77 West Wacker Drive, Suite 3100, Chicago, IL 60601, Attn: Nancy A. Peterman (PetermanN@gtlaw.com); (ii) counsel to the DIP Lender, Faegre Drinker Biddle & Reath LLP, 320 S. Canal Street, Suite 3300, Attn: Mike T. Gustafson (mike.gustafson@faegredrinker.com); and (iii) the Office of the U.S. Trustee for the Southern District of Texas.

27.     **Retention of Jurisdiction**.  The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

Signed:  December 10, 2024

Christopher Lopez
United States Bankruptcy Judge

46

**EXHIBIT 1**

**DIP TERM SHEET**

**COSMED GROUP, INC.**
**SPICEY PARTNERS REAL ESTATE HOLDINGS, LLC**

**Secured Superpriority Debtor in Possession Financing**
**Summary of Terms and Conditions**
**December 3, 2024**

The following is a summary of proposed terms and conditions by Zimmer, Inc. and/or one or more of its affiliates ("Zimmer" or the "DIP Lender") for the establishment of a senior secured term loan facility (the "DIP Facility") in favor of Cosmed Group, Inc. and Spicey Partners Real Estate Holdings, LLC, in their capacity as debtors-in-possession (collectively, the "Borrowers") in the chapter 11 cases (the "Chapter 11 Cases") commenced in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court").

This term sheet (together with the exhibits hereto, the "Term Sheet") shall be a binding agreement from and after, and subject to, the entry of the Interim DIP Financing Order with respect to the DIP Facility Loans (as defined below) but does not purport to summarize all of the terms, conditions, representations and other provisions with respect to the DIP Facility, which will be set forth in the DIP Documents (as defined below).  The obligation of the DIP Lender to provide financing pursuant to this Term Sheet is conditioned upon the execution and delivery of signature pages to this Term Sheet by each of the parties hereto and shall be subject to the conditions precedent and other terms and conditions set forth herein.  In the event of any conflict between this Term Sheet and the terms of the Interim DIP Financing Order or the Final DIP Financing Order (as defined below), the terms of the Interim DIP Financing Order or the Final DIP Financing Order (as applicable) shall govern.

| **Borrowers**: | Cosmed Group, Inc. ("Cosmed") and Spicey Partners Real Estate Holdings, LLC ("SPRE," and together with Cosmed, the "Borrowers"). |
| --- | --- |
| **DIP Lender**: | Zimmer, Inc. and/or one or more of its affiliates (the "DIP Lender"). |
| **DIP Facility**: | The DIP Lender will provide to the Borrowers a priming, senior secured, superpriority debtor-in-possession credit facility (the "DIP Facility") consisting of a multiple-draw delayed draw term loan facility in the aggregate maximum principal amount of up to $7.5 million (the "DIP Facility Commitment" and the portion thereof drawn by the Debtors, the "DIP Facility Loans").

The DIP Facility will be made available to the Borrowers through an initial maximum aggregate amount of up to $2 million (the "Interim Advance") following the entry of the Interim DIP Financing Order (defined below).  The balance of the DIP Facility ($5.5 million) will be available only upon and after entry of the Final DIP Financing Order, with draws no more frequently, than bi-weekly absent exigent circumstances demonstrated by the Borrowers, and in accordance with the latest Approved Budget (as defined below). |

| | |
|---|---|
| | Pending the entry of the Final DIP Financing Order, the DIP Lender shall be afforded all of the protections contained in the Interim DIP Financing Order. |
| **Use of Proceeds**: | The DIP Facility Loans may be used only for: |

The DIP Facility Loans may be used only for:

    i.    Post-petition working capital and maintenance capital expenditure purposes of the Debtors;

    ii.    Current fees, and expenses under the DIP Facility;

    iii.    The allowed administrative costs and expenses of the Chapter 11 Cases, including professional fees and expenses;

    iv.    Payment of prepetition claims and expenses as authorized by the Bankruptcy Court;

    v.    Any forecasted cash outlays included in any Approved Budget; or

    vi.    As otherwise agreed;

in each case, other than iii. above, solely in accordance with the Approved Budget and the applicable DIP Financing Order incorporating the terms hereof.

| **DIP Facility Interest Rate and Fees**: | The DIP Facility Loans shall accrue interest at 8.00%, with a default interest rate of an additional 2.00%, each of which shall be payable monthly in kind and added to the principal balance of the DIP Facility. |

The DIP Facility shall provide for a commitment fee of 1.5% percent of the DIP Facility Commitment (the "<u>Commitment Fee</u>"), which shall be added to the principal balance of the DIP Facility on the Closing Date and thereafter shall be treated as DIP Facility Loans.

The DIP Facility shall provide for an exit fee of 1.5% percent of the DIP Facility Commitment (the "<u>Exit Fee</u>"). The Exit Fee shall be due and payable in cash upon the earlier of (i) the DIP Termination Date (as defined below) or (ii) payment in full of the DIP Obligations (as defined below), provided, however, if the DIP Termination Date has occurred solely as a result of the occurrence and continuation of an Event of Default under the DIP Documents, then the Exit Fee shall not be payable until the DIP Obligations have been accelerated by the DIP Lender.

| Priority and Security: | Subject to the Carve-Out (as defined below), all obligations of the Borrowers under the DIP Facility (the "<u>DIP Obligations</u>") shall be: |
|---|---|
| | i.    entitled to superpriority claim status under section 364(c)(1) of the Bankruptcy Code with priority over all administrative expense claims now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113, 1114 and any other provision of the Bankruptcy Code, subject only to the Carve-Out (as defined below) (the "<u>DIP Superpriority Claims</u>").  The DIP Superpriority Claims may be repaid from any cash of the Debtors, including without limitation, Cash Collateral and, following entry of the Final Order, the proceeds of any of the estate's causes of action under Chapter 5 of the Bankruptcy Code ("<u>Avoidance Actions</u>") and property received or recovered thereby (the "<u>Avoidance Action Proceeds</u>"); |
| | ii.    secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by valid, enforceable, first priority, fully perfected security interests in and liens on all of the Debtors' rights in property of the Debtors' estates as of the Petition Date that, as of the Petition Date, were unencumbered (and do not become perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) (including, following entry of the Final DIP Financing Order, Avoidance Action Proceeds) (such liens, subject only to the Carve-Out); |
| | iii.    secured, pursuant to section 364(c)(3) of the Bankruptcy Code, by valid, enforceable, fully perfected security interests in and liens on all of the Debtors' rights in property of the Debtors' estates as of the Petition Date that, as of the Petition Date, were subject to valid, perfected and non-avoidable liens and unavoidable liens in existence immediately prior to the Petition Date, if any, that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (the "<u>Permitted Prior Liens</u>"),[1] which security interests and liens shall be junior and subordinate only to such Permitted Prior Liens and the Carve-Out; |
| | iv.    secured, pursuant to section 364(d)(1) of the Bankruptcy Code, by valid, enforceable, priming first priority, fully perfected security interests in and liens upon all of the |

---

[1]    The DIP Documents shall include a schedule of Permitted Prior Liens.

|  | Debtors' rights in property of the Debtors' estates as of the Petition Date, and all of the Debtors' rights in property acquired post-petition (and proceeds thereof), whether now existing or hereafter acquired or arising, that secure the Prepetition Debt (such lien, together with the liens described in clauses (i) through (iii) above, the "<u>DIP Liens</u>" and the collateral described in clauses (i)(iv) above, collectively, the "<u>DIP Collateral</u>"), which liens shall be subject to the Carve-Out.<br><br>The DIP Collateral shall also include any and all rents, issues, products, offspring, proceeds and profits generated by any item of DIP Collateral.<br><br>The DIP Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of any Debtor and their estates under section 551 of the Bankruptcy Code, (ii) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of any Debtor, or (iii) any intercompany or affiliate liens of any Debtor.<br><br>The DIP Collateral will be free and clear of other liens, claims and encumbrances, except valid, perfected, enforceable and unavoidable liens, rights of recoupment enforceable in bankruptcy, and rights of setoff permissible under section 553 of the Bankruptcy Code, in each case except as otherwise agreed by the applicable creditor or lienholder, as applicable, in existence as of the Petition Date and permitted pursuant to the Prepetition Loan Documents, if any, and any other Permitted Prior Liens.<br><br>The DIP Liens will automatically attach to the DIP Collateral and become valid and perfected immediately upon entry of the Interim DIP Financing Order without the requirement of any further action by the DIP Lender; *provided that* if the DIP Lender determines to file any financing statements, notice of liens or similar instruments, the Debtors will cooperate and assist in any such filings and the automatic stay shall be modified to allow such filing. |
| **Adequate Protection**: | Subject in all cases to the Carve-Out (as defined below), the Prepetition Lenders (as defined in the Cash Collateral Motion [ECF No. 29]) shall receive adequate protection for the Debtors' use of the collateral securing the Prepetition Loans as set forth in the Interim Cash Collateral Order [ECF No. 47]. |

| Closing Date: | The first business date on which the DIP Conditions Precedent below shall have been satisfied and the making of the Interim Advance shall have occurred (the "Closing Date"), which is expected to be within one (1) business day of entry of the Interim DIP Financing Order. |
|---|---|
| DIP Conditions Precedent: | The closing of the DIP Facility will be subject to the satisfaction of all conditions precedent to be set forth in this DIP Term Sheet deemed necessary or appropriate by the DIP Lender, including but not limited to: |

<div style="margin-left: 2em;">

i. no later than two (2) days prior to the filing of the DIP Motion (as defined below), the DIP Lender shall have received a cash forecast for the period from the filing of the DIP Motion through the following 13-weeks setting forth projected cash flows and disbursements that is acceptable to the DIP Lender (the "Initial Approved Budget");

ii. orders (which may be interim orders) approving all "first day" motions shall have been entered (including, without limitation, the cash management order);

iii. other than as set forth herein, the Debtors shall not have executed, entered into or otherwise committed to any plan or restructuring support agreement or any other agreement or understanding concerning the terms of a chapter 11 plan or other exit strategy without the consent of the DIP Lender;

iv. an interim debtor-in-possession financing order, substantially on the terms contemplated in this DIP Term Sheet (and otherwise acceptable to the DIP Lender in its sole discretion) (the "Interim DIP Financing Order"), shall have been entered by the Bankruptcy Court on or before December 10, 2024 and shall not have been vacated, reversed or stayed, appealed, or modified or amended without the prior written consent of the DIP Lender. Notwithstanding anything to the contrary contained herein, funding of the Interim Advance shall be subject to entry of the Interim DIP Financing Order, and funding of the balance of the DIP Facility Commitments shall be subject to entry, within thirty (30) days following the filing of the motion seeking authorizing to enter into the DIP Facility (the "DIP Motion"), of a final debtor-in-possession financing order, substantially on the terms contemplated by this DIP Term Sheet and in form and substance acceptable to the DIP Lender (the "Final DIP Financing Order" and, together with the Interim Order, collectively, the "DIP Financing Orders"), which shall not have been vacated, reversed or stayed, appealed (and for which the appeal period has expired or has

</div>

5

| | |
|---|---|
| | been waived), or modified or amended without the prior written consent of the DIP Lender; |
| | v. reimbursement in full in cash of the DIP Lender's reasonable and documented out-of-pocket costs and expenses; and |
| | vi. such other deliverables as the DIP Lender may reasonably require. |
| | Modification of the DIP Financing Orders shall require the consent of the DIP Lender, in its sole discretion.  With the exception of condition v. (entry of Interim DIP Financing Order), DIP Lender may, in its sole discretion, waive any of the above conditions precedent. |
| **Conditions Precedent to DIP Facility Loans**: | The obligations of the DIP Lender to make any DIP Facility Loan will be subject to conditions precedent customarily found in loan documents for similar debtor-in-possession financings, including, but not limited to: |
| | i. (a) with regard to the Interim Advance, the Interim DIP Financing Order shall have been entered in a form acceptable to the DIP Lender in its sole and exclusive discretion and shall be in full force and effect, shall not have been vacated or reversed, and shall not be subject to any stay and (b) with regard to the balance of the DIP Facility Loans, the Final DIP Financing Order shall have been entered in a form acceptable to the DIP Lender in its sole and exclusive discretion and shall be in full force and effect, shall not have been vacated or reversed, and shall not be subject to any stay; |
| | ii. With regard to all DIP Facility Loans other than the Interim Advance, a definitive credit agreement (the "<u>DIP Credit Agreement</u>") and related security agreement(s),   security documents, and other agreements, instruments and documents required by the DIP Lender (collectively, and together with the DIP Credit Agreement, the "<u>DIP Documents</u>") shall have been executed and delivered by the Debtors to the DIP Lender, in form and substance acceptable to the DIP Lender in its sole and exclusive discretion; |
| | iii. The Borrowers shall be in compliance with the terms of the Interim DIP Financing Order or the Final DIP Financing Order, as applicable; |
| | iv. the Approved Budget shall demonstrate a need for the funds to be advanced under such credit extension within the next two weeks, there shall be at least two (2) weeks between each drawing, and the Borrowers shall have delivered at least three (3) business days prior to the applicable draw date (or such shorter period as the DIP Lender may agree in its sole |

| | |
|---|---|
| | discretion) a borrowing notice showing the proposed use of such funds within the next two (2) weeks in accordance with an Approved Budget that was approved within the last week; |
| | v.   the Debtor shall have provided a certificate confirming that all of the representations and warranties of the Debtors in this DIP Term Sheet or the DIP Documents, as applicable, remain true and correct, unless otherwise agreed by the DIP Lender; |
| | vi.   there shall be no defaults or Events of Default under the terms of this DIP Term Sheet or the DIP Documents, as applicable, or any defaults or Events of Default shall have been waived by the DIP Lender; and |
| | vii.   the Borrowers shall be in compliance with the Milestones (as set forth below). |
| | With the exception of condition i. above (entry of Interim DIP Financing Order and entry of Final DIP Financing Order), DIP Lender may, in its sole discretion, waive any of the above conditions precedent. |
| **Milestones:** | Subject to Bankruptcy Court availability, each of the Debtors will agree to comply with the following deadlines (each of which may be extended or waived with the prior written consent of the DIP Lender, which may be by e-mail, without further order of the Bankruptcy Court) (collectively, the "Milestones"): |
| | i.   The Bankruptcy Court shall have entered the Interim DIP Financing Order on or before December 10, 2024. |
| | ii.   The Debtors shall have sought the retention of an investment banker reasonably acceptable to the DIP Lender (the "Investment Banker") by the date that is no later than ten (10) days following the filing of the DIP Motion. |
| | iii.   The Bankruptcy Court shall have entered the Final Order by the date that is no later than thirty (30) days after the filing of the DIP Motion. |
| | iv.   The Debtors shall file, by the date that is no later than forty-five (45) days after the Petition Date, a motion to sell all or substantially all of the Debtors' assets through a sale pursuant to section 363 of the Bankruptcy Code in form and substance reasonably acceptable to the DIP Lender (the "Sale Motion"). |
| | v.   The Bankruptcy Court shall have entered an order approving the bidding procedures of the sale contemplated by the Sale Motion (the "Sale") by the date that is no later than sixty-five (65) days after the Petition Date. |

| | |
|---|---|
| | vi.  The Bankruptcy Court shall have entered an order approving the Sale by the date that is no later than one-hundred and ten (110) days after the Petition Date. |
| | vii.  The Sale shall be consummated by the date that is no later than one-hundred and twenty (120) days after the Petition Date. |
| | viii.  A liquidating chapter 11 plan shall be consummated by the date that is no later than ninety (90) days after consummation of the Sale. |
| | The extension of any Milestone is subject to the consent of the DIP Lender at its sole discretion.  For the avoidance of doubt, the DIP Lender reserves the right to amend the dates set forth for each of the Milestones in a proposed Final DIP Financing Order to be filed with the Court no later than seven (7) days before any such hearing to consider entry of the Final DIP Financing Order (the "Final DIP Hearing"). |
| **Representations and Warranties**: | The DIP Documents will contain representations and warranties customary for debtor-in-possession facilities of this size, type and purpose. |
| **Prepayments**: | The Borrowers may voluntarily, at any time, prepay any of the DIP Obligations and/or reduce the commitments under the DIP Facility at par plus accrued interest. |
| | Until the DIP Facility has been repaid in full, and subject to the Carve-Out, the following mandatory prepayments will be required to be made toward the DIP Facility within three (3) business days of receipt by any Debtor:  (i) 100% of any net cash proceeds from any asset disposition; (ii) 100% of any proceeds received (x) under any insurance policy on account of the damage or destruction of any assets or property of any Debtor and (y) due to any taking or condemnation of any assets or property; (iii) 100% of the net cash proceeds of the incurrence or issuance of any indebtedness or equity by any Debtor; *provided that* no Debtor shall incur or issue any additional postpetition superpriority indebtedness or liens unless such amount shall be sufficient to prepay the DIP Facility in cash in full; (iv) 100% of any proceeds received or any cash received by or paid to or for the account of any Debtor not in the ordinary course of business, including but not limited to tax refunds, pension plan reversions, indemnity payments and any purchase price adjustments (other than casualty and condemnation event proceeds) and (v) the consummation of the Sale. |

| Reporting and Information: | Reporting requirements usual and customary for financings of this type, including, without limitation, the requirement that the Borrowers provide the DIP Lender, with reasonable promptness, such information regarding the operations, business affairs and financial condition of the Debtors as the DIP Lender may reasonably request in writing from time to time. |
|---|---|
| **Budget; Variance Covenant; Other Financing Covenants**: | The Debtors shall prepare for the DIP Lender's review and approval a thirteen-week (13-week) detailed rolling cash projection similar in form to the 13-week cash projection attached hereto as **Exhibit A** (the "Initial Approved Budget"), which shall be thereafter updated, as necessary, not later than March 2, 2025 (each, a "Proposed Budget," together with the Initial Approval Budget, the "Budget"). |
| | Upon the Debtors' receipt of the DIP Lender's approval (in its sole discretion and in writing, with e-mail notice being sufficient) of a Proposed Budget, such budget shall become an "Approved Budget" and shall replace the then-operative Approved Budget for all purposes. |
| | The Initial Approved Budget shall be the Approved Budget until such time as a new Proposed Budget is approved, following which such Proposed Budget shall constitute the Approved Budget until a subsequent Proposed Budget is approved.  The Debtors shall operate in accordance with the Approved Budget and all disbursements shall be consistent with the provisions of the Approved Budget (subject to the Permitted Variance (as defined below)).  The Debtors may submit additional Proposed Budgets to the DIP Lender, but until the DIP Lender approves such Proposed Budget in writing, it shall not become an Approved Budget and the Debtors shall continue to comply with the then-operative Approved Budget.  The DIP Lender's failure to respond to any submitted Proposed Budget within two (2) business days following submission thereof shall be deemed to be the DIP Lender's approval of the same, whereupon such Proposed Budget shall constitute an Approved Budget; however, DIP Lender's written notice within two (2) business days following submission of the submitted Proposed Budget that such submitted Proposed Budget is still under consideration shall not be considered a "failure to respond." |
| | Subject to the schedule below, and beginning on Monday, January 6, 2024 (the "Initial Reporting Date, and with each subsequent Monday, collectively and individually, each a "Reporting Date"), the Debtors shall deliver to the DIP Lender, in a form consistent with the form of the Approved Budget, a variance report describing in reasonable detail, by line item (including capital expenditures and professional fees, excluding the fees of Lender's professionals), (i) the actual |

9

disbursements of the Debtors and actual receipts during the applicable Testing Period (as defined below); (ii) any variance (whether positive or negative, expressed as a percentage) between the actual receipts or disbursements, as applicable, during such Testing Period against the estimated receipts or disbursements, as applicable, for the applicable Testing Period, as set forth in the applicable Approved Budget (each a "Variance Report"); and (iii) comments relating to any variances between budgeted and actual disbursements/receipts (the "FA Reports").

As used herein, "Testing Period" shall mean the cumulative period from the beginning date of the Approved Budget through the Sunday that is eight calendar days prior to the applicable Reporting Date. The last day of each Testing Period shall be a "Testing Date".

The FA Report provided no later than the Initial Reporting Date shall report on the Testing Period ended December 15, 2024 (such Testing Period to be referred to as "Week 1"). The FA Reports for the two Testing Periods ended December 22, 2024 and December 29, 2024 (referred to as "Week 2" and "Week 3," respectively) shall be provided to the DIP Lender on January 13, 2025. The FA Report for the Testing Period ended January 5, 2025 (referred to as "Week 4") shall be provided to the DIP Lender on January 21, 2025.[2] Beginning with the Testing Period ended January 12, 2025 (referred to as "Week 5") and for each subsequent Testing Period thereafter, each FA Report shall be provided on a weekly basis no later than the Monday of the week that is a full week after the week for which the FA Reports relate.

As of any applicable Testing Date, actual cumulative disbursements (excluding DIP Lender professional fees) on an aggregate basis (the "Actual Disbursement Variance") shall not exceed budgeted cumulative disbursements (excluding DIP Lender professional fees) on an aggregate basis as reflected in the Approved Budget for such period, by more than 15.0% (the "Permitted Disbursement Variance"); *provided that* the actual cumulative Cash receipts on an aggregate basis (the "Actual Cash Variance," together with the Actual Disbursement Variance, the "Actual Variances") shall not exceed budgeted cumulative Cash receipts on an aggregate basis as reflected in the Approved Budget for such period, by more than 50.0% (the "Permitted Cash Variance," together with the Permitted Disbursement Variance, the "Permitted Variances").

---

[2]   To account for the holiday on Monday, Jan. 20.

|  | If the Actual Variances for such period are less than or equal to the Permitted Variances, the amount by which each Actual Variance is less than the Permitted Variance shall be carried forward to the next Testing Date and added to the Permitted Variance for such next Testing Date. |
|---|---|
|  | The Debtors shall be deemed to be in compliance with the Approved Budget for all purposes under this DIP Term Sheet and the DIP Financing Orders unless, as of any Testing Date, the Debtors' actual disbursements or actual Cash receipts vary from the Approved Budget by more than the applicable Permitted Variances as measured on any Testing Date (the "<u>Variance Covenant</u>"). |
|  | The financial advisor for the DIP Lender and the financial advisor for the Debtors shall hold weekly calls to discuss the Budget and relevant portions of the Chapter 11 Cases, including actual performance against the Approved Budget, status of the Sale process, and receive a business update. |
|  | The Investment Banker shall provide weekly process reporting to the financial advisor for the DIP Lender and shall hold weekly calls with the financial advisor to the DIP Lender. |
|  | DIP Lender may, in its sole discretion, waive or extend any of the foregoing Approved Budget or Variance reporting or approval procedures, provided such procedure change is not more onerous or otherwise adverse to the Debtor. |
|  | For the avoidance of doubt, the terms of the financial reporting package, Budget, and FA Reports may be re-negotiated prior to the hearing on the Final DIP Financing Order. |
| **Affirmative Covenants**: | The DIP Documents will contain affirmative covenants customary for debtor-in-possession facilities of this size, type and purpose including, but not limited, to the following as reasonably determined by the DIP Lender: |
|  | i.     Compliance with the Milestones. |
|  | ii.    The Borrowers shall at all times, (a) comply with the DIP Financing Orders and each other order entered by the Bankruptcy Court in the Chapter 11 Cases and all applicable laws, rules and regulations, (b) comply with the Approved Budget, subject to the Permitted Variances, (c) provide reasonable access to the DIP Lender to the Borrowers' financial advisors, management team and books and records and other information (including historical information), in all |

11

| | |
|---|---|
| | cases, including with respect to strategic planning, cash, and liquidity management, and operational and restructuring activities (subject to customary exceptions) during normal business hours, and (d) operate in the ordinary course of business. |
| | iii.  Compliance with the Approved Budget, including delivery of each Proposed Budget and Variance Report. |
| | DIP Lender may, in its sole discretion, waive any of the above affirmative covenants. |
| **Negative Covenants:** | The DIP Documents will contain negative covenants customary for debtor-in-possession facilities of this size, type and purpose including, but not limited to, the following as reasonably determined by the DIP Lender: |
| | i.  The Borrowers will not seek any other debtor-in-possession financing with liens senior or *pari passu* to the DIP Lender's liens during the pendency of its bankruptcy proceedings unless such financing is sufficient in amount and is actually used to fully repay all DIP Obligations and all other post-petition indebtedness of the Borrowers to the DIP Lender. |
| | ii.  The Borrowers shall not use any funds or the proceeds of the DIP Facility in a manner or for a purpose other than in accordance the Approved Budget, or on such other terms as the DIP Lender may agree. |
| | iii.  Without the prior written consent of the DIP Lender, the Borrowers will not sell, lease or otherwise transfer or dispose of any material assets of the Borrowers, other than in the ordinary course of business, or otherwise in accordance with the Approved Budget. |
| | iv.  The Borrowers shall not open any new deposit or securities accounts; *provided however*, the Borrowers may open deposit or securities accounts if such account is pledged to the DIP Lender and the DIP Lender has received an account control agreement in form and substance reasonably acceptable to the DIP Lender. |
| | v.  No Borrower shall do, cause to be done, and agree to do or cause to be done any of the following: (a) create, incur, assume or permit to exist any indebtedness or liens, other than in respect of the DIP Facility, other than Permitted Liens (as defined in the applicable documents); (b) purchase, hold or acquire (including pursuant to any merger, consolidation or amalgamation with a person that is not a wholly owned subsidiary immediately prior to such merger, consolidation or amalgamation) any equity interests, evidences of indebtedness |

or other securities of, make or permit to exist any loans or advances to or guarantees of the obligations of, or make or permit to exist any investment or any other interest in any other person other than the subsidiaries of the Borrowers as of the petition date; (c) merge into, or consolidate or amalgamate with, any other person, or permit any other person to merge into or consolidate with it, or sell, transfer, license, lease or otherwise dispose of (in one transaction or in a series of transactions) all or any part of its assets, or issue, sell, transfer or otherwise dispose of any equity interests of any Borrower or any subsidiary of any Borrower, or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or any substantial part of the assets of any other person or any division, unit or business of any other person, other than (i) asset sales approved by an order of the Bankruptcy Court that is in form and substance acceptable to the DIP Lender in its reasonable discretion or is otherwise in accordance with the Approved Budget, (ii) asset sales in the ordinary course of business and consistent with past practice and (iii) dispositions of obsolete, worn out, used or surplus property in the ordinary course of business and consistent with past practice; (d) incur or make any dividend or distribution (whether in cash, property, securities or otherwise), investment, loan or other payment without the prior written consent of the DIP Lender, other than as expressly contemplated under the Approved Budget; (e) modify or alter (i) in any material manner the nature and type of its business or the manner in which such business is conducted or (ii) its organizational documents, except as required by the Bankruptcy Code or a plan of reorganization and otherwise acceptable to the DIP Lender; (f) subject to the DIP Lender's discretion, not to be unreasonably withheld, assume or reject any executory contract or unexpired lease; (g) engage in any activities that would result in any Borrower becoming an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940; or (h) transfer any cash or cash equivalents that constitute DIP Collateral to a subsidiary of any Borrower without the prior written approval of the DIP Lender (other than as expressly contemplated under the Approved Budget).

vi.    Such additional covenants as the DIP Lender and the Borrowers may agree.

DIP Lender may, in its sole discretion, waive any of the above negative covenants.

13

| Events of Default: | "<u>Events of Default</u>" under the DIP Facility shall contain events of default usual and customary for debtor-in-possession facilities of this size, type and purpose including, but not limited to, the following as determined by the DIP Lender: |
|---|---|
| | i.      the Interim DIP Financing Order at any time ceases to be in full force and effect, or shall be vacated, reversed or stayed, or modified or amended, or shall not have been entered on or before December 10, 2024; |
| | ii.      the Final DIP Financing Order at any time ceases to be in full force and effect, or shall be vacated, reversed or stayed, modified or amended, or shall not have been entered within thirty (30) days after the DIP Motion is filed; |
| | iii.      failure of the Debtors to comply in any material respect with the terms of the applicable DIP Financing Order; |
| | iv.      the failure of any Debtor to (a) comply with the Variance Covenant, (b) have an Approved Budget; (c) comply with any negative covenant or certain other customary affirmative covenants in the DIP Term Sheet or with any other covenant or agreement contained in the DIP Financing Orders or DIP Documents in any respect or (d) comply with any other covenant or agreement contained in this DIP Term Sheet subject, in the case of the foregoing clause (d), to a grace period of five (5) business days; |
| | v.      other than payments authorized by the Bankruptcy Court and which are set forth in the Approved Budget to the extent authorized by one or more "first day" or other orders reasonably satisfactory to the DIP Lender, any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables; |
| | vi.      any of the Chapter 11 Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; a Chapter 11 trustee or an examiner (other than a fee examiner) with enlarged powers relating to the operation of the business of any Debtor (powers beyond those expressly set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed, (b) any other superpriority claim or grant of any other lien (including any adequate protection lien) other than as provided for herein which is *pari passu* with or senior to the claims and liens of the DIP Lender shall be granted in any of the Chapter 11 Cases, or (c) the filing of any pleading by any Debtor seeking or |

14

|  | | otherwise consenting to or supporting any of the matters set forth in clause (a) or clause (b) of this subsection (vi); |
|  | vii. | the Bankruptcy Court shall enter one or more orders during the pendency of the Chapter 11 Cases granting relief from the automatic stay to the holder or holders of any lien evidencing indebtedness in excess of $200,000 to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on assets of any Debtor; |
|  | viii. | the Debtors petition the Bankruptcy Court to obtain additional financing *pari passu* or senior to the DIP Facility; |
|  | ix. | the Debtors' "exclusive period" under section 1121 of the Bankruptcy Code for the filing of a plan of reorganization terminates; |
|  | x. | the consummation of a sale of any material portion of the DIP Collateral without the DIP Lender's prior written consent (other than through the contemplated Sale or a sale in the ordinary course of business that is contemplated by the Approved Budget); |
|  | xi. | the confirmation of a plan of reorganization or liquidation that does not provide for payment in full in cash of the DIP Facility Loans or such other treatment acceptable to DIP Lender, or any Debtor proposes or supports, or fails to contest in good faith, the entry of such a plan of reorganization or liquidation; |
|  | xii. | any Debtor (A) engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of the DIP Facility or the liens on or security interest in the assets of the Debtors securing the DIP Obligations, including without limitation seeking to equitably subordinate or avoid the liens securing such indebtedness or (B) engages in or supports any investigation or asserts any claims or causes of action (or directly or indirectly support assertion of the same) against the DIP Lender; |
|  | xiii. | the entry of an order by the Bankruptcy Court in favor of any statutory committee appointed in these Cases by the U.S. Trustee (each, a "Committee"), any ad hoc committee, or any other party in interest, (i) sustaining an objection to claims of the DIP Lender, or (ii) avoiding any liens held by the DIP Lender; |
|  | xiv. | the allowance of any claim or claims under section 506(c) of the Bankruptcy Code against any of the DIP Collateral; |

15

| | |
|---|---|
| | xv. the inaccuracy in any material respect of any representation of any Debtor when made or deemed made; |
| | xvi. the failure to meet any Milestone; |
| | xvii. entry of an order by the Bankruptcy Court in favor of any Committee, any ad hoc committee, or any other party in interest, (i) granting such party standing to pursue any claims against the DIP Lender, (ii) sustaining an objection to claims of the DIP Lender, or (iii) avoiding any liens held by the DIP Lender; and |
| | xviii. the Termination Date (as defined below) shall have occurred. |
| **Remedies**: | Upon the occurrence and during the continuance of any Event of Default, and without further application to the Bankruptcy Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to take any of the following actions, at the same or different time: |
| | i. issue a written notice (the "<u>Remedies Notice</u>") (which may be by e-mail) to the Debtors and their counsel, counsel for any Committee, and the U.S. Trustee (the "<u>Remedies Notice Parties</u>") declaring the occurrence of the Termination Date (as defined below); |
| | ii. issue a Carve-Out Notice (as defined below); |
| | iii. declare all DIP Obligations to be immediately due and payable without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Debtors; |
| | iv. declare the suspension or termination of the DIP Facility as to any further liability or obligation of the DIP Lender thereunder, but without affecting the DIP Liens or DIP Obligations (the "<u>Termination Notice</u>"); and |
| | v. charge the default rate of interest under the DIP Facility. |
| | During the five business (5) days immediately following the date the DIP Lender delivers a Remedies Notice to the Remedies Notice Parties (the "<u>Remedies Notice Period</u>"), the DIP Lender and/or Debtors may seek an emergency hearing (a "<u>Stay Relief Hearing</u>") to determine whether an Event of Default has occurred, and the filing of any such motion shall toll the Remedies Notice Period.  In the event the Bankruptcy Court determines during a Stay Relief Hearing that an Event of Default has occurred, the Court may fashion an appropriate remedy, which may include the exercise of any and all rights available to the DIP Lender under this DIP Term Sheet, the DIP Credit |

16

| | Agreement, the Interim DIP Financing Order, and/or the Final DIP Financing Order, as applicable.

Upon expiration of the Remedies Notice Period, if a motion seeking emergency relief has not been filed or unless ordered otherwise by the Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified without further order of the Bankruptcy Court to the extent necessary to permit the DIP Lender to exercise any and all remedies against the DIP Collateral permitted under state law.

During the Remedies Notice Period, the Borrowers shall be authorized to use cash collateral in accordance with the Approved Budget. |
|---|---|

17

| Maturity/Termination Date: | The DIP Facility shall automatically terminate without further notice or court proceedings on the earliest to occur of: |
|---|---|
| | i. six (6) months after entry of the Interim DIP Financing Order (the "<u>Scheduled Maturity Date</u>"); |
| | ii. the effective date of a plan of reorganization or liquidation for the Debtors confirmed in the Chapter 11 Cases; |
| | iii. the date of termination of the commitments under the DIP Facility and/or acceleration of any outstanding borrowings under the DIP Facility, in each case, by the DIP Lender following the occurrence of an Event of Default and upon the delivery of a Termination Notice to the Remedies Notice Parties, in each case, subject to the Debtors' right to use Cash Collateral during the Remedies Notice Period as set forth above, and pending the outcome of the Stay Relief Hearing; |
| | iv. the first business day on which the Interim DIP Financing Order expires by its terms or is terminated, unless the Final DIP Financing Order has been entered and become effective prior thereto; |
| | v. the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code unless otherwise consented to in writing (which may be e-mail) by the DIP Lender; |
| | vi. the dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing (which may be e-mail) by the DIP Lender; or |
| | vii. the repayment in full in cash of all obligations and termination of all commitments under the DIP Facility |
| | (each, a "<u>Termination Date</u>"), unless extended with the prior written consent (which may be by e-mail) of the DIP Lender. |
| Carve-Out: | Notwithstanding anything to the contrary in this DIP Term Sheet, or the DIP Financing Orders, the DIP Facility shall be subject and subordinate to the Carve-Out. |
| | The Carve-Out shall include (a) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the Carve-Out Notice), (b) all reasonable fees and expenses up to $10,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the Carve-Out Notice), (c) to the extent allowed by the Bankruptcy Court at any time, unpaid fees and expenses ("<u>Allowed Professional Fees</u>") |

of estate professionals incurred through the date of delivery of a Carve-Out Notice (defined below) up to the amounts for such professional included in the Approved Budget through the date of the Carve-Out trigger notice, and (d) to the extent allowed by the Bankruptcy Court at any time, up to $500,000 of fees and expenses incurred by persons or firms retained by (i) the Debtors pursuant to Sections 327, 328, or 363 of the Bankruptcy Code or (ii) any committee appointed in the cases ((i) and (ii) together, the "Estate Professionals") after the first business day following delivery of a Carve-Out Notice (excluding, for the avoidance of doubt, any success fee, transaction fee, deferred fee or other similar fee set forth in any professional's engagement letter, the amounts set forth in this clause (d) being the "Post Carve-Out Notice Cap").

"Carve-Out Notice" means a written notice (which may be by e-mail) by the DIP Lender to the Debtors, Debtors' counsel, the U.S. Trustee, and counsel to any Committee stating that the Post Carve-Out Notice Cap has been invoked, which notice may be delivered only following the occurrence and during the continuation of an Event of Default.

Delivery of a Carve-Out Notice shall constitute a demand to the Debtors to utilize all cash on hand (including the proceeds of DIP Facility Loans) to fund a reserve in an amount equal to the Carve-Out, which shall be earmarked and held in trust to pay unpaid fees and expenses incurred by Estate Professionals, to the extent allowed by the Bankruptcy Court at any time, prior to any and all other claims in the Cases (the "Carve-Out Reserve").

All funds in the Carve-Out Reserve shall be used first to pay the obligations set forth in clauses (a)-(d) in the above definition of "Carve-Out" until paid in full, and second, to pay the DIP Lender until paid in full.  Notwithstanding anything to the contrary in this DIP Term Sheet or the DIP Financing Orders, the failure of the Carve-Out Reserve to satisfy in full the fees of Estate Professionals shall not affect the priority of the Carve-Out.

| | |
|---|---|
| **Credit Bidding**: | The Final DIP Financing Order shall provide that the DIP Lender shall have the right to credit bid (pursuant to section 363(k) of the Bankruptcy Code and/or applicable law) the DIP Facility Loans in whole or in part, in connection with any sale or disposition of assets by the Debtors in the Chapter 11 Cases and shall not be prohibited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code. |
| **DIP Facility Amendments**: | In order to amend, waive, or modify provisions related to this DIP Term Sheet or any of the DIP Documents, the express written consent of the DIP Lender shall be required. |

19

| | |
|---|---|
| **Section 506(c) Waiver**: | The Final DIP Financing Order shall include a ruling that, except to the extent of the Carve-Out, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from any DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender; and the Debtors shall irrevocably waive and shall be prohibited from asserting any claim described in this paragraph, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender upon the DIP Collateral. |
| **No Marshaling**: | The Final DIP Financing Order shall provide that the DIP Lender may exercise all remedies available under this DIP Term Sheet and the DIP Documents, as applicable, without any requirement first to look to exercise any of its or their rights against any particular collateral or party or to exhaust any remedies available to it or them against any particular collateral or party or to resort to any other source or means of obtaining payment of any of such obligations or to elect any other remedy.  Subject to entry of the Final DIP Financing Order, in no event shall any of the DIP Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the collateral securing the DIP Facility Loans. |
| **Section 552(b)**: | The Final DIP Financing Order shall provide that the DIP Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, the "equities of the case" exception under sections 552(b)(i) and (ii) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, products, rents, issues or profits of any of their collateral, and no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the collateral under section 552(b) of the Bankruptcy Code.<br><br>Furthermore, subject to entry of the Final DIP Financing Order, the Debtors and their estates shall be deemed to have irrevocably waived and have agreed not to assert any claim or right under sections 552 or 726 of the Bankruptcy Code to avoid the imposition of the liens of the DIP Lender on any property acquired by any of the Debtors or any of their estates or to seek to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by, the DIP Lender upon the DIP Collateral. |

20

| | |
|---|---|
| **Restrictions on Use of DIP Facility Loans**: | None of the Carve-Out, the DIP Facility Loans, or the DIP Collateral may be used to challenge the amount, validity, perfection, priority or enforceability of, or assert any defense, counterclaim or offset to, the DIP Facility, this DIP Term Sheet, or the DIP Documents, or the security interests and liens securing any of the DIP Obligations, or to fund prosecution or assertion of any claims, or to otherwise litigate against the DIP Lender, provided that up to $25,000 shall be made available to the Committee (if any) for investigation costs in respect of the stipulations contemplated below or otherwise set forth in the DIP Financing Orders. |
| **Payment of Expenses**: | The reasonable and documented fees and out-of-pocket expenses incurred or accrued by the DIP Lender and its counsel, Faegre Drinker Biddle & Reath LLP and any financial advisor retained by the DIP Lender in connection with the Chapter 11 Cases (the foregoing to include all unpaid reasonable and documented prepetition fees, out-of-pocket costs and expenses incurred by the DIP Lender in connection with the DIP Facility) in connection with any and all aspects of the Debtors' Chapter 11 Cases shall be timely paid upon receipt of an invoice or other request for payment in accordance with the DIP Financing Orders. |
| **Indemnification**: | The Debtors shall agree to indemnify and hold harmless the DIP Lender (solely in its capacity as DIP Lender) and its affiliates and each of their officers, directors, employees, agents, advisors, attorneys and representatives (each, an "<u>Indemnified Party</u>") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable and documented fees and out-of-pocket expenses of counsel), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), arising out of or in connection with or by reason of the DIP Facility, or any of transactions contemplated hereby, except to the extent arising from an Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any of the Debtors, any of their respective directors, security holders or creditors, an Indemnified Party or any other person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. |

21

| | |
|---|---|
| **Fiduciary Duties**: | Notwithstanding anything to the contrary in this DIP Term Sheet or the DIP Financing Orders, or any other document, order, or instrument, nothing in the DIP Term Sheet or the DIP Financing Orders shall require the Debtors, the Debtors' board of directors, or any similar governing body of the Debtors, after consulting with counsel, to take any action or to refrain from taking any action with respect to any alternative financing transaction to the extent taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under applicable law.  To extent of any conflict between this provision and any other provision in this DIP Term Sheet, this provision will control. |
| **Miscellaneous**: | This summary of terms and conditions does not purport to summarize all of the conditions, covenants, representations, warranties and other provisions that would be contained in definitive credit documentation for the DIP Facility contemplated hereby, all of which shall be acceptable to the DIP Lender. |
| **Governing Law**: | The laws of the State of New York (excluding the laws applicable to conflicts or choice of law), except as governed by the Bankruptcy Code. |

22

IN WITNESS WHEREOF, this DIP Term Sheet is duly executed as of the date first set forth above.

**COSMED GROUP, INC.**
**SPICEY PARTNERS REAL ESTATE HOLDINGS, LLC**

By: _____
      Name: David G. Howe
      Title: Chief Operating Officer

**ZIMMER, INC.**

By: _____
      Name: _____
      Title: _____

[*Signature Page to DIP Term Sheet*]

**<u>EXHIBIT A</u>**

**Initial Approved Budget**

ACTIVE 704524941v2

## EXHIBIT 2

## INITIAL APPROVED BUDGET

ACTIVE 704834316v2

**Cosmed Group Inc and Subsidiary**
**13 Week Cash Flow Projection**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | *Projected Wk Ended 12/15/24* | *Projected Wk Ended 12/22/24* | *Projected Wk Ended 12/29/24* | *Projected Wk Ended 1/5/25* | *Projected Wk Ended 1/12/25* | *Projected Wk Ended 1/19/25* | *Projected Wk Ended 1/26/25* | *Projected Wk Ended 2/2/25* | *Projected Wk Ended 2/9/25* | *Projected Wk Ended 2/16/25* | *Projected Wk Ended 2/23/25* | *Projected Wk Ended 3/2/25* | *Projected Wk Ended 3/9/25* | *Total 13 Weeks* |
| **Cash Receipts** | | | | | | | | | | | | | | |
| AR Collections- Sterilization | 288,813 | 288,813 | 288,813 | 288,813 | 288,813 | 288,813 | 288,813 | 304,563 | 304,563 | 304,563 | 304,563 | 304,563 | 304,563 | 3,849,063 |
| AR Collections - Chamber | - | - | - | - | - | - | - | - | 720,000 | - | - | - | - | 720,000 |
| total Collections | 288,813 | 288,813 | 288,813 | 288,813 | 288,813 | 288,813 | 288,813 | 304,563 | 1,024,563 | 304,563 | 304,563 | 304,563 | 304,563 | 4,569,063 |
| **Cash Disbursements:** | | | | | | | | | | | | | | |
| **Operating:** | | | | | | | | | | | | | | |
| Purchases | - | 93,355 | - | - | - | - | 81,219 | - | - | - | 81,219 | - | - | 255,792 |
| Supplies | - | 47,025 | - | - | - | - | 47,025 | - | - | - | 47,025 | - | - | 141,076 |
| Lab Services | - | 9,521 | - | - | - | - | 9,521 | - | - | - | 9,521 | - | - | 28,563 |
| Cost of Sales -Other | - | 8,430 | - | - | - | - | 8,430 | - | - | - | 8,430 | - | - | 25,289 |
| Chamber Production | 232,031 | 7,031 | 7,031 | 7,031 | 7,031 | 232,031 | 7,031 | 7,031 | 7,031 | 232,031 | 7,031 | 7,031 | 7,031 | 766,406 |
| Wages & Payroll Taxes | 310,964 | 70,627 | 70,627 | 200,931 | 70,627 | 70,627 | 70,627 | 200,931 | 70,627 | 70,627 | 70,627 | 200,931 | 70,627 | 1,549,399 |
| Employee Benefits | - | - | 85,600 | - | - | - | 85,600 | - | - | - | 85,600 | - | - | 256,800 |
| Repair & Maintenance | - | 65,914 | - | - | - | - | 65,914 | - | - | - | 65,914 | - | - | 197,743 |
| Rent | 171,875 | - | - | 211,802 | - | - | - | 211,802 | - | - | - | 211,802 | - | 807,281 |
| Property Taxes | 13,219 | - | - | 18,944 | - | - | - | 18,944 | - | - | - | 18,944 | - | 70,052 |
| Utilities | - | 83,424 | - | - | - | - | 83,424 | - | - | - | 83,424 | - | - | 250,271 |
| Insurance | - | - | 4,721 | - | 7,554 | - | - | 7,221 | 7,554 | 58,016 | - | 4,721 | 7,554 | 97,340 |
| Professional Fees - OCP | - | - | 125,000 | - | - | - | - | 125,000 | - | - | - | - | - | 250,000 |
| Office Expense | - | 36,744 | - | - | - | - | 36,744 | - | - | - | 36,744 | - | - | 110,232 |
| T&E | - | 3,379 | - | - | - | - | 3,379 | - | - | - | 3,379 | - | - | 10,136 |
| Automobile Expense | - | 6,028 | - | - | - | - | 6,028 | - | - | - | 6,028 | - | - | 18,083 |
| SG&A-Other | - | 53,073 | - | - | - | - | 53,073 | - | - | - | 53,073 | - | - | 159,218 |
| Contingency | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 65,000 |
| total - Operating Disbursmnts | 733,089 | 489,550 | 297,979 | 443,709 | 90,212 | 307,658 | 563,014 | 575,930 | 90,212 | 365,674 | 563,014 | 448,430 | 90,212 | 5,058,682 |
| Oper. Cash Flow | (444,276) | (200,737) | (9,166) | (154,896) | 198,601 | (18,846) | (274,201) | (271,367) | 934,351 | (61,112) | (258,451) | (143,867) | 214,351 | (489,619) |
| **Debt Service:** | | | | | | | | | | | | | | |
| First Lienholder-P&I | - | - | - | 91,466 | - | - | - | 91,466 | - | - | - | 30,754 | - | 213,686 |
| DIP Financing - costs | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| total debt service | - | - | - | 91,466 | - | - | - | 91,466 | - | - | - | 30,754 | - | 213,686 |
| **Cash flow before Bk expenses** | (444,276) | (200,737) | (9,166) | (246,362) | 198,601 | (18,846) | (274,201) | (362,833) | 934,351 | (61,112) | (258,451) | (174,621) | 214,351 | (703,305) |

1

**Cosmed Group Inc and Subsidiary**
**13 Week Cash Flow Projection**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | *Projected* | *Projected* | *Projected* | *Projected* | *Projected* | *Projected* | *Projected* | *Projected* | *Projected* | *Projected* | *Projected* | *Projected* | *Projected* | |
| | *Wk Ended* | *Wk Ended* | *Wk Ended* | *Wk Ended* | *Wk Ended* | *Wk Ended* | *Wk Ended* | *Wk Ended* | *Wk Ended* | *Wk Ended* | *Wk Ended* | *Wk Ended* | *Wk Ended* | *Total* |
| | *12/15/24* | *12/22/24* | *12/29/24* | *1/5/25* | *1/12/25* | *1/19/25* | *1/26/25* | *2/2/25* | *2/9/25* | *2/16/25* | *2/23/25* | *3/2/25* | *3/9/25* | *13 Weeks* |
| **Bankruptcy Related expenses** | | | | | | | | | | | | | | |
| Legal Fees - Bk Counsel-Debtor | | | | | | | - | | 750,000 | | | | 500,000 | 1,250,000 |
| Financial Advisor- Debtor | | | | | | | - | | 125,000 | | | | 100,000 | 225,000 |
| Claims Agent fees | | | | | | | - | | 75,000 | | | | 50,000 | 125,000 |
| Investment Banker | 62,500 | | | 62,500 | | | | 62,500 | | | | 62,500 | | 250,000 |
| Utilities Adequate Assurance | 16,819 | | | | | | | | | | | | | 16,819 |
| US Trustee Fees | | | | | | 23,684 | | | | | | | | 23,684 |
| Critical Vendor Payments | | 45,000 | | | | | | | | | | | | 45,000 |
| Professional Fees-Committee | | | | 75,000 | | | - | | 75,000 | | | | 75,000 | 225,000 |
| total restructuring related fees | 79,319 | 45,000 | - | 137,500 | - | 23,684 | - | 62,500 | 1,025,000 | - | - | 62,500 | 725,000 | 2,160,503 |
| | | | | | | | | | | | | | | |
| Net Cash Flow | (523,595) | (245,737) | (9,166) | (383,862) | 198,601 | (42,530) | (274,201) | (425,333) | (90,649) | (61,112) | (258,451) | (237,121) | (510,649) | (2,863,809) |
| | | | | | | | | | | | | | | |
| Beginning Cash - estimated | 42,544 | (481,052) | (726,789) | (735,955) | (1,119,818) | (921,217) | (963,747) | (1,237,948) | (1,663,282) | (1,753,931) | (1,815,043) | (2,073,494) | (2,310,615) | 42,544 |
| Net Cash Flow | (523,595) | (245,737) | (9,166) | (383,862) | 198,601 | (42,530) | (274,201) | (425,333) | (90,649) | (61,112) | (258,451) | (237,121) | (510,649) | (2,863,809) |
| Ending Cash | (481,052) | (726,789) | (735,955) | (1,119,818) | (921,217) | (963,747) | (1,237,948) | (1,663,282) | (1,753,931) | (1,815,043) | (2,073,494) | (2,310,615) | (2,821,265) | (2,821,265) |